United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued November 3, 1999 Decided June 30, 2000 

 As Amended Nov. 14, 2000

 No. 97-1715

 Transmission Access Policy Study Group, et al. 
 Petitioner

 v.

 Federal Energy Regulatory Commission, 
 Respondent

 Vermont Department of Public Service, et al., 
 Intervenors

 

 

 

 

 Consolidated with 
 98-1111, 98-1112, 98-1113, 98-1114, 98-1115, 98-1118, 
 98-1119, 98-1120, 98-1122, 98-1124, 98-1125, 98-1126, 
 98-1127, 98-1128, 98-1129, 98-1131, 98-1132, 98-1134, 
 98-1136, 98-1137, 98-1139, 98-1140, 98-1141, 98-1142, 
 98-1143, 98-1145, 98-1147, 98-1148, 98-1149, 98-1150, 
 98-1152, 98-1153, 98-1154, 98-1155, 98-1156, 98-1159, 
 98-1162, 98-1163, 98-1166, 98-1168, 98-1169, 98-1170, 
 98-1171, 98-1172, 98-1173, 98-1174, 98-1175, 98-1176, 
 98-1178,98-1180

 On Petitions for Review of Orders of the 
 Federal Energy Regulatory Commission

 Sherilyn Peterson, John T. Miller, Jr., Robert C. McDiar-
mid, Stanley C. Fickle, Sara D. Schotland, Jeffrey L. Lands-
man, Lawrence G. Malone, Jeffery D. Watkiss, Richard M. 
Lorenzo, Isaac D. Benkin, Wallace E. Brand, Daniel I. 
Davidson, Cynthia S. Bogorad, Harvey L. Reiter and Ran-
dolph Lee Elliott argued the causes for petitioners. With 
them on the briefs were William R. Maurer, Ben Finkel-
stein, David E. Pomper, Ronald N. Carroll, John Michael 
Adragna, Sean T. Beeny, Wallace F. Tillman, Susan N. 
Kelly, Craig W. Silverstein, A. Hewitt Rose, Bryan G. Tabler, 
James D. Pembroke, David C. Vladeck, Robert F. Shapiro, 
Lynn N. Hargis, Wallace L. Duncan, Richmond F. Allan, 
Alan H. Richardson, Michael A. Mullett, C. Kirby Mullen, 
Robert A. Jablon, Sara C. Weinberg, John F. Wickes, Jr., 
Todd A. Richardson, Brian A. Statz, John P. Cook, Charles 
F. Wheatley, Jr., Christine C. Ryan, Robert S. Tongren, 
Joseph P. Serio, Barry E. Cohen, Carrol S. Verosky, Jennifer 
S. McGinnity, Jonathan D. Feinberg, Charles D. Gray, Rob-
ert Vandiver, Cynthia Miller, Helene S. Wallenstein, Wil-
liam H. Chambliss, C. Meade Browder, Jr., Mary W. Coch-
ran, Paul R. Hightower, Brad M. Purdy, Gisele L. Rankin, 
Robert D. Cedarbaum, Edward H. Comer, Edward Berlin, 

Robert V. Zener, Elizabeth W. Whittle, James H. McGrew, 
Donald K. Dankner, Frederick J. Killion, Joseph L. Laksh-
manan, Stephen C. Palmer, Michael E. Ward, Steven J. 
Ross, Marvin T. Griff and Thomas C. Trauger. Leja D. 
Courter, Robert E. Glennon, Jr., Neil Butterklee, Zachary D. 
Wilson, Sheila S. Hollis, Janice L. Lower and James B. 
Ramsay entered appearances.

 John H. Conway, Deputy Solicitor, Federal Energy Regu-
latory Commission, and Timm L. Abendroth and Larry D. 
Gasteiger, Attorneys, argued the causes for respondent. 
With them on the brief was Jay L. Witkin, Solicitor. Susan J. 
Court, Special Counsel, and Edward S. Geldermann, Attor-
ney, entered appearances.

 Edward Berlin argued the cause for intervenors. With 
him on the briefs were J. Phillip Jordan, Robert V. Zener, 
Edward H. Comer, William M. Lange, Deborah A. Moss, 
James H. McGrew, Steven J. Ross, Elizabeth W. Whittle, 
Richard M. Lorenzo, David M. Stahl, D. Cameron Findlay, 
Peter Thornton, J. Phillip Jordan, Robert V. Zener, Robert C. 
McDiarmid, Cynthia S. Bogorad, Ben Finkelstein, Peter J. 
Hopkins, Margaret A. McGoldrick, Jeffery D. Watkiss, Ron-
ald N. Carroll, Sara D. Schotland, Alan H. Richardson, 
Wallace L. Duncan, Richmond F. Allan, A. Hewitt Rose, 
Wallace F. Tillman, Susan N. Kelly, John M. Adragna, Sean 
T. Beeny and Randolph Lee Elliott. Edward J. Twomey, 
Richard P. Bonnifield, Frederick H. Ritts, David L. Huard, 
Dan H. McCrary, Mark A. Crosswhite, John N. Estes, III, 
Kevin J. McIntyre, John S. Moot, Clark E. Downs, Martin V. 
Kirkwood, Robert S. Waters, John T. Stough, Jr., Bruce L. 
Richardson, Floyd L. Norton, IV, William S. Scherman, 
Douglas F. John, Gary D. Bachman, Nicholas W. Fels, 
Robert Weinberg, Robert A. Jablon, Peter G. Esposito, Chris-
tine C. Ryan, Sheila S. Hollis, Stephen L. Teichler, James K. 
Mitchell, Gordon J. Smith, Edward J. Brady, Kevin F. 
Duffy, Michael P. May, Barbara S. Brenner, Michael J. 
Rustum, Sandra E. Rizzo, Kirk H. Betts, Pierre F. de Ravel 
d'Esclapon, Glen L. Ortman and William D. DeGrandis 
entered appearances.

 Before: Sentelle, Randolph and Tatel, Circuit Judges.

 Opinion for the Court filed Per Curiam1:

 Table of Contents

 I. Introduction 7
 
 II. FERC's Authority to Require Open Access 11
 A. Statutory Challenges: FPA ss 205 and 
 206 14
 1. ss 205 and 206 and Otter Tail Power 
 Company 15
 2. s 206(a) Procedural and Evidentiary 
 Requirements 18
 3. Discriminatory Effect of Order 888 21
 B. Constitutional Challenge: Fifth Amend-
 ment Takings Clause 23
 
 III. Federal versus State Jurisdiction over Trans-
 mission Services 24
 A. Bundled Retail Sales 26
 B. Local Distribution Facilities 31
 
 IV. Reciprocity 35
 A. Indirect Regulation of Non-Jurisdictional Utilities 36
 B. Limitation on Reciprocity 37
 
 V. Stranded Cost Recovery Provisions 39
 A. Wholesale Stranded Costs 40
 1. FERC's Authority to Provide for 
 Stranded Cost Recovery 44
 a. Reasonable expectation of contin-
 ued service 44
 

__________
 1 Following our normal practice in complex cases, we shared the 
writing of this opinion. Judge Sentelle wrote Section II, Section 
III, and Section VII. Judge Randolph wrote Section IV, Section 
VI, and Section VIII. Judge Tatel wrote Section I, Section V, and 
Section IX.

 b. Sections 206 and 212 of the FPA 46
 c. Implications of Cajun 48
 2. Natural Gas Precedent and Conform-
 ance to Cost Causation Principles 49
 a. Natural gas precedent: AGD, K 
 N Energy, and UDC 50
 b. Conformance to cost causation 
 principles 54
 3. FERC's Mobile-Sierra Findings 57
 a. FERC's authority to make a ge-
 neric public interest finding 59
 b. FERC's stranded cost public in-
 terest finding 61
 c. FERC's public interest finding 
 regarding customers 62
 4. Availability of Stranded Cost Recov-
 ery to Nonjurisdictional Utilities 
 and G & T Cooperatives 63
 5. Challenges to Technical Aspects of 
 Order 888's Stranded Cost Recov-
 ery Provisions 65
 a. POSCR's challenges to the 
 stranded cost formula 66
 b. Inclusion of known and measura-
 ble costs 68
 c. Treatment of energy costs in the 
 market option 68
 d. Rescission of notice of termi-
 nation provision 70
 e. Provision for benefits lost 71
 B. Retail Stranded Costs 72
 1. Stranded Costs Arising from Retail 
 Wheeling 72
 a. FERC's jurisdiction over 
 retail stranded costs 73
 b. FERC's refusal to assert jurisdict-
 ion over all retail stranded 
 costs 76
 

 2. Stranded Costs Relating to Retail-
 Turned-Wholesale Customers 80
 
 VI. Credits for Customer-Owned Facilities and 
 Behind-The-Meter Generation 85
 . 
 VII. Liability, Interface Allocation, and Discount-
 ing 90
 A. Liability and Indemnification 90
 B. Interface Allocation 94
 C. Delivery-Point-Specific Discounting 96
 
 VIII. Tariff Terms and Conditions 100
 A. Headroom Allocation 100
 B. Headroom Prioritization 101
 C. Duplicative Charges 102
 D. Multiple Control Areas 103
 E. Right-of-First-Refusal 104
 
 IX. National Environmental Policy Act and Regu-
 latory Flexibility Act Compliance 105
 A. NEPA Compliance 105
 1. Adequacy of Base Case 105
 2. Failure to Adopt Mitigation Measures 107
 B. Regulatory Flexibility Act Compliance 108 
 ----------
 Following two notices of proposed rulemaking, the Federal 
Energy Regulatory Commission issued Orders 888 and 889 on 
April 24, 1996.2 Reflecting the Commission's effort to end 

__________
 2 Promoting Wholesale Competition Through Open Access Non-
discriminatory Transmission Services by Public Utilities; Recov-
ery of Stranded Costs by Public Utilities and Transmitting Utili-
ties, Order No. 888, FERC Stats. & Regs. p 31,036, 61 Fed. Reg. 
21,540 (1996), clarified, 76 FERC p 61,009 and 76 FERC p 61,347 
(1996) ("Order 888"), on reh'g, Order No. 888-A, FERC Stats. and 
Regs. p 31,048, 62 Fed. Reg. 12,274, clarified, 79 FERC p 61,182 
(1997), on reh'g, Order No. 888-B, 81 FERC p 61,248, 62 Fed. Reg. 
64,688 (1997), on reh'g, Order No. 888-C, 82 FERC p 61,046 (1998); 

discriminatory and anticompetitive practices in the national 
electricity market and to ensure that electricity customers 
pay the lowest prices possible, these orders represent, as the 
Commission described in a later order not before us, "the 
foundation necessary to develop competitive bulk power mar-
kets...." Regional Transmission Organizations, Order No. 
2000, 65 Fed. Reg. 810, 812 (2000).

 Open access is the essence of Orders 888 and 889. Under 
these orders, utilities must now provide access to their trans-
mission lines to anyone purchasing or selling electricity in the 
interstate market on the same terms and conditions as they 
use their own lines. By requiring utilities to transmit com-
petitors' electricity, open access transmission is expected to 
increase competition from alternative power suppliers, giving 
consumers the benefit of a competitive market. Most funda-
mentally, FERC's open access policies, combined with paral-
lel action now occurring on the state level, are intended to 
create a market in which customers may purchase power 
from any of a number of suppliers. A municipality or factory 
in Florida, for example, will no longer have to purchase power 
from its local utility but instead may seek cheaper power 
anywhere in the country. A customer in Vermont may 
purchase electricity from an environmentally friendly power 
producer in California or a cogeneration facility in Oklahoma.

 All key players in the electricity market have challenged 
various provisions of Orders 888 and 889. Their claims range 
from the hypertechnical to arguments that FERC lacks au-
thority to order open access transmission at all. Finding few 
defects in the orders, we uphold them in nearly all respects.

 I. Introduction

 Historically, vertically integrated utilities owned genera-
tion, transmission, and distribution facilities. They sold gen-

__________
Open Access Same-Time Information System and Standards of 
Conduct, Order No. 889, FERC Stats. & Regs. p 31,035, 61 Fed. 
Reg. 21,737 (1996) ("Order 889"), on reh'g, Order No. 889-A, FERC 
Stats. & Regs. p 31,049, 62 Fed. Reg. 12,484 (1997), on reh'g, Order 
No. 889-B, 81 FERC p 61,253 (1997).

eration, transmission, and distribution services as part of a 
"bundled" package. Due to technological limitations on the 
distance over which electricity could be transmitted, each 
utility served only customers in a limited geographic area. 
And because of their natural monopoly characteristics, utili-
ties have been heavily regulated at both the federal and state 
levels.

 Since enactment of the Federal Power Act in 1935, the 
electricity industry has undergone significant change, both 
economically and technologically. Economies of scale have 
justified the construction of large (greater than 500 MW) 
generation facilities, such as nuclear power plants. Techno-
logical advances in the 1970s and 1980s have permitted small 
plants to operate efficiently as well. See Notice of Proposed 
Rulemaking, Promoting Wholesale Competition Through 
Open Access Non-discriminatory Transmission Services by 
Public Utilities; Recovery of Stranded Costs by Public Utili-
ties and Transmitting Utilities, FERC Stats. & Regs. 
p 32,514 at 33,059-60, 60 Fed. Reg. 17,662 (1995) ("Open 
Access NOPR"). Technological improvements also made 
feasible the transmission of electric power over long distances 
at high voltages. See id. p 32,514 at 33,060. Alternative 
power suppliers, such as cogenerators, small power produc-
ers, and independent power producers emerged in response 
to these developments. Constructing and operating genera-
tion capacity at prices lower than the embedded generation 
costs of traditional utilities, these alternative suppliers have 
created a wholesale market for low-cost power.

 The growth of this new wholesale market faced a serious 
obstacle. "As entry into wholesale power generation markets 
increased," FERC explained, "the ability of customers to gain 
access to the transmission services necessary to reach com-
peting suppliers became increasingly important." Id. at 
33,062. Yet the owners of transmission lines, the traditional 
utilities that had built the high-cost generation capacity, 
denied alternative producers access to their transmission 
lines on competitive terms and conditions. FERC therefore 
began requiring utilities to file open access transmission 
tariffs that permitted other suppliers to transmit power over 

their lines under certain circumstances, such as when a utility 
sought authorization to merge with another utility or to sell 
power at market-based rather than cost-based rates.

 Then, in 1992, Congress enacted the Energy Policy Act, 
which amended sections 211 and 212 of the FPA to authorize 
FERC to order utilities to "wheel" power--i.e., transmit 
power for wholesale sellers of power over the utilities' trans-
mission lines--on a case-by-case basis. Pub. L. No. 102-486, 
106 Stat. 2776, 2915-16 (1992) (codified at 16 U.S.C. ss 824j-
k). FERC "aggressively implemented" amended sections 211 
and 212 to " 'facilitate the development of competitively 
priced generation supply options, and to ensure that whole-
sale purchasers of electric energy can reach alternative power 
suppliers and vice versa.' " Open Access NOPR, p 32,514 at 
33,064 (quoting Notice of Proposed Rulemaking, Recovery of 
Stranded Costs by Public Utilities and Transmitting Utili-
ties, FERC Stats. & Regs. p 32,507 at 32,866, 59 Fed. Reg. 
35,274 (1994) ("Stranded Cost NOPR")).

 Despite these efforts, a persistent barrier to the develop-
ment of a competitive wholesale power sale market remained. 
The Commission found that "utilities owning or controlling 
transmission facilities possess substantial market power; 
that, as profit maximizing firms, they have and will continue 
to exercise that market power in order to maintain and 
increase market share, and will thus deny their wholesale 
customers access to competitively priced electric generation; 
and that these unduly discriminatory practices will deny 
consumers the substantial benefits of lower electricity prices." 
Open Access NOPR, p 32,514 at 33,052. Power generators 
not permitted to use utilities' transmission lines on reasonable 
terms have no way to transmit their power to customers.

 Invoking its authority under sections 205 and 206 of the 
FPA to remedy unduly discriminatory or preferential rules, 
regulations, practices, or contracts affecting public utility 
rates for transmission in interstate commerce, 16 U.S.C. 
ss 824d-e, and building on its experience in restructuring the 
natural gas industry, see Associated Gas Distribs. v. FERC, 
824 F.2d 981 (D.C. Cir. 1987), the Commission issued Orders 

888 and 889 to "prevent this discrimination by requiring all 
public utilities owning and/or controlling transmission facili-
ties to offer non-discriminatory open access transmission 
service." Open Access NOPR, p 32,514 at 33,052. Orders 
888 and 889 mandate what FERC terms "functional unbun-
dling," i.e., separating utilities' wholesale transmission func-
tions from their wholesale electricity merchant functions. 
Specifically, the orders require utilities to (1) file open access 
nondiscriminatory tariffs that contain the minimum terms and 
conditions of nondiscriminatory services prescribed by FERC 
through its pro forma tariff; (2) take transmission service for 
their own new wholesale sales and purchases of electric 
energy under the same terms and conditions as they offer 
that service to others; (3) develop and maintain a same-time 
information system that will give potential and existing trans-
mission users the same access to transmission information 
that the utility enjoys (called the "Open Access Same-Time 
Information System" or "OASIS"); and (4) state separate 
rates for wholesale generation, transmission, and ancillary 
services. See Order 888, p 31,036 at 31,635-36.

 In requiring utilities to provide open access transmission, 
FERC acknowledged the dramatic change the orders would 
bring about, explaining that "[t]he most critical transition 
issue that arises as a result of the Commission's actions in 
this rulemaking is how to deal with the uneconomic sunk 
costs that utilities prudently incurred under an industry 
regime that rested on a regulatory framework and a set of 
expectations that are being fundamentally altered." Order 
888-A, p 31,048 at 30,346. Known as "stranded costs," these 
"uneconomic sunk costs" are costs that utilities incurred not 
only with regulatory approval, but with the expectation of 
continuing to serve their current customers. These costs will 
become "stranded" when customers take advantage of open 
access transmission to purchase cheaper power from suppli-
ers other than their historic utilities. Order 888 affords 
utilities an opportunity to recover stranded costs from their 
wholesale requirements customers, but only from those cus-
tomers who use their utility's transmission service to pur-
chase power from new suppliers, and only if the utility can 

prove that it had a reasonable expectation of continued ser-
vice to that customer.

 After three rehearing orders, the Commission denied any 
further rehearing. All petitions for review of Orders 888 and 
889 were consolidated and transferred to this circuit. We 
consider these petitions in this opinion. Section II considers 
challenges to FERC's authority to require utilities to file 
open access tariffs as a remedy for undue discrimination. 
Section III evaluates FERC's conclusion that it lacked juris-
diction to order retail unbundling yet has jurisdiction over 
transmission where state commissions have unbundled retail 
sales. Section IV addresses FERC's authority to require 
nonpublic utilities to provide reciprocal open access transmis-
sion service. Section V considers challenges to Order 888's 
stranded cost recovery provisions. Section VI evaluates peti-
tioners' arguments relating to credits for customer-owned 
facilities and behind-the-meter generation. Section VII ad-
dresses discounting, interface allocation, and liability. Sec-
tion VIII evaluates other arguments relating to the terms and 
conditions of the pro forma tariff. Section IX assesses 
FERC's compliance with the National Environmental Policy 
Act and the Regulatory Flexibility Act.

 In the end, we affirm the orders in all respects except two: 
we remand for FERC to explain its treatment of energy costs 
in the stranded cost market option (Section V.A.5.c) and to 
provide a reasonable cap on contract extensions under exist-
ing customers' right-of-first-refusal (Section VIII.E).

 II. FERC's Authority to Require Open Access

 Although FERC asserts that "mounting claims of undue 
discrimination in transmission access" prompted its move-
ment toward open access, the open access requirement of 
Order 888 is premised not on individualized findings of dis-
crimination by specific transmission providers, but on 
FERC's identification of a fundamental systemic problem in 
the industry. Generally, those entities that own or control 
interstate transmission facilities are vertically-integrated pub-
lic utilities that also generate and sell electricity. In its 1995 

notice of proposed rulemaking, FERC observed that there 
were at that time approximately 328 public utilities, market-
ers, and wholesale generation entities with transmission 
needs, and that approximately 137 of those owned or con-
trolled the transmission facilities. See Open Access NOPR, 
p 32,514 at 33,051. Entry into the transmission market is 
difficult and restricted, so those utilities that already own 
transmission facilities enjoy a natural monopoly over that 
field. The transmission-owning utilities can use their position 
to favor their own generated electricity and to exclude com-
petitors from the market, whether by denying transmission 
access outright, or by providing transmission services to 
competitors only at comparatively unfavorable rates, terms, 
and conditions. Utilities that own or control transmission 
facilities naturally wish to maximize profit. The transmis-
sion-owning utilities thus can be expected to act in their own 
interest to maintain their monopoly and to use that position to 
retain or expand the market share for their own generated 
electricity, even if they do so at the expense of lower-cost 
generation companies and consumers.

 Even before Order 888, some transmission-owning utilities 
voluntarily opened their transmission facilities to third party 
suppliers and purchasers of electricity; and FPA s 211 ex-
plicitly gives FERC the authority to order involuntary wheel-
ing on a case-by-case basis. The Commission decided, howev-
er, that relying upon voluntary arrangements and s 211 
orders would not remedy the fundamentally anti-competitive 
structure of the transmission industry. Instead, the Commis-
sion concluded, such a piecemeal approach would result in an 
inefficient "patchwork" of transmission systems nationwide. 
"The ultimate loser in such a regime is the consumer." Open 
Access NOPR, p 32,514 at 33,071.

 As an alternative, the Commission interpreted the anti-
discrimination language of FPA ss 205 and 206, 16 U.S.C. 
ss 824d, 824e (1994), as giving it the authority to impose open 
access as a generic remedy for its findings of systemic anti-
competitive behavior. Invoking that broad authority, in Or-
der 888, FERC requires every transmission-owning public 
utility within FERC's jurisdiction to file an Open Access 

Transmission Tariff (OATT) containing minimum terms and 
conditions for non-discriminatory service and to take trans-
mission service for their own wholesale sales and purchases of 
electric energy under those filed OATTs. In other words, 
this order requires the public utilities to provide the same 
transmission services to anyone purchasing or selling whole-
sale power--other public utilities, federal power suppliers and 
marketers, municipalities, cooperatives, independent power 
producers, qualifying facilities, or power marketers--as they 
provide to themselves. The Board of Water, Light and 
Sinking Fund Commissioners of the City of Dalton (Dalton) 
operates a municipally-owned utility system which provides 
electric power to residential, commercial, and industrial con-
sumers in the city of Dalton, Georgia. Dalton obtains trans-
mission services from the Georgia Integrated Transmission 
System (ITS), which it owns along with public utility Georgia 
Power Company (GPC) and two other utilities that are not 
subject to FERC's jurisdiction, and which GPC operates 
according to the terms of various filed agreements. Puget 
Sound Energy, Inc. (Puget) is a public utility in the Pacific 
Northwest, where Bonneville Power Administration, which is 
not a public utility subject to Order 888's requirements,3 

__________
 3 Bonneville Power Administration (BPA) "is a power marketing 
agency in the Pacific Northwest that markets power from thirty 
federal hydroelectric projects constructed and operated by the 
Corps of Engineers and the Bureau of Reclamation." In re Bonne-
ville Power Administration, Power Sale and Transmission Rates, 
54 F.E.R.C. p 62,143 (1991). In Order 888, FERC concluded that 
BPA is not a public utility as defined by Federal Power Act (FPA) 
s 201(e), and thus is not subject to Order 888's requirements. 
Order 888, p 31,036 at 31,858. FERC admitted, however, to three 
circumstances under which it might review BPA's transmission 
access and pricing policies: (1) if BPA files an open access tariff for 
review and confirmation under the Northwest Power Act and asks 
FERC to find that the tariff meets FERC's open access policies; 
(2) to the extent that BPA "is a transmitting utility subject to a 
request for mandatory transmission services" under FPA s 211; 
and (3) to the extent that BPA receives open access transmission 
from a public utility and is thereby subject to the reciprocity 
provision in that public utility's pro-forma tariff. Id.

dominates the electricity transmission market. These two 
industry petitioners challenge the open access requirement of 
Order 888 on various statutory, constitutional, and other 
grounds.

 Turning first to the FPA itself, Puget and Dalton argue 
that ss 205 and 206 do not give the Commission the authority 
to order open access as a generic remedy; and even if the 
FPA does give the agency such authority, FERC has failed to 
satisfy the statutory requirements for invoking it. Dalton 
also argues that Order 888 itself violates the FPA by discrim-
inating against transmission facility owners who have invest-
ed in those assets. Shifting to constitutional concerns, Puget 
and Dalton, along with amicus curiae Pacific Legal Founda-
tion, maintain that Order 888 violates the Takings Clause of 
the Fifth Amendment. Finally, Dalton argues that the open 
access requirements of the OATT interfere with the antitrust 
conditions of outstanding nuclear licenses, and thus are un-
lawful. While we consider each of these challenges separate-
ly,4 we hold that Order 888's open access requirement is 
authorized by and consistent with the FPA and the Takings 
Clause. We conclude also that Dalton has not yet suffered 
injury from the alleged conflict between open access and the 
nuclear license antitrust conditions, and that its complaint on 
that issue is therefore not yet ripe for judicial review.

A. Statutory Challenges: FPA ss 205 and 206

 Section 205 of the FPA broadly precludes public utilities, in 
any transmission or sale subject to FERC's jurisdiction, from 
"mak[ing] or grant[ing] any undue preference or advantage to 

__________
 4 The Commission and various intervenors on its behalf argue 
extensively against our jurisdiction over these issues on the grounds 
that the petitioners failed, in various ways, adequately to raise their 
concerns before the agency and to preserve the issues for judicial 
review. Upon careful review of the record, we can safely conclude 
without further elaboration that these jurisdictional arguments are 
without merit, that the Commission has had ample notice and 
opportunity to address all of the petitioners' various statutory, 
constitutional, and other challenges to Order 888's open access 
requirement, and that we have jurisdiction to consider these issues.

any person or subject[ing] any person to any undue prejudice 
or disadvantage...." 16 U.S.C. s 824d(b). Section 206 of 
the FPA further provides in relevant part that

 [w]henever the Commission, after a hearing had upon its 
 own motion or upon complaint, shall find that any rate, 
 charge, or classification, demanded, observed, charged, 
 or collected by any public utility for any transmission or 
 sale subject to the jurisdiction of the Commission, or that 
 any rule, regulation, practice, or contract affecting such 
 rate, charge, or classification is unjust, unreasonable, 
 unduly discriminatory or preferential, the Commission 
 shall determine the just and reasonable rate, charge, 
 classification, rule, regulation, practice, or contract to be 
 thereafter observed and in force, and shall fix the same 
 by order.
 
16 U.S.C. s 824e(a). The statutory issues before us are 
whether these provisions give FERC the authority to order 
involuntary wheeling as a generic remedy, and if they do, 
whether FERC satisfied the procedural and evidentiary re-
quirements imposed by these provisions.

1. ss 205 and 206 and Otter Tail Power Company

 The Commission did not write on a blank slate when it 
interpreted FPA ss 205 and 206 as giving it the authority to 
order involuntary wheeling as a generic remedy for systemic 
anti-competitive behavior. Puget and Dalton argue principal-
ly that the Supreme Court's decision in Otter Tail Power Co. 
v. United States, 410 U.S. 366 (1973), controls the disposition 
of this issue. Otter Tail was an antitrust case in which the 
Supreme Court addressed whether the district court could 
require Otter Tail Power Company to wheel power for its 
competitors as a remedy for monopolistic practices. Con-
trary to the company's arguments, the Supreme Court con-
cluded that the district court's order did not impermissibly 
conflict with the authority of the Federal Power Commission, 
FERC's predecessor, because the agency did not have the 
power itself to order involuntary wheeling under Part II of 
the FPA, which includes ss 205 and 206. Puget and Dalton 

cite various circuit court precedents, including one from this 
circuit, as construing Otter Tail to prevent the Commission 
from ordering involuntary wheeling as a generic remedy. 
See, e.g., Florida Power & Light Co. v. FERC, 660 F.2d 668 
(5th Cir. Unit B Nov. 1981); New York State Electric & Gas 
Corp. v. FERC, 638 F.2d 388 (2d Cir. 1980); Richmond 
Power & Light v. FERC, 574 F.2d 610 (D.C. Cir. 1978). 
Finally, Puget and Dalton note that subsequent to Otter Tail, 
Congress enacted FPA s 211, 16 U.S.C. s 824j, giving FERC 
the authority to impose open access on a case-by-case basis to 
remedy a broad range of problems. The petitioners argue 
that, if FPA ss 205 and 206 authorize the Commission to 
impose open access, and if Otter Tail does not prohibit such 
action, then there was no reason for Congress to enact s 211.

 In response, the Commission contends that we should not 
read Otter Tail as limiting its authority under FPA s 206 to 
remedy discriminatory behavior, since Otter Tail was an 
antitrust case and not an undue discrimination case. The 
Commission also maintains that the circuit court cases cited 
by the petitioners are not on point and do not prohibit a 
generic open access remedy. The Commission points instead 
to our decision in Associated Gas Distributors v. FERC, 824 
F.2d 981, 998 (D.C. Cir. 1987) (AGD), in which we upheld a 
similar open access transportation requirement imposed by 
FERC on natural gas transmission, as the controlling prece-
dent. Finally, FERC argues that Congress enacted FPA 
s 211 to broaden its already existing authority to order 
involuntary wheeling, as FPA ss 205 and 206 authorize such 
action only as a remedy for undue discrimination.

 We agree with FERC that our decision in AGD controls 
the disposition of this issue. In AGD, we reviewed a FERC 
order imposing open access conditions on pipelines transport-
ing natural gas. See 824 F.2d at 997-1001. Considering 
arguments quite similar to those made by the petitioners 
here, we concluded that Otter Tail does not constrain FERC 
from mandating open access where it finds circumstances of 
undue discrimination to exist. See id. at 998-99. Turning to 
relevant circuit precedent, we construed Richmond Power & 
Light as supporting only the proposition that a refusal to 

provide transmission services to another utility was not per se 
unduly discriminatory and we noted that the court in Florida 
Power & Light expressly left open the question of whether 
FERC could impose open access conditions as a remedy for 
anti-competitive behavior. See id. at 999. Further, we point-
ed out that our reading of Richmond is consistent with other 
precedent, specifically Central Iowa Power Coop. v. FERC, 
606 F.2d 1156 (D.C. Cir. 1979), in which we upheld FERC's 
use of its authority to prevent undue discrimination to condi-
tion its approval of a power-pooling agreement upon removal 
of membership criteria which denied certain privileges to 
some but not all participants. See AGD, 824 F.2d at 999. 
Indeed, in AGD, we noted that open access relies upon the 
very same principles that we upheld in Central Iowa. See id. 
Although AGD addressed open access under the anti-
discrimination provisions of the Natural Gas Act (NGA) rath-
er than FPA ss 205 and 206, we have repeatedly recognized 
the similarity of the two statutes and held that they should be 
interpreted consistently. See Environmental Action v. 
FERC, 996 F.2d 401, 410 (D.C. Cir. 1993); Tennessee Gas 
Pipeline Co. v. FERC, 860 F.2d 446, 454 (D.C. Cir. 1988); see 
also Arkansas La. Gas Co. v. Hall, 453 U.S. 571, 577 n.7 
(1981). Thus, AGD counsels the conclusion that, while Otter 
Tail may represent a general rule that FERC's authority to 
order open access is limited, the FPA, like the NGA, makes 
an exception to that rule where FERC finds undue discrimi-
nation.

 Moreover, as in AGD, the deferential standard of Chevron 
U.S.A. Inc. v. Natural Resources Defense Council, 467 U.S. 
837 (1984), governs our review of FERC's interpretation of 
FPA ss 205 and 206. See AGD, 824 F.2d at 1001. If we 
agreed with Puget and Dalton that the Supreme Court's Otter 
Tail opinion dictates a particular construction of ss 205 and 
206, then the Commission's contrary interpretation would not 
be entitled to Chevron deference. See Maislin Indus., U.S., 
Inc. v. Primary Steel, Inc., 497 U.S. 116, 131 (1990) ("Once 
we have determined a statute's clear meaning, we adhere to 
that determination under the doctrine of stare decisis, and we 
judge an agency's later interpretation of the statute against 

our prior determination of the statute's meaning."). But 
having concluded that Otter Tail does not govern the disposi-
tion of this case, we are faced solely with considering the 
validity of FERC's interpretation of the FPA, a statute that 
the Commission administers. In AGD, we concluded that 
FERC reasonably interpreted the NGA's ambiguous anti-
discrimination provisions as giving it broad authority to reme-
dy unduly discriminatory behavior through a generic open 
access requirement. See AGD, 824 F.2d at 1001. Given the 
FPA's similar language, we can only reach the same conclu-
sion with respect to Order 888. For all of these reasons, we 
find that the Commission has the authority under FPA 
ss 205 and 206 to require open access as a generic remedy to 
prevent undue discrimination.

2. s 206(a) Procedural and Evidentiary Requirements

 Puget and Dalton next argue that, even if FPA ss 205 and 
206 authorize FERC to impose open access generically, 
s 206(a) imposes certain procedural and evidentiary require-
ments for action which the Commission failed in two separate 
but related ways to satisfy. First, the petitioners claim that 
FPA s 206(a) requires substantial evidence of contemporane-
ous "unjust, unreasonable, unduly discriminatory or preferen-
tial" behavior before the Commission can act. The Commis-
sion made no finding of discrimination or monopoly control on 
the part of Georgia Power Company or Puget. None of the 
applications or complaints filed with the Commission accused 
these petitioners of unduly discriminatory or anti-competitive 
behavior. Instead, the Commission premised Order 888 on a 
generic finding that public utility holders as a group have 
sufficient monopoly power over the transmission of electricity 
to engage in unduly discriminatory and anti-competitive prac-
tices, and that this condition will worsen in the future. To 
support its finding, the Commission relied upon unsubstanti-
ated allegations of discriminatory conduct in public com-
ments, its own experience in reviewing applications and com-
plaints, and its own understanding of the incentives for 
monopolists to behave discriminatorily.

 Puget and Dalton additionally assert that FPA s 206(a) 
requires that the requisite findings of undue discrimination be 
made in the context of a hearing. Although they concede 
that a rulemaking proceeding can satisfy the statute's hearing 
requirement, Puget and Dalton maintain that the rulemaking 
proceeding nevertheless must clearly identify the challenged 
activities and actors, and give the accused actors the opportu-
nity to demonstrate that their activities were not unlawful. 
The petitioners protest that the Commission's notice-and-
comment rulemaking process did not afford them such oppor-
tunity.

 FERC claims the discretion under NLRB v. Bell Aerospace 
Co., 416 U.S. 267, 293 (1974), to choose between rulemaking 
and case-by-case adjudication; and FERC contends that its 
generic rulemaking process fully satisfied the requirements of 
FPA s 206(a). FERC concedes that it relied upon general 
findings of systemic monopoly conditions and the resulting 
potential for anti-competitive behavior, rather than evidence 
of monopoly and undue discrimination on the part of individu-
al utilities. Citing our opinion in Wisconsin Gas Co. v. 
FERC, 770 F.2d 1144, 1166 (D.C. Cir. 1985), however, FERC 
maintains that such findings are sufficient to substantiate its 
decision to impose the open access requirement. Finally, 
FERC observes that we rejected these same arguments in 
AGD. See 824 F.2d at 1008 (citing Wisconsin Gas, 770 F.2d 
at 1165-68).

 Again, we must agree with the Commission. In American 
Public Gas Ass'n v. FPC, we held that the Commission could 
exercise its authority under NGA s 5(a), the provision paral-
lel to FPA s 206, through rulemaking as well as adjudication. 
See 567 F.2d 1016, 1064-67 (D.C. Cir. 1977); see also Wiscon-
sin Gas, 770 F.2d at 1153 (articulating the American Public 
Gas holding). Congress subsequently ratified the American 
Public Gas holding when it enacted the Department of Ener-
gy Organization Act, 42 U.S.C. s 7173(c) (1994). See Wiscon-
sin Gas, 770 F.2d at 1153 n.8 (acknowledging the Act). That 
statute provides that "the establishment of rates and charges 
under the Federal Power Act [16 U.S.C. 791a et seq.] or the 
Natural Gas Act [15 U.S.C. 717 et seq.], may be conducted by 

rulemaking procedures." 42 U.S.C. s 7173(c) (brackets in 
original). By passing a statute adopting the holding of 
American Public Gas, and explicitly applying that rule to the 
FPA as well as the NGA, Congress signaled its intent that 
the hearing requirements of NGA s 5(a) and FPA s 206(a) 
be interpreted similarly.

 Interpreting the hearing requirement of NGA s 5(a), we 
have said that, while the Commission cannot rely solely on 
"unsupported or abstract allegations," the agency is also not 
required to make "specific findings," so long as the agency's 
factual determinations are reasonable. See Wisconsin Gas, 
770 F.2d at 1158. In AGD, we applied Wisconsin Gas in 
holding that the Commission was not required to make 
specific findings that individual rates charged by individual 
pipelines were unlawful, or to offer empirical proof for all the 
propositions upon which its order depended, before promul-
gating a generic rule to eliminate undue discrimination. See 
AGD, 824 F.2d at 1008-09. Upon comparison of the order 
considered in AGD with Order 888, if anything, FERC more 
thoroughly documented the reasons for its actions in Order 
888 than in the earlier natural gas order.

 Puget claims that AGD and Wisconsin Gas are distinguish-
able, and that this case is governed by Electricity Consumers 
Resource Council v. FERC, 747 F.2d 1511 (D.C. Cir. 1984), in 
which we reversed FERC's adoption of a rate based on an 
economic theory in the absence of a discussion of the practical 
applications of that theory. See 747 F.2d at 1514. As the 
AGD court recognized, however, the court in Electricity 
Consumers was persuaded that the Commission had distorted 
the economic theory it claimed to apply. See AGD, 824 F.2d 
at 1008. Just as the pipelines in AGD did, Puget has failed to 
articulate exactly how FERC has distorted the theories on 
which it relies in Order 888. Additionally, the AGD court 
rejected the idea that "Electricity Consumer's reference to 
'economic theory' was intended to invalidate agency reliance 
on generic factual predictions merely because they are typi-
cally studied in the field called economics." Id. Following 
the rationale of Wisconsin Gas and AGD, we conclude that 

FERC has satisfied the requirements for invoking its authori-
ty under FPA s 206(a).

3. Discriminatory Effect of Order 888

 Dalton charges that, even if the FPA permits FERC to 
impose involuntary wheeling generally, the open access re-
quirement of Order 888 causes rather than remedies discrimi-
nation, and therefore violates FPA s 206(a)'s express re-
quirement that FERC act against undue discrimination. 
Specifically, Dalton and the other non-jurisdictional owners of 
the Georgia ITS facilities invested millions of dollars in those 
facilities in order to use the facilities each owns and receive 
reciprocal open access transmission services from the other 
owners. Under the Open Access Transmission Tariff 
(OATT), other customers do not have to make such invest-
ments to use the Georgia ITS facilities. FERC responds 
that Order 888 does not unduly discriminate between old and 
new customers of integrated transmission systems like the 
Georgia ITS; and that if Dalton has evidence that the tariff 
results in undue discrimination in its individual circum-
stances, Dalton remains free to file a petition under FPA 
s 206 for redress, and FERC will consider its claim.

 FERC's conclusion that its open access requirement is not 
unduly discriminatory is subject only to arbitrary and capri-
cious review. See 5 U.S.C. s 706(2)(A) (1994); Sithe/ 
Independence Power Partners, LP v. FERC, 165 F.3d 944, 
948 (D.C. Cir. 1999); Union Pacific Fuels, Inc. v. FERC, 129 
F.3d 157, 161 (D.C. Cir. 1997). We conclude that FERC has 
adequately explained why its open access requirement is not 
unduly discriminatory. Relying upon extensive commentary 
as well as its own experiences, FERC concluded that, as a 
general matter, transmission industry conditions were condu-
cive to discriminatory practices and anti-competitive behavior, 
such that case-by-case adjudication could not adequately ad-
dress the problem. FERC also recognized that its generic 
findings may have exceptions, and thus that Order 888 may in 
individual circumstances have a different result than that 
intended. Therefore, Order 888 does not preclude facilities 
owners the opportunity to argue their particular circum-

stances in their OATT filings or, as with Dalton, in their own 
petitions for relief under FPA s 206(a). Rather, Order 888 
merely shifts from a regulatory norm in which a user of 
transmission services must demonstrate to FERC an individ-
ualized need for open access to one in which a provider of 
transmission services must present to FERC individualized 
circumstances requiring relief from open access. As the 
petitioners have a mechanism by which they can seek relief 
for their particular concerns, we find nothing arbitrary or 
capricious about FERC's conclusion that its approach to open 
access is not unduly discriminatory.

 In another stab at demonstrating the discriminatory effect 
of Order 888's open access requirement, Dalton alerts us to 
an agreement entered into between it and Georgia Power 
Company (GPC) in partial implementation of antitrust condi-
tions contained in operating licenses issued by the Nuclear 
Regulatory Commission for jointly owned nuclear facilities 
connected to the Georgia ITS. Those antitrust conditions 
require GPC to provide Dalton with transmission services 
until the nuclear licenses expire, long after the ITS Agree-
ment terminates. Dalton alleges that limitations imposed by 
Order 888 on Dalton's rights upon termination of the ITS 
Agreement are inconsistent with GPC's obligations under the 
nuclear licenses, and that the interference will result in 
discrimination against Dalton. FERC maintains that it 
agreed in addressing GPC's Order 888 compliance filing to 
treat the ITS Agreements separately.

 Ultimately, Dalton has offered no present injury from the 
alleged conflict, so this issue is not ripe for review. Dalton 
will only be injured if, upon termination of the ITS Agree-
ment, Order 888 interferes with Dalton's right to transmis-
sion services. Dalton's own argument suggests as much, 
observing that FERC "left to GPC the decision whether it 
'must, but cannot, comply with separate orders' of NRC and 
FERC and whether it will present evidence of such conflict to 
either Commission," and complaining that even if GPC does 
act, "the orders under review provide no assurance that the 
competitive transmission and other service rights provided by 
the nuclear licenses will be respected under the OATT." Br. 

of Petitioner Dalton at 23 (quoting Order 888-A, p 31,048 at 
30,452). In short, GPC and FERC are still in the process of 
determining whether the antitrust provisions even conflict 
with Order 888, as well as how to deal with any such 
inconsistency.5 Accordingly, this issue is not appropriate for 
judicial review at this time.

B. Constitutional Challenge: Fifth Amendment Takings 
 Clause

 Puget and amicus curiae Pacific Legal Foundation (Pacific) 
contend that Order 888 violates the Takings Clause of the 
Fifth Amendment. These petitioners maintain that Order 
888's open access requirement engineers a "taking" in two 
ways: First, that FERC's open access requirement effects a 
regulatory taking by arbitrarily changing pricing methodolo-
gy in a way that excessively deprives transmission owners of 
their investments in facilities; and, second, that the open 
access requirement allows a physical invasion, a permanent 
physical occupation, by taking away the transmission owners' 
right to exclude competitors from their transmission proper-
ty. We cannot grant relief on either ground.

 When the action of the federal government effects a "tak-
ing" for Fifth Amendment purposes, there is no inherent 
constitutional defect, provided just compensation is available. 
At bottom, both of the petitioners' Fifth Amendment claims 
turn not on whether open access effects a taking, but whether 
FERC's cost-based transmission pricing policies in the end 
provide just compensation. The remedy of just compensation 
is not within our jurisdiction but that of the United States 
Court of Federal Claims, under the Tucker Act, 28 U.S.C. 
s 1491. See Bell Atlantic Tel. Cos. v. Federal Communica-
tions Comm'n, 24 F.3d 1441, 1444 n.1 (D.C. Cir. 1994); 
Railway Labor Executives' Ass'n v. United States, 987 F.2d 
806, 815-16 (D.C. Cir. 1993).

 We recognize that our jurisdiction to review an agency's 
construction of a statute necessarily involves an exercise of 

__________
 5 GPC's management of the Georgia ITS is subject to the di-
rection of a committee that includes Dalton representatives.

the policy of avoiding constitutional issues where possible, 
even though the issues may concern arguable takings amena-
ble to Tucker Act remedy, "when 'there is an identifiable 
class of cases in which application of a statute will necessarily 
constitute a taking.' " Bell Atlantic, 24 F.3d at 1445 (D.C. 
Cir. 1994) (quoting United States v. Riverside Bayview 
Homes, Inc., 474 U.S. 121, 128 n.5 (1985)). We need not 
decide whether this case falls within that category, however, 
because even if it did, any takings problem created by Order 
888 does not raise such significant constitutional doubt as to 
require us to construe the FPA to prohibit FERC from 
ordering open access. If there is a taking, and a claim for 
just compensation, then that is a Tucker Act matter to be 
pursued in the Court of Federal Claims, and not before us.

 III. Federal versus State Jurisdiction 
 over Transmission Services 

 Vertically integrated utilities use their own facilities to 
generate, transmit, and distribute electricity to their custom-
ers. Traditionally, the customer paid one combined rate for 
both the power and its delivery, thus the industry refers to 
such sales as "bundled." To the extent that bundled sales are 
made directly to the end user of the electricity, they are also 
recognized as retail sales. Utilities may also sell the electrici-
ty they generate at wholesale to other utilities or other 
resellers of power, which then resell that power to their own 
customers. Thus, the same utility may use its facilities to 
serve both retail and wholesale customers. Vertically inte-
grated utilities use their transmission facilities to move elec-
tricity over long distances, and use local distribution lines to 
deliver the electricity to the end user.

 Even before Congress enacted the FPA, the Supreme 
Court held that states could not regulate wholesale sales of 
electricity. See Public Utils. Comm'n of R.I. v. Attleboro 
Steam & Elec. Co., 273 U.S. 83 (1927). A few years later in 
1935, Congress included in the FPA a provision giving the 
Federal Power Commission, FERC's predecessor agency, the 
authority to regulate "the sale of [electric] energy at whole-

sale," as well as "the transmission of electric energy in 
interstate commerce." FPA s 201(a), 16 U.S.C. s 824(a) 
(1994). Congress also limited federal regulation "to those mat-
ters which are not subject to regulation by the States," id., 
and reserved to the states "jurisdiction ... over facilities 
used for the generation of electric energy or over facilities 
used in local distribution or only for the transmission of 
electric energy in intrastate commerce...." FPA s 201(b), 
16 U.S.C. s 824(b). Pursuant to these provisions, FERC has 
regulated wholesale power sales and interstate transmissions, 
and state agencies have retained jurisdiction over bundled 
retail transactions, including service issues and the intrastate 
sale and distribution of electricity through local distribution 
facilities.

 Initially, as most transactions involved either a wholesale or 
a retail sale, and correspondingly transmission or local distri-
bution facilities, this regulatory division of labor was straight-
forward in application. Indeed, in 1935, when Congress 
enacted the FPA, the networks of high-voltage, long-distance 
transmission lines which today crisscross the United States 
did not exist. Instead, vertically integrated utilities individu-
ally built facilities sufficient to meet the power needs of their 
customers. Over time, however, the landscape of the electric 
industry changed.

 Utilities decided to cover demand spikes by sharing power, 
rather than by building more generation capacity. The trans-
mission grid developed from these arrangements. Eventual-
ly, nonutility generators started producing electricity; and 
power marketers began to buy and resell electricity to other 
power marketers, utilities, or even directly to consumers. 
These industry participants do not own transmission lines, so 
they rely upon the utilities that own such facilities to provide 
transmission services. In addition to their traditional bun-
dled sales activity, vertically integrated utilities started "un-
bundling" their own services and developing their own power 
marketing units to buy and sell electricity at wholesale. 
Some states even mandate unbundling of retail services. As 
a result of these changes, facilities once used solely for local 
distribution of bundled retail sales now engage regularly in 

unbundled wholesale transmissions and retail delivery as well. 
Thus, while the electricity world once neatly divided into 
spheres of retail versus wholesale sales, and local distribution 
versus transmission facilities, such is no longer the case.

 In Order 888, FERC reinterpreted FPA s 201 to accom-
modate the new industry practices and conditions. FERC 
left the regulation of bundled retail transmissions to the 
states, concluding that "when transmission is sold at retail as 
part and parcel of the delivered product called electric ener-
gy, the transaction is a sale of electric energy at retail." 
Order 888, p 31,036 at 31,781. Nevertheless, FERC asserted 
jurisdiction over all unbundled retail transmissions, and left 
to the states only the sales portion of unbundled retail 
transactions, on the ground that FPA s 201 gives it jurisdic-
tion without qualification over all transmission by public 
utilities in interstate commerce. See id. Also, while ac-
knowledging that FPA s 201(b) explicitly places retail trans-
missions by "facilities used in local distribution" beyond the 
Commission's jurisdiction, FERC adopted a seven factor jur-
isdictional test for determining which facilities fall within that 
category, and claimed exclusive authority over those that do 
not. See id. at 31,780, 31,784. In the present litigation, each 
of these changes is challenged, with some petitioners claiming 
that FERC went too far, and others contending that the 
Commission did not go far enough in asserting jurisdiction.

A. Bundled Retail Sales

 Several state regulatory commissions complain that FERC 
exceeded the boundaries of its statutory authority by assert-
ing jurisdiction over unbundled retail transmissions. These 
state petitioners argue that the plain meaning and history of 
FPA s 201(a) gives FERC the authority to regulate only 
transmissions of electricity consumed in a state other than 
that in which the electricity was generated, if the transmis-
sion was not otherwise subject to state regulation. The 
states historically have regulated retail transmissions as part 
of bundled retail sales of electricity, while FERC has regulat-
ed wholesale transmissions; and the division of regulatory 
jurisdiction should not change merely because those transac-

tions have now been unbundled into separate generation, 
transmission, and sales components.

 Two groups of transmission dependent utilities, TAPS and 
TDU Systems, and the nation's largest power wholesaler, 
Enron Power Marketing (collectively the "unbundling and 
discounting" or "U&D" petitioners), both intervene on the 
side of FERC with respect to the states' claim, and separate-
ly challenge FERC's interpretation of its jurisdiction on 
different grounds. The U&D petitioners contend that FERC 
impermissibly limited its jurisdiction by leaving the regulation 
of bundled retail transmissions to the states. These parties 
maintain that FERC has the authority to regulate both 
bundled and unbundled retail transmissions, and that FERC 
violates FPA s 206 by limiting the scope of Order 888 to the 
latter. To establish that bulk transmission by utilities is 
transmission in interstate commerce regardless of whether 
the power is sold at wholesale or retail, the U&D petitioners 
cite particularly FPC v. Florida Power & Light Co., 404 U.S. 
453 (1972), and Jersey Central Power & Light Co. v. FPC, 319 
U.S. 61 (1943), two of the cases relied upon by FERC in the 
Notice of Proposed Rulemaking, p 32,514 at 33,135-42. As 
further support that FERC's jurisdiction extends to all inter-
state transmissions, the U&D petitioners offer NGA prece-
dent recognizing FERC's authority over all interstate gas 
transportation, if not the gas being transported. See, e.g., 
FPC v. Louisiana Power & Light Co., 406 U.S. 621, 636 
(1972); United Distribution Cos. v. FERC, 88 F.3d 1105, 1153 
(D.C. Cir. 1996) (UDC); Mississippi River Transmission 
Corp. v. FERC, 969 F.2d 1215 (D.C. Cir. 1992). These 
petitioners contend that excluding bundled retail transmis-
sions from the OATT will permit discrimination and give 
owners a competitive advantage, contrary to the mandate of 
FPA s 206(a) that FERC eliminate undue discrimination. 
Accordingly, the U&D petitioners claim that FERC erred 
when it declined to mandate functional unbundling for an 
owner's transmissions to bundled retail customers of (1) its 
own generated power or (2) power purchased at wholesale.

 In response to these challenges, FERC maintains that the 
plain meaning of FPA s 201 gives the Commission jurisdic-

tion over all interstate transmissions without qualification, 
while at the same time limiting jurisdiction over sales to 
wholesale sales. Relying particularly on Florida Power & 
Light and Jersey Central Power & Light, FERC asserts 
broad jurisdiction over all transmission activities in interstate 
commerce. As for bundled retail sales, FERC's position is 
that once the transmission service is bundled with generation 
and local distribution, it becomes merely a component of the 
retail sale itself, over which FERC has no jurisdiction. 
FERC maintains that natural gas jurisprudence is inapplica-
ble because the language of the NGA and FPA differ on this 
issue, and the natural gas cases turned on the existence of a 
regulatory gap that does not exist in the electricity field. 
FERC also asserts that its interpretation of the FPA's juris-
dictional grant is entitled to deference under Chevron U.S.A. 
Inc. v. Natural Resources Defense Council, 467 U.S. 837 
(1984).

 Both FPA s 201(a) and (b) clearly and unambiguously 
confer upon FERC jurisdiction over the "transmission of 
electric energy in interstate commerce." FPA s 201(c) fur-
ther provides that "electric energy shall be held to be trans-
mitted in interstate commerce if transmitted from a State and 
consumed at any point outside thereof." 16 U.S.C. s 824(c). 
In both Florida Power & Light and Jersey Central Power & 
Light, the Supreme Court considered whether certain indirect 
transmissions of electrical power across state lines represent-
ed transmissions in interstate commerce.

 Jersey Central Power & Light involved the transmission of 
energy generated by Jersey Central in New Jersey. Jersey 
Central transmitted electricity to the New Jersey transmis-
sion facilities of another company, Public Service, which then 
transmitted the power first to another of its New Jersey 
facilities, and then on to a facility owned by yet a third 
company and located in the middle of a body of water 
separating New Jersey from Staten Island, New York. The 
third company in the chain then transmitted the energy first 
to its own facilities in New York, then finally and ultimately 
to consumers in New York. Jersey Central's own transmis-
sion facilities were located solely in New Jersey, as were 

the facilities used by Public Service to receive the transmis-
sions from Jersey Central.

 The Supreme Court recognized that Jersey Central had no 
control over the transmissions' destination once the electricity 
was delivered to Public Service, see Jersey Central, 319 U.S. 
at 65, and that the total flow of electricity from Jersey 
Central to New York was small. See id. at 66. Nevertheless, 
because some electricity generated by Jersey Central in New 
Jersey was consumed in New York, the Court upheld 
FERC's jurisdiction under FPA s 201 over Jersey Central's 
transmission facilities as utilized for transmissions in inter-
state commerce. See id. at 67. The Court said that, under 
FPA s 201(a) and (b), FERC's power extends over all facili-
ties "which transmit energy actually moving in interstate 
commerce." Id. at 72. The Court emphasized, however, that 
"mere connection" of one utility's transmission facilities to 
those of another transmitting in interstate commerce was 
insufficient for jurisdiction under FPA s 201. Id.

 The Court revisited the issue in Florida Power & Light, 
which involved certain Florida and Georgia utilities who 
voluntarily connected their transmission facilities to coordi-
nate their activities and exchange power as required to meet 
temporary needs. Like Jersey Central, FP&L's transmission 
facilities were confined to Florida, and none of FP&L's 
transmission lines directly connected with those of out-of-
state companies. Nevertheless, because FP&L was a mem-
ber of a group of interconnected utilities, its transmission 
lines connected with those of other Florida utilities; and the 
lines of one of those other utilities, Florida Power Corp., 
interconnected just short of Florida's northern border with 
those of Georgia Power Co. Records indicated that power 
transfers between FP&L and Florida Power coincided with 
transfers between Florida Power and Georgia Power.

 In Jersey Central, logs of the relevant companies demon-
strated at least a dozen occasions when facilities in New York 
drew power from certain lines at times when Jersey Central 
was the only supplier of electricity to those lines. See 
Florida Power & Light, 404 U.S. at 459. By way of contrast, 

there was no similar evidence that power generated by FP&L 
specifically passed through Florida Power to Georgia Power, 
with Florida Power serving as a mere conduit. See id. At 
best, company records demonstrated instances when trans-
fers between FP&L and Florida Power occurred at or about 
the same time as transfers between Florida Power and 
Georgia Power. See id. at 457.

 Instead, the Court considered two theories by which 
FP&L's power could be deemed transmitted across state 
lines. The first posited a cause and effect relationship by 
which every flick of a light switch would cause every genera-
tor on a multi-state interconnected system to produce some 
quantity of additional electricity to maintain the system's 
balance, and thus to transmit electric energy throughout the 
system and across state lines. The second theory suggested 
that where the transmission lines of two utilities interconnect, 
their energy commingles, such that inevitably some energy 
transmitted by FP&L to Florida Power was then transmitted 
to Georgia Power and across state lines.

 Despite its statement in Jersey Central that "mere connec-
tion determines nothing," 319 U.S. at 72, the Court relied on 
the second of these theories to conclude that FP&L's facilities 
were transmitting energy in interstate commerce, and left 
open the possible validity of the cause and effect theory. See 
404 U.S. at 462-63. Writing in dissent, Justice Douglas 
characterized the Court's opinion as "mean[ing] that every 
privately owned interconnected facility in the United States 
... is within the [Federal Power Commission's] jurisdiction," 
such that otherwise local utilities would now be subject to the 
mandates of the federal bureaucracy. Id. at 471 (Douglas, J., 
dissenting).

 The Supreme Court has interpreted the language in FPA 
s 201 regarding FERC's jurisdiction over transmissions in 
interstate commerce. We are bound by the High Court's 
dictates to conclude that the FPA gives FERC the authority 
to regulate the transmissions at issue here, whether retail or 
wholesale. Even if the Court had not so spoken, however, 
and even if we independently concluded that the statute's text 

was less than clear, it is the law of this circuit that the 
deferential standard of Chevron U.S.A. Inc. v. Natural Re-
sources Defense Council, 467 U.S. 837 (1984), applies to an 
agency's interpretation of its own statutory jurisdiction. See 
Oklahoma Natural Gas Co. v. FERC, 28 F.3d 1281, 1283-84 
(D.C. Cir. 1994). As guided by Chevron, unless Congress has 
directly spoken to the contrary, or FERC has unreasonably 
or impermissibly interpreted the statute, we must defer to 
the Commission's construction of ambiguous provisions of the 
FPA. See Chevron, 467 U.S. at 842-43. In this age of 
interconnected transmission grids, and given the accompany-
ing technological complexities, we would be hard pressed to 
conclude that FERC's interpretation of s 201(c) as giving it 
jurisdiction over both wholesale and retail transmissions is 
unreasonable or impermissible.

 Nevertheless, we are not persuaded that this conclusion 
requires FERC to mandate unbundling and assert jurisdic-
tion over all retail transmissions. Just as FPA s 201 gives 
FERC jurisdiction over transmissions in interstate commerce 
and sales at wholesale, the statute also clearly contemplates 
state jurisdiction over local distribution facilities and retail 
sales. The statute is much less clear about exactly where the 
lines between those activities are to be drawn. A regulator 
could reasonably construe transmissions bundled with genera-
tion and delivery services and sold to a consumer for a single 
charge as either transmission services in interstate commerce 
or as an integral component of a retail sale. Yet FERC has 
jurisdiction over one, while the states have jurisdiction over 
the other. FERC's decision to characterize bundled trans-
missions as part of retail sales subject to state jurisdiction 
therefore represents a statutorily permissible policy choice to 
which we must also defer under Chevron. Accordingly, we 
affirm FERC's decisions in Order 888 to assert jurisdiction 
over unbundled retail transmissions while leaving regulation 
of bundled retail transmissions to the states.

B. Local Distribution Facilities

 FPA s 201(b) explicitly excludes from FERC jurisdiction 
"facilities used in local distribution or only for the transmis-

sion of electric energy in intrastate commerce." 16 U.S.C. 
s 824(b)(1). Historically, wholesale sales have not for the 
most part involved local distribution facilities. FERC claims 
that increased unbundling gives resellers the opportunity to 
reconfigure the wholesale sales so that they might now occur 
on those facilities which traditionally have been treated as 
local distribution facilities. Moreover, FERC's assertion of 
jurisdiction over the transmission component of unbundled 
retail sales blurred the line between local distribution facili-
ties and facilities used for transmission in interstate com-
merce.

 In Order 888, FERC claimed exclusive authority over the 
regulation of facilities which sell and transmit electricity at 
wholesale to customers who will resell the electricity to end 
users. With respect to unbundled retail sales, FERC ac-
knowledged that transmissions by "facilities used in local 
distribution" are beyond the Commission's jurisdiction, while 
facilities engaged in interstate transmission are subject to 
FERC jurisdiction under FPA s 201(a). Thus FERC 
adopted a seven factor jurisdictional test to identify whether a 
facility is a local distribution facility subject to state jurisdic-
tion or a facility engaged in interstate transmission subject to 
FERC jurisdiction.6 In short, under Order 888, when a 

__________
 6 The Commission's seven factor test involves evaluating on a 
case-by-case basis whether the activities of the facilities in question 
correspond with seven specific indicators of local distribution:

 (1) Local distribution facilities are normally in close proximity 
 to retail customers. 
 (2) Local distribution facilities are primarily radial in charac-
 ter. 
 (3) Power flows into local distribution systems; it rarely, if 
 ever, flows out. 
 (4) When power enters a local distribution system, it is not 
 reconsigned or transported on to some other market. 
 (5) Power entering a local distribution system is consumed in a 
 comparatively restricted geographical area. 
 (6) Meters are based at the transmission/local distribution 
 
public utility is engaged in wholesale transmission, FERC has 
jurisdiction regardless of the nature of the facility; but when 
the public utility is engaged in unbundled retail transmission, 
the facts and circumstances will determine whether the facili-
ties are subject to FERC or state jurisdiction.

 The state petitioners argue that FERC's dual approach 
radically expands its jurisdiction and violates Congress' ex-
plicit directive in FPA s 201(b) that regulation of local distri-
bution facilities be left to the states. The states contend that 
Congress clearly intended to preserve state jurisdiction over 
local distribution facilities, regardless of whether the energy 
comes from out of state or the sale is a wholesale sale. The 
states maintain that, by claiming jurisdiction over any facility 
transporting energy for resale, regardless of whether the 
facility might otherwise be a local distribution facility under 
the seven factor test, FERC has adopted the circular reason-
ing that wholesale sales do not occur on local distribution 
facilities, so any facility that engages in wholesale activities is 
not a local distribution facility. The states contend further 
that FERC offers no reasoned analysis of why local distribu-
tion should be defined differently for wholesale versus retail 
sales. The states finally charge that, under Order 888, nearly 
identical facilities would be under federal jurisdiction and 
state jurisdiction for different customers receiving indistin-
guishable service. Such a situation, they contend, will only 
encourage energy marketers to choose their regulator by 
using middlemen to shift the point at which title to the power 
transfers, and thus undermine the jurisdictional certainty that 
Order 888 states is necessary for competition.

 FERC responds that it is not asserting jurisdiction over 
local distribution facilities, but asserts that when a public 
utility delivers unbundled energy at wholesale to a supplier 
for the purpose of resale to an end user, FPA s 201 gives 
FERC unqualified authority to assert jurisdiction over the 
facility used to effect that transaction. When the public 
utility is engaged in unbundled retail transmission, however, 

__________
 interface to measure flows into the local distribution system. 
 (7) Local distribution systems will be of reduced voltage. 
 
Order 888, p 31,036 at 31,981.

the circumstances of a specific case will determine whether 
the facilities used are subject to FERC or state jurisdiction. 
The arguments by the states do no more than raise policy 
concerns which are for FERC and not the court. See Arent 
v. Shalala, 70 F.3d 610 (D.C. Cir. 1995).

 Intervening again on FERC's behalf on this issue, the 
U&D petitioners add that FERC's use of different tests is 
appropriate given the differences in the two separate jurisdic-
tional grants of FPA s 201. The intervenors argue that, 
given the statute's clear grant to FERC of jurisdiction over 
all aspects of wholesale sales, FERC is fully justified in 
employing a functional test to identify wholesale transmis-
sions. In contrast, because FERC's jurisdiction over retail 
sales is limited to transmissions in interstate commerce, the 
seven factor test is more appropriate.

 We agree that FERC's dual approach to assessing its 
jurisdiction stems from the fact that FPA s 201 contains 
more than one jurisdictional grant. FPA s 201(b) denies 
FERC jurisdiction over local distribution facilities "except as 
specifically provided in this subchapter and subchapter III." 
16 U.S.C. s 824(b)(1) (emphasis added). FPA s 201(a) 
makes clear that all aspects of wholesale sales are subject to 
federal regulation, regardless of the facilities used. FERC's 
assertion of jurisdiction over all wholesale transmissions, 
regardless of the nature of the facility, is clearly within the 
scope of its statutory authority. Moreover, various cases 
support the proposition that FERC regulates all aspects of 
wholesale transactions. See, e.g., Duke Power Co. v. FPC, 
401 F.2d 930, 935-36 (D.C. Cir. 1968) (noting that the FPC 
regulates public utility facilities used in wholesale transmis-
sions or sales in interstate commerce); Arkansas Power & 
Light Co. v. FPC, 368 F.2d 376, 383 (8th Cir. 1966) (stating 
that the functional use of the transmission lines--wholesale 
versus retail--controls); Wisconsin-Michigan Power Co. v. 
FPC, 197 F.2d 472, 477 (7th Cir. 1952) (finding that transmis-
sion facilities used at wholesale are not "local distribution 
facilities").

 The seven factor test applies only to unbundled retail sales, 
where FERC seeks to regulate pursuant to the separate 
grant of jurisdictional authority over transmissions in inter-
state commerce. In this context, the definition of "facilities 
used in local distribution" becomes relevant. The statute 
does not define "facilities used in local distribution," but 
instead leaves that task to FERC. As Chevron counsels us, 
FERC's interpretation of undefined and ambiguous statutory 
terms is entitled to deference. See Chevron, 467 U.S. at 842-
43.

 FERC has adopted a multi-factor test to determine the 
nature of transmission facilities. In a footnote, Order 888 
says that distribution-only facilities which sell only at retail 
will still be considered local distribution facilities. See Order 
888, p 31,036 at 31,981 n.99. This is consistent with the fact 
that states historically have regulated bundled retail sales to 
end users. However, Order 888 implicitly recognizes the 
current reality that many primarily retail utilities engage in 
both local distribution and interstate transmissions, and seeks 
through the seven factors to discern each facility's primary 
function. We cannot agree with the state petitioners that this 
approach is unreasonable or otherwise impermissible.

 IV. Reciprocity

 Section 6 of the Tariff contains a reciprocity provision 
resting on the principle that any public utility offering "non-
discriminatory open access transmission for the benefit of 
customers should be able to obtain the same non-
discriminatory access in return." Order 888, p 31,036 at 
31,760. Non-public utilities--those outside the Commission's 
jurisdiction because, for instance, they are state-owned, see 16 
U.S.C. s 824(f)--would otherwise not have to offer open-
access. Under the Tariff, a public utility does not have to 
offer them access unless they reciprocate. In order to avoid 
controversies between public and non-public utilities regard-
ing reciprocal service, the Commission adopted a voluntary 
"safe harbor" provision pursuant to which non-public utilities 
could submit a transmission tariff to the Commission for a 

determination whether it satisfied the reciprocity condition. 
If it did, the public utility would have to offer service; if it did 
not, the public utility could refuse service (although it had the 
option of waiving the reciprocity condition, as did the Com-
mission itself).

A. Indirect Regulation of Non-Jurisdictional Utilities

 Nebraska Public Power District (NPPD), a state entity, 
provides electrical generation, transmission and distribution 
service to wholesale and retail customers throughout Nebras-
ka.7 It claims that the Commission, through the reciprocity 
provision, has reached beyond its statutory authority and is 
illegally attempting to regulate entities, including NPPD, over 
which the Commission has no jurisdiction, in violation of the 
Federal Power Act and the Tenth Amendment to the Consti-
tution. NPPD admits that pursuant to Nebraska law, all 
state power districts are obligated to provide open access 
transmission service. They have been doing so for years. 
This is doubtless why, after Order No. 888 issued, another 
Nebraska public power district so easily obtained a safe 
harbor declaration. See Omaha Pub. Power Dist., 81 
F.E.R.C. p 61,054 (1997). In light of this, the Commission 
argues--and we agree--that NPPD's petition is unripe. 
Since NPPD already offers open access transmission, it is far 
from certain that the reciprocity provision will have any effect 
on it.8 It certainly has not demonstrated any particular 
hardship that it would suffer if we refused to engage in pre-
enforcement judicial review. See AT&T Corp. v. Iowa Utils. 
Bd., 525 U.S. 366, 386 (1999). From all that appears, no 
public utility has refused, or even threatened to refuse, to 
give NPPD access to its transmission system in the wake of 

__________
 7 "Nebraska is unique among the States in the Union in that all 
generation, transmission and distribution service is provided by 
public entities, municipalities and cooperatives whose governing 
boards are responsible to, and serve at the voting pleasure of, the 
rate-payers they serve." NPPD Brief at 2.

 8 The Commission made clear that existing contracts will not be 
affected. See Order 888-A, p 31,048 at 30,181.

Order No. 888.9 Given the fact that public utilities may waive 
the reciprocity provision anyway, and that NPPD has the 
same option of obtaining a safe harbor as did the Omaha 
Public Power District, we are not persuaded that the provi-
sion is currently altering NPPD's conduct of its affairs or that 
withholding judicial review will cause it any hardship whatev-
er. "Unlike the drug manufacturers in Abbott Laboratories 
[v. Gardner, 387 U.S. 136 (1967)], but like the cosmetics 
companies in Toilet Goods Ass'n v. Gardner, 387 U.S." 158, 
164 (1967), NPPD need not change its "behavior or risk costly 
sanctions." Clean Air Implementation Project v. EPA, 150 
F.3d 1200, 1205 (D.C. Cir. 1998). Furthermore, exactly how 
the Commission will fill in the contours of the reciprocity 
provision remains to be seen. That it may defer to state 
commissions, as it indicated in Houston Lighting & Power 
Co., 81 F.E.R.C. p 61,015 (1997), order on reh'g, 83 F.E.R.C. 
p 61,181 (1998), affects NPPD's contention that the Commis-
sion is seeking to bring about nationwide uniformity by 
forcing non-public utilities to comply with its "detailed man-
dates." NPPD Brief at 5. We therefore believe the issues 
raised would benefit from a more concrete setting in which 
NPPD can demonstrate exactly how the reciprocity provision 
has affected its primary conduct. See Clean Air Implemen-
tation Project, 150 F.3d at 1204. For all these reasons, 
NPPD's challenge to the reciprocity provision is not ripe for 
judicial review.

B. Limitation on Reciprocity

 The Investor Owned Utilities (IOUs) challenge the follow-
ing limitation on reciprocity: non-public utilities owe recipro-
cal open access only to the public utility from which they take 
open access service--not to all utilities. See IOU Brief at 40-
44; IOU Reply Brief at 18-20. These petitioners argue that 
the Commission has left open the door for non-public utilities 

__________
 9 For this reason we find unpersuasive NPPD's claim that the 
Tariff's reciprocity provision places it at a disadvantage in negotia-
tions because a public utility may simply refuse to provide service 
without any fear of a Commission enforcement action. See NPPD 
Reply Brief at 4-5.

to discriminate against all other utilities and that it has done 
so solely because of tax considerations that no longer apply.

 We agree with Commission counsel that tax considerations 
were not the only basis on which the Commission's limitation 
rested. The Commission stated that "the reciprocity require-
ment strikes an appropriate balance by limiting its application 
to circumstances in which the non-public utility seeks to take 
advantage of open access on a public utility's system." Order 
888, p 31,036 at 31,762. The Commission also explained that 
it "do[es] not have the authority to require non-public utilities 
to make their systems generally available." Id. at 31,761. 
The Commission stated also that it did not want broad open 
access reciprocity to jeopardize the tax-exempt financing non-
public utilities enjoy,10 that the IRS was then reexamining the 
question, id. at 31,762, and that if the tax issue is favorably 
resolved, it will reconsider the matter. Order 888-A, 
p 31,048 at 30,287. The IRS has now acted. See Temporary 
Regulations s 1.141-7T(f), in 63 Fed. Reg. 3256 (1998). The 
IOUs argue that we must therefore remand for reconsidera-
tion. See IOU Brief at 44 (citing Panhandle Eastern Pipe-
line v. FERC, 890 F.2d 435, 439 (D.C. Cir. 1989); National 
Fuel Gas Supply Corp. v. FERC, 899 F.2d 1244, 1249-50 
(D.C. Cir. 1990); Ciba-Geigy v. EPA, 46 F.3d 1208 (D.C. Cir. 
1995)).

 We think not. So far as we know, the IRS has not finalized 
its temporary and proposed regulations. The IRS acknowl-
edges that its temporary regulations "raise[ ] a number of 
complex technical issues" many of which "may need to be 
addressed legislatively" and it anticipates that the finalization 
process will take three years to accomplish. 63 Fed. Reg. at 
3258-59. Second, as the Commission indicates, the possible 
tax consequences of requiring open access from non-
jurisdictional utilities was its secondary concern. The Com-
mission's greater concern was its lack of jurisdiction to do 
what the IOUs ask. And lastly the Commission should be 

__________
 10 See 26 U.S.C. ss 141, 142 (permitting "private activity" bonds 
and "local furnishing" bonds, respectively).

taken at its word that it will reconsider the scope of reciproci-
ty when and if the temporary tax regulations are finalized.

 V. Stranded Cost Recovery Provisions

 Ordering open access transmission, Order 888-A explains 
that "[t]he most critical transition issue that arises as a result 
of the Commission's actions in this rulemaking is how to deal 
with the uneconomic sunk costs that utilities prudently in-
curred under an industry regime that rested on a regulatory 
framework and a set of expectations that are being funda-
mentally altered." Order 888-A, p 31,048 at 30,346. "If a 
former wholesale requirements customer or a former retail 
customer uses the new open access to reach a new supplier," 
FERC said, "we believe that the utility is entitled to recover 
legitimate, prudent and verifiable costs that it incurred under 
the prior regulatory regime...." Order 888, p 31,036 at 
31,789.

 According to FERC, these "stranded" costs consist pre-
dominantly of costs of building generation capacity, which 
utilities incurred with the expectation that they would use the 
additional capacity to serve existing customers. See Notice of 
Proposed Rulemaking, Recovery of Stranded Costs by Public 
Utilities and Transmitting Utilities, FERC Stats. & Regs. 
p 32,507 at 32,863-64, 59 Fed. Reg. 35,274 (1994) ("Stranded 
Cost NOPR"). Because of the increased competition in the 
generation market that will result from open access, this 
capacity may become underutilized or uneconomical, i.e., 
"stranded." Stranded costs also include nonrecurring costs 
approved by regulators that, in order to avoid rate increases, 
were recovered over a period of years instead of at the time 
the expenditures were made. Known as "regulatory assets," 
these costs include deferred income taxes, deferred pension 
and other employee benefit and retirement costs, research 
and development, extraordinary property losses, and the 
phase-in of new plant costs. Nuclear decommissioning costs 
and costs to buy out high-priced fuel and power contracts 
may also become stranded as a result of open access.

 Exercising its exclusive jurisdiction over wholesale power 
sales, FERC through Order 888 gave utilities the opportunity 
to recover their stranded costs from former wholesale cus-
tomers who take advantage of open access transmission to 
purchase power from other suppliers. Order 888, p 31,036 at 
31,810. With respect to stranded costs resulting from state-
ordered retail wheeling, Order 888 provides that FERC will 
consider stranded cost claims only when state regulatory 
agencies lack authority to do so. Id. at 31,824-25. Order 888 
also designated FERC as the primary forum for stranded 
cost claims stemming from what are known as new municipal-
izations and municipal annexations. See Order 888-A, 
p 31,048 at 30,404; Order 888-B, 81 FERC at 62,104. 
Stranded costs in these situations result from retail (as 
opposed to wholesale) power sales.

 Petitioners challenge nearly every aspect of FERC's 
stranded cost policy as set forth in Order 888, from the 
mechanics of calculating customers' stranded cost obligations 
to whether FERC has authority to address stranded costs at 
all. We begin with those challenges that relate to the recov-
ery of wholesale stranded costs (Section V.A), then turn to 
challenges to Order 888's treatment of retail stranded costs 
(Section V.B). We affirm FERC's stranded cost policy in all 
respects, except we vacate that portion of the orders dealing 
with the treatment of energy costs in the market option and 
remand to FERC for further explanation. See Section 
V.A.5.c.

A. Wholesale Stranded Costs

 In requiring nondiscriminatory open access transmission as 
a remedy for undue discrimination, FERC recognized that it 
"cannot change the rules of the game without providing a 
mechanism for recovery of the costs caused by such 
regulatory-mandated change." Order 888-A, p 31,048 at 
30,346. Under the pre-open access regulatory regime, utili-
ties entered into long-term contracts to make wholesale pow-
er sales to municipal, cooperative, and investor-owned utili-
ties. See Stranded Cost NOPR, p 32,507 at 32,862. Because 
these customers had no source of power supply other than 

their historic utility, these contracts were typically extended 
at the end of their term. This produced an implicit obligation 
by the utilities to continue satisfying their customers' power 
needs, as well as a reciprocal expectation by customers of 
continued service. See id. at 32,863-64. To satisfy expected 
customer demand, utilities invested money, built facilities, and 
entered into long-term fuel or power contracts, relying on the 
"regulatory compact" under which utility shareholders accept-
ed lower rates of return on their investment in exchange for 
the certainty of regulated rates and resulting ability to recov-
er prudently incurred costs. See Notice of Proposed Rule-
making, Promoting Wholesale Competition Through Open 
Access Non-discriminatory Transmission Services by Public 
Utilities; Recovery of Stranded Costs by Public Utilities and 
Transmitting Utilities, FERC Stats. & Regs. p 32,514 at 
33,049, 60 Fed. Reg. 17,662 (1995).

 Order 888 fundamentally undermines utilities' expectation 
of continued service and cost recovery. A utility's require-
ments customers may now use the utility's open access trans-
mission service to purchase power from other suppliers at the 
end of their contract terms. If customers leave before paying 
their share of costs the historic utility incurred on their 
behalf, the utility will be left with stranded costs, which it will 
either absorb or shift to remaining customers.

 Unless utilities are able to recover stranded costs, FERC 
reasoned, their ability to compete and attract investor capital 
in a deregulated market may be seriously impaired. FERC 
therefore decided that it had to "address recovery of the 
transition costs of moving from a monopoly-regulated regime 
to one in which all sellers can compete on a fair basis and in 
which electricity is more competitively priced." Order 888, 
p 31,036 at 31,635. In reaching this conclusion, FERC relied 
on its experience in restructuring the natural gas industry, 
where this court faulted it for failing to provide transitional 
mechanisms such as stranded cost recovery. FERC ex-
plained: "We have learned from our experience in the natural 
gas area the importance of addressing competitive transition 
issues early and with as much certainty to market partici-
pants as possible." Id.

 In shaping its stranded cost recovery mechanism, FERC 
had to balance two competing interests: speeding the transi-
tion to competition versus protecting utilities that had in-
curred costs with the expectation that their customers would 
remain and eventually pay those costs through electricity 
rates. Allowing recovery of stranded costs, FERC acknowl-
edged, would delay full realization of the benefits of open 
access--lower electricity rates--because customers facing 
stranded cost liability might continue purchasing power from 
their historic utility even though competitors are selling 
power at lower rates. See Order 888-A, p 31,048 at 30,355. 
Indeed, a customer would only switch suppliers if the compet-
itor offered a rate less than the historic utility's rate plus the 
customer's stranded cost liability. But given the highly regu-
lated nature of the electricity industry, in which utilities 
incurred costs with the expectation of recouping them, FERC 
concluded that the delay was a necessary component of its 
open access program. See id. Mindful of its ultimate goal of 
converting the electricity industry into a competitive market, 
however, FERC fashioned the stranded cost recovery provi-
sions to be transitional, allowing utilities to recover stranded 
costs only in connection with wholesale requirements con-
tracts entered into on or before July 11, 1994 (the date of the 
stranded cost notice of proposed rulemaking). See 18 C.F.R. 
s 35.26(b)(8), 35.26(c)(1)(v)-(vi).

 As to precisely who should pay for stranded costs, utilities 
and customers not surprisingly had dramatically different 
positions. Customers argued that utilities should absorb 
most, if not all, stranded costs. Utilities (and their investors) 
argued that customers should pay.

 Facing an enormously difficult task in balancing these 
sharply conflicting positions, FERC crafted a rule that re-
quires customers to pay stranded costs but only in certain 
circumstances. Most important, in order to recover stranded 
costs from a customer, the historic utility must prove that it 
had a reasonable expectation of continued service to that 
particular customer for a certain number of years beyond the 
end of the contract term; a utility unable to prove such an 
expectation may not recover stranded costs under Order 888. 

See 18 C.F.R. s 35.26(c)(2)(i). Moreover, a utility able to 
demonstrate a reasonable expectation of continued service 
may recover stranded costs only if its wholesale customer 
actually takes advantage of the utility's open access tariff to 
obtain access to a new generation supplier at the end of its 
contract term (i.e., the former customer continues to use the 
historic utility's transmission service but no longer purchases 
power from it). See 18 C.F.R. s 35.26(b)(1)(i). Through 
these two limitations, FERC balanced the interests of utilities 
and customers by allowing utilities to recover their stranded 
costs only if they can demonstrate a reasonable expectation of 
continued service and requiring customers to pay those costs 
only if they take advantage of their historic utility's open 
access transmission to reach cheaper sources of power. And 
of course, no customer will have to pay stranded costs at all if 
it continues purchasing power from its historic utility 
throughout the period during which the utility has a reason-
able expectation of continued service--precisely what the 
customer would have done in the absence of Order 888's open 
access requirement.

 Under Order 888, stranded costs are calculated on a "reve-
nues lost" basis. A departing customer's stranded cost obli-
gation equals the estimated revenue it would have paid had it 
continued to purchase power from the historic utility minus 
the current market value of the power it would have pur-
chased, calculated over the period the utility is determined to 
have a reasonable expectation of continued service to that 
customer. See 18 C.F.R. s 35.26(c)(2)(iii). In other words, 
the stranded cost formula is not tied to particular stranded 
assets or contractual commitments, but rather awards utilities 
the difference between the pre-open access cost-based rate 
and the post-open access market rate. Once a customer's 
stranded cost liability is calculated, it may pay through a 
lump-sum payment, installment payments, or a surcharge to 
the transmission rate charged by the historic utility. See 
Order 888, p 31,036 at 31,799.

 Before turning to petitioners' arguments, we emphasize 
what should be obvious from the foregoing summary of Order 
888: Order 888 awards stranded costs to no one. It does 

nothing more than establish a mechanism by which utilities 
may seek to recover stranded costs. To recover stranded 
costs, a utility must demonstrate its continued expectation of 
service at an evidentiary hearing. The customer may appear 
at that hearing and, through evidentiary submissions of its 
own, attempt to demonstrate that the utility had no such 
expectation. Only after such a hearing may FERC decide 
whether a utility can recover stranded costs and, if so, how 
much.

 Petitioners mount many challenges to Order 888's stranded 
cost recovery provisions. For purposes of analysis, we group 
these challenges into five categories: (1) challenges to 
FERC's authority to provide for stranded cost recovery 
(section V.A.1); (2) claims that Order 888 conflicts with cost 
causation principles and case law developed under the Natu-
ral Gas Act (section V.A.2); (3) challenges to FERC's Mobile-
Sierra findings (section V.A.3); (4) claims that FERC arbi-
trarily and capriciously failed to provide for stranded cost 
recovery by certain entities, such as transmission dependent 
utilities and generation and transmission cooperatives (section 
V.A.4); and (5) challenges to various technical aspects of 
Order 888's stranded cost recovery provisions (section V.A.5).

1. FERC's Authority to Provide for Stranded Cost Recovery

 A group called Petitioners Opposing Stranded Cost Recov-
ery ("POSCR") advances three challenges to FERC's authori-
ty to provide for stranded cost recovery: (1) as a factual 
matter, utilities could never have had a reasonable expecta-
tion of continued service to wholesale customers beyond the 
contract term; (2) sections 206 and 212 of the Federal Power 
Act ("FPA") forbid stranded cost recovery; and (3) our 
decision in Cajun Elec. Power Coop., Inc. v. FERC, 28 F.3d 
173 (D.C. Cir. 1994), holds that stranded cost recovery is 
anticompetitive. We consider each argument in turn.

a. Reasonable expectation of continued service

 To recover stranded costs relating to a specific departing 
wholesale requirements customer, a utility must show that it 

had a reasonable expectation of service to that customer 
beyond the term of its existing contract. See 18 C.F.R. 
s 35.26(c)(2)(i). Pointing out that contracts define the extent 
of the parties' obligations and that customers have long 
exercised their rights to purchase power from other suppliers 
at the end of their contract terms, POSCR contends that 
utilities could never have had an expectation of service be-
yond their contract terms. In considering this argument it is 
important to remember that Order 888 does not itself award 
stranded costs; it merely establishes a procedure by which 
utilities may petition FERC in individual proceedings to 
recover stranded costs from a specific customer based on a 
specific evidentiary showing. Utilities failing to show an 
expectation of continued service will be unable to recover 
stranded costs. POSCR's challenge thus amounts to a claim 
that no utility could ever, under any circumstances, have had 
a reasonable expectation to serve a wholesale customer be-
yond the term of its contract. We review this claim under 
the APA's familiar arbitrary and capricious standard. See 5 
U.S.C. s 706(2)(A); Williams Field Services Group, Inc. v. 
FERC, 194 F.3d 110, 115 (D.C. Cir. 1999).

 Responding to this same challenge in Order 888-A, FERC 
explained that utilities historically had an implicit obligation 
to serve customers beyond the contract term for a simple 
reason: Customers had no means of reaching alternative 
suppliers. See Order 888-A, p 31,048 at 30,354. As part of 
that obligation to serve, FERC found, a local utility "had a 
concomitant obligation to plan to supply [its] customers' 
continuing needs, and planned its system taking account of 
the wholesale load. In many cases the wholesale customers 
participated by supplying load forecasts." Id. In making 
capital decisions and predicting future demand, utilities fre-
quently consulted with their wholesale requirements custom-
ers. For these reasons, FERC concluded, utilities may have 
a reasonable expectation of continued service to particular 
customers. See id. at 30,354-55.

 Not only is FERC's judgment about utilities' reasonable 
expectations precisely the type of policy assessment to which 
we owe great deference, but POSCR points to nothing sug-

gesting that FERC's reasoning is arbitrary and capricious. 
In fact, POSCR's argument completely ignores the highly 
regulated nature of the electricity industry prior to Order 
888. Unlike competitive markets, where buyers may freely 
purchase from many sellers, the monopolistic character of the 
electricity industry, combined with the congressionally im-
posed regulatory structure, left requirements customers high-
ly dependent on a single supplier--their historic utility. In-
deed, as intervenors point out, utilities were even unable to 
choose not to renew an expiring wholesale requirements 
contract without first notifying FERC. See 18 C.F.R. s 35.15 
(1995) (repealed by Order 888). Although it may well be 
true, as POSCR argues, that some wholesale customers have 
long been able to purchase unbundled transmission service, 
we think such evidence is best reserved for individual pro-
ceedings, where a departing customer can attempt to refute 
the utility's claim that it had an expectation of continued 
service.

b. Sections 206 and 212 of the FPA

 Section 206(a) of the FPA gives FERC authority to "deter-
mine the just and reasonable rate, charge, classification, rule, 
regulation, practice, or contract to be thereafter observed and 
in force" if it finds that any existing arrangement "is unjust, 
unreasonable, unduly discriminatory or preferential." 16 
U.S.C. s 824e(a). Relying on section 206(a) as the basis for 
Order 888, FERC found that utilities had used their monopo-
ly transmission power to discriminate against potential com-
petitors and that such practices would increase as competitive 
pressures in the industry increased. Order 888, p 31,036 at 
31,676, 31,682.

 POSCR contends that Order 888's stranded cost recovery 
provisions themselves violate FERC's own construction of 
section 206, the construction FERC relied on as the basis for 
the open access rule. According to POSCR, "[t]he stranded 
cost rule perpetuates the very 'discrimination' FERC found 
unlawful, and subjects the same victims--customers held 
hostage to uneconomic electric generation by transmission 
monopolists--to continued abuse."

 In challenging FERC's policy decision to provide for 
stranded cost recovery, POSCR conflates the violation 
(FERC's generic determination that utilities' practice of pro-
hibiting access to their transmission lines on reasonable terms 
was unduly discriminatory) with the remedy (FERC's more 
limited finding that recovery of stranded costs in particular 
circumstances would not be unduly discriminatory). FERC 
has not, as POSCR contends, given "unduly discriminatory" 
different meanings; rather, it has applied the term in differ-
ent contexts.

 POSCR's argument thus boils down to a challenge to 
FERC's conclusion that the stranded cost recovery pre-
scribed in Order 888 is not unduly discriminatory, a challenge 
meriting arbitrary and capricious review. Viewed through 
this lens, we think FERC more than adequately explained 
why it concluded that stranded cost recovery is not unduly 
discriminatory--stranded cost recovery, FERC said, is transi-
tional only, follows cost causation principles, and requires 
utilities to prove that they had a reasonable expectation of 
continued service. FERC faced an enormously difficult task. 
It had to balance the transition to competitive markets 
against the need to maintain the competitiveness of utilities 
that had incurred costs based on a reasonable expectation 
that they would recoup them. We find nothing either arbi-
trary or capricious in how FERC struck this balance.

 POSCR next contends that stranded cost recovery violates 
section 212 of the FPA, which governs the rates for transmis-
sion ordered by FERC pursuant to section 211. 16 U.S.C. 
ss 824j-k. Section 212 
allows FERC to order "rates, charges, terms, and conditions 
which permit the recovery by [a transmitting] utility of all the 
costs incurred in connection with the transmission services 
and necessary associated services, including, but not limited 
to, an appropriate share, if any, of legitimate, verifiable and 

economic costs, including taking into account any benefits to 
the transmission system of providing the transmission ser-
vice, and the costs of any enlargement of transmission facili-
ties." 16 U.S.C. s 824k(a). Contending that "economic 
costs" cannot be read to include payment of stranded costs, 
which by definition relate to generation (not transmission) 
services, POSCR reads section 212 to preclude stranded cost 
recovery.

 Straightforward application of the Chevron doctrine demon-
strates the lack of merit in this argument. See Chevron, 
U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 
837 (1984). Because Congress has not "directly spoken to the 
precise question at issue"--do "economic costs" include 
stranded costs?--and because nothing in the statute pre-
cludes recovering through transmission rates costs that were 
traditionally recovered through generation rates, the term 
"economic costs" is ambiguous. Id. at 842.

 Proceeding to Chevron's second step, we ask whether 
FERC has reasonably interpreted the term "economic costs." 
See id. at 843. We have no doubt that it has. As FERC 
explained, but for section 211 wheeling orders, there would be 
no stranded costs. Stranded costs, according to FERC, are 
therefore economic costs of section 211 wheeling. See Order 
888-A, p 31,048 at 30,390. POSCR offers nothing to under-
mine this eminently reasonable interpretation of the statute.

c. Implications of Cajun

 Next, POSCR contends that our decision in Cajun Elec. 
Power Coop., Inc. v. FERC, 28 F.3d 173 (D.C. Cir. 1994), 
condemns stranded cost recovery as anticompetitive. A pre-
Order 888 decision, Cajun reviewed two tariffs allowing a 
utility, Entergy Corporation, to sell power at market rates, 
and a third tariff providing for open access to Entergy's 
transmission services at cost-based rates. The third tariff 
gave Entergy an opportunity to recover stranded costs from 
customers who no longer purchase power from Entergy but 
use its transmission lines to reach other suppliers--exactly 
the circumstances in which Order 888 provides for stranded 
cost recovery. Under the tariff, the stranded cost charge was 
included in Entergy's transmission rate. See id. at 175-77.

 Characterizing the stranded cost provision as a "tying 
arrangement" under antitrust law, Cajun explained that un-
der the tariff, Entergy could charge a former customer for 
the cost of generation services when the customer wished to 
purchase only transmission services; because Entergy has a 
monopoly over transmission, customers would have no choice 
but to pay costs relating to generation they no longer wanted 
from Entergy. Id. at 177-78. Thus, because "Entergy could 
use its monopoly over transmission services to eliminate 
competition in the market for generation services," the net 
effect of the tariffs may be anticompetitive. Id. at 176.

 Of significance to this case, however, we did not strike 
down the tariffs. Instead, we remanded the case for FERC 
to determine "how much competition in fact is dampened" by 
the stranded cost provision. Id. at 178. Thus, contrary to 
POSCR's suggestion, Cajun does not represent a blanket 
condemnation of stranded cost recovery; rather, recognizing 
that such recovery could be anticompetitive, Cajun directed 
FERC to evaluate and justify the potential anticompetitive 
impact. This is precisely what FERC has done in Order 888. 
It expressly considered the anticompetitive effects of strand-
ed cost recovery. See Order 888-A, p 31,048 at 30,372-74. 
Then, stressing the transitional nature of the recovery and 
the fact that recovery was compelled by the open access 
requirement, which utilities could not have anticipated, FERC 
concluded that the limited anticompetitive effects of stranded 
cost recovery were both a necessary and acceptable conse-
quence of the transition to competition. See id. Not only 
has POSCR offered no evidence that would lead us to ques-
tion FERC's conclusion, but such judgments about anticom-
petitive effects are "the kind of reasonable agency prediction 
about the future impact of its own regulatory policies to which 
we ordinarily defer." Louisiana Energy and Power Auth. v. 
FERC, 141 F.3d 364, 370 (D.C. Cir. 1998).

2. Natural Gas Precedent and Conformance to Cost Causa-
 tion Principles

 Having rejected POSCR's arguments that FERC lacks 
authority to authorize stranded cost recovery, we turn to its 

argument that FERC has failed adequately to explain why 
Order 888 requires departing customers to pay one-hundred 
percent of stranded costs. In support of this argument, 
POSCR claims that our decisions reviewing FERC's restruc-
turing of the natural gas industry require cost sharing; it also 
argues that Order 888's stranded cost recovery conflicts with 
the cost causation principles that traditionally govern alloca-
tion of costs.

a. Natural gas precedent: AGD, K N Energy, and UDC

 In introducing competition into the electricity industry, 
FERC has taken essentially the same path that it took in 
restructuring the natural gas industry, although what FERC 
has done in a single order in the electricity industry (Order 
888) it did in a series of orders in the natural gas industry. 
Because POSCR relies so heavily on FERC's natural gas 
orders and our decisions reviewing them, we begin by sum-
marizing them in some detail.

 Finding practices in the natural gas industry "unduly dis-
criminatory" in violation of the Natural Gas Act, FERC 
began by issuing Order 436, which "unbundled" pipeline 
transportation and merchant functions. Regulation of Natu-
ral Gas Pipelines After Partial Wellhead Decontrol, Order 
No. 436, FERC Stats. & Regs. p 30,665, 50 Fed. Reg. 42,408 
(1985) (rehearing orders omitted). At the time of Order 436, 
pipelines were facing enormous liabilities under long-term 
"take-or-pay" contracts. Entered into when gas prices were 
expected to rise, these contracts obligated pipelines to pur-
chase minimum quantities of gas from wellhead producers at 
fixed prices that turned out to be well in excess of market 
prices. See Associated Gas Distributors v. FERC, 824 F.2d 
981, 1021 (D.C. Cir. 1987) ("AGD"). Although FERC esti-
mated take-or-pay liabilities at billions of dollars, and al-
though Order 436 would exacerbate the take-or-pay problem 
by providing incentives to pipeline customers to purchase gas 
from cheaper suppliers, FERC declined to take any action 
with respect to the contracts. In AGD, we found that 
FERC's decision to do nothing failed to meet the require-
ments of reasoned decisionmaking, citing FERC's "seeming 

blindness to the possible impact of Order No. 436 on take-or-
pay liability" and permanent market distortions that may 
result from FERC's inaction. Id. at 1021-23, 1025. Specifi-
cally, we noted, in words echoed by FERC years later in 
Order 888, that consumers who purchased from the "least 
nimble" local distribution companies would "be stuck with the 
burden of the overpriced gas." Id. at 1023.

 In response to AGD, FERC issued Order 500. Regulation 
of Natural Gas Pipelines After Partial Wellhead Decontrol, 
Order No. 500, FERC Stats. & Regs. p 30,761, 52 Fed. Reg. 
30,334 (1987) (rehearing orders omitted). Recognizing that 
no one segment of the gas industry was wholly responsible 
for the take-or-pay problem, Order 500 allowed pipelines to 
recover take-or-pay costs through "equitable sharing." Pipe-
lines that willingly absorbed twenty-five to fifty percent of 
their costs could require sales customers to match that 
amount through a fixed charge. Pipelines could recover any 
balance through commodity rates or volumetric surcharges, 
borne by both sales and transportation customers. For an 
overview of these components of Order 500, see K N Energy, 
Inc. v. FERC, 968 F.2d 1295, 1297-98 (D.C. Cir. 1992). We 
sustained this approach in K N Energy, holding that even 
though Order 500 replaced traditional "cost causation" princi-
ples with cost spreading and value-of-service concepts, it did 
not violate Natural Gas Act section 4's requirement that rates 
be just and reasonable. Id. at 1301-02. Citing statements in 
AGD that "all actors in the natural gas industry" are "candi-
dates" for absorbing take-or-pay liability, we relied on "the 
unusual circumstances surrounding the take-or-pay problem, 
and the limited nature--both in time and scope--of the 
Commission's departure from the cost-causation principle." 
Id. at 1301.

 Concluding that Order 436 had been only partially success-
ful in introducing competition into the natural gas industry, 
FERC issued its third major restructuring order, Order 636. 
Pipeline Service Obligations and Revisions to Regulations 
Governing Self-Implementing Transportation; and Regula-
tion of Natural Gas Pipelines After Partial Wellhead Decon-
trol, Order No. 636, FERC Stats. & Regs. p 30,939, 57 Fed. 

Reg. 13,267 (1992) (rehearing orders omitted). That order 
imposed mandatory unbundling of sales and transportation 
services and allowed sales customers to reduce the amount of 
gas they had to purchase pursuant to existing contracts. 
When customers took advantage of this option and purchased 
gas from sources other than the pipelines, the pipelines were 
once again left with substantial take-or-pay liabilities. Label-
ing the costs of reducing these liabilities gas supply realign-
ment or GSR costs, Order 636 authorized pipelines to bill 
current transportation customers for one-hundred percent of 
their GSR costs by charging either a negotiated exit fee or 
reservation fee surcharge. Order 636 also authorized pipe-
lines to recover all stranded costs in rate filings. In the 
natural gas industry, stranded costs represented the costs of 
pipeline assets (such as storage facilities) used to provide 
bundled sales services that were not directly assignable to 
transportation customers. For an overview of these compo-
nents of Order 636, see United Distribution Cos. v. FERC, 88 
F.3d 1105, 1125-27, 1176-78 (D.C. Cir. 1996) ("UDC").

 In UDC, we affirmed FERC's determination that pipelines 
could recover all stranded costs through filed rates, so long as 
FERC "adequately balanced the interests of investors and 
ratepayers." Id. at 1180. Reaffirming the appropriateness 
of the cost spreading and value-of-service principles approved 
in K N Energy, we found that FERC's allocation of GSR 
costs to pipeline transportation customers, as opposed to the 
pipelines themselves, properly applied those principles. Id. 
at 1182. Although recognizing that GSR costs stemmed from 
pipeline sales customers, not transportation customers, we 
found that FERC appropriately imposed the costs on trans-
portation customers because these customers benefitted from 
the availability of lower-priced transportation and also be-
cause FERC could not spread costs to the pre-Order 636 
sales customers since those customers no longer purchased 
gas from the pipelines. Id. at 1185-86. We remanded for 
FERC to explain more fully why pipelines should not have to 
pay some of the costs, noting an inconsistency in the Commis-
sion's analysis: While FERC applied cost spreading princi-
ples to justify imposing costs on transportation customers, it 

invoked cost causation principles in concluding that pipelines 
should not have to pay any of these costs. Id. at 1188-89. 
We explicitly stated, however, that we were not saying that 
"it is impossible, or even improbable, that the Commission on 
remand can establish a convincing rationale for exempting the 
pipelines." Id. at 1189.

 POSCR reads this history to require FERC to order cost 
sharing, but it ignores Order 888's explanation of the differ-
ence between natural gas restructuring and the situation in 
the electricity industry. Most fundamentally, Order 888 ex-
plains, stranded cost recovery in the electricity industry 
conforms to cost causation principles, which normally govern 
the allocation of costs and require customers to pay the costs 
they caused. See Order 888, p 31,036 at 31,798. Cost causa-
tion principles could not be applied in natural gas restructur-
ing, Order 888 explains, because many customers had already 
begun purchasing gas from other suppliers before FERC had 
addressed the take-or-pay problem on remand from AGD, 
and because the filed rate doctrine prohibits assessing 
charges against former customers. Id. at 31,800-01. Order 
888 also explains that unlike stranded costs in the electricity 
industry, the take-or-pay liabilities in the gas industry were 
extraordinary. The billions of dollars of take-or-pay liabilities 
resulted not from Order 636, but from earlier regulatory 
policies that had encouraged pipelines to enter into long-term, 
fixed-price gas purchase contracts, combined with declining 
gas prices that made those contracts uneconomical. See 
Order 888-A, p 31,048 at 30,380. Under all of these circum-
stances, "[t]o have allocated these costs solely to any one 
segment of the industry would have imposed a crushing new 
burden on that segment." Id. at 30,380-81.

 Stranded costs in the electricity industry, Order 888 ex-
plains, are quite different. Resulting directly from Order 
888, they represent "ordinary costs that have always been, 
and are currently, included in the utility's rates for electric 
generation approved by the Commission." Id. at 30,382. 
Moreover, wholesale customers may avoid stranded cost lia-
bility by continuing to purchase power from their historic 
utility, precisely what they probably would have done in the 

absence of Order 888. In other words, in contrast to the 
natural gas industry, where customers would have faced 
enormous new burdens had FERC forced them to pay take-
or-pay costs, customers in the electricity industry face no new 
burdens; instead, Order 888 requires them to pay nothing 
more than costs they would have had to pay in the absence of 
Order 888. In the electricity industry, the only effect of 
stranded cost recovery is delayed realization of the full bene-
fits of a competitive market.

 In light of these differences between the natural gas and 
electricity industries and FERC's exhaustive treatment of the 
natural gas restructuring in Order 888, POSCR's contention 
that FERC has failed "to offer a coherent rationale, rising to 
the level of reasoned decisionmaking" for not imposing cost 
sharing is wholly without merit. Equally without merit is 
POSCR's assertion that UDC "teaches that, where customers 
and utilities benefit from an open access rule/order that leads 
to early contract termination and where anticompetitive con-
duct by utilities has given rise to the need for the open access 
order, utilities must share transition costs." POSCR ignores 
three important points. First, FERC, not this court, deter-
mined that cost sharing was appropriate with respect to take-
or-pay liabilities. UDC merely affirmed FERC's decision. 
Second, K N Energy recognized that cost sharing in the 
natural gas industry was a departure from the cost causation 
principles that normally apply, a departure justified by ex-
traordinary circumstances in the natural gas industry. K N 
Energy, 968 F.2d at 1301-02. And finally, as to stranded 
costs that more closely resemble those at issue in this case--
for example, pipeline assets that would no longer be fully 
employed when customers took advantage of unbundling to 
purchase gas from alternative suppliers--FERC ordered, and 
UDC affirmed, that pipelines recover one-hundred percent of 
those costs.

b. Conformance to cost causation principles

 Having established that the natural gas cases impose no 
obligation on FERC to order cost sharing, we next consider 
POSCR's argument that the inclusion of stranded costs in 

transmission rates does not conform to cost causation princi-
ples. This is so, POSCR asserts, because Order 888's strand-
ed cost provisions require customers to pay through transmis-
sion rates for costs the utility previously incurred to provide 
generation services.

 As an initial matter, we note that payment through trans-
mission rates is only one of three ways that a departing 
customer may pay its stranded cost obligation; the customer 
also has the option of making a lump-sum payment or install-
ment payments. Thus POSCR's challenge seems aimed only 
at the method of payment, not at the fact that payment is 
required. But even viewing POSCR's challenge more broad-
ly, as a claim that stranded cost recovery no matter what the 
method of payment violates cost causation principles, we 
think it lacks merit.

 We have explained the cost causation principle as follows: 
"Simply put, it has been traditionally required that all ap-
proved rates reflect to some degree the costs actually caused 
by the customer who must pay them." K N Energy, 968 F.2d 
at 1300. Given this definition, we are puzzled by POSCR's 
claim that because inclusion of stranded costs in transmission 
rates requires customers to pay currently for costs incurred 
in the past, it violates cost causation principles. To some 
degree, all utility rates reflect past costs; utilities typically 
expend funds today (for example, constructing generation 
facilities), fully expecting to recover those costs through 
future rates. In fact, current rates often include past costs 
that utilities deferred in order to avoid rate increases. Cost 
causation requires not that costs be incurred at the same time 
they are included in rates, but that the rates "reflect to some 
degree the costs actually caused by the customer who must 
pay them." Id.

 In fashioning Order 888's stranded cost recovery provi-
sions, FERC went to great lengths to ensure that customers 
would be responsible for only those costs they caused.

 [T]he Rule is consistent with the traditional cost causa-
 tion principle because it recognizes the link between the 
 incurrence of the stranded costs and the decision of a 
 
 particular generation customer to use open-access trans-
 mission on the utility's system to leave the utility's 
 generation system and shop for power, and bases the 
 utility's ability to recover stranded costs on its ability to 
 demonstrate that it incurred costs with the reasonable 
 expectation that the customer would remain on its gener-
 ation system beyond the term of the contract.
 
Order 888-A, p 31,048 at 30,382.

 We cannot see how including stranded costs in transmission 
rates instead of lump sum payments changes this analysis. 
To the extent POSCR is arguing that including in a transmis-
sion rate costs incurred to provide generation services vio-
lates cost causation principles, we reiterate that stranded 
costs are not costs of providing the physical transmission 
services but, as Order 888-A explains, they are utilities' cost 
of open access transmission. See Order 888-A, p 31,048 at 
30,389 & n.634. More generally, given the fundamental 
changes wrought by Order 888 and the unprecedented oppor-
tunity for customers to purchase power from alternative 
suppliers, we are quite comfortable deferring to FERC's 
judgment that stranded cost recovery--through transmission 
rates or otherwise--conforms to cost causation principles. In 
fact, FERC may have violated cost causation principles had it 
failed to assign stranded costs to customers who caused them.

 POSCR next argues that Order 888 is unduly discriminato-
ry because including stranded costs in transmission rates 
forces transmission customers who previously used a utility's 
generation capacity to pay higher costs than new transmis-
sion customers. Disagreeing, FERC determined that requir-
ing customers receiving similar services to pay different rates 
is necessitated by Order 888's open access requirement. See 
Order 888-A, p 31,048 at 30,388-90. Cf. AGD, 824 F.2d at 
1009 ("[T]he mere fact of a rate disparity is not enough to 
constitute unlawful discrimination.") (internal quotation 
marks omitted). Moreover, FERC concluded, the application 
of cost causation principles justifies this different treatment. 
See Order 888-A, p 31,048 at 30,379, 30,388-90. Seeing noth-

ing unreasonable (let alone arbitrary or capricious) in 
FERC's policy judgment, we reject POSCR's challenge.

 Nor do we agree with POSCR's argument that stranded 
cost recovery violates the filed rate doctrine, which "forbids a 
regulated entity to charge rates for its services other than 
those properly filed with the appropriate federal regulatory 
authority." Western Resources, Inc. v. FERC, 72 F.3d 147, 
149 (D.C. Cir. 1995). In Western Resources, we held that 
FERC's assignment to current customers of costs relating to 
take-or-pay liabilities did not violate the filed rate doctrine. 
Recognizing that "a central purpose of the doctrine is to 
enable purchasers to know in advance the consequences of 
the purchasing decisions they make," we determined that the 
doctrine was satisfied where customers received "adequate 
notice of a rate in advance of the service to which it relates." 
Id. at 149-50 (internal quotation marks omitted). Order 888's 
stranded cost policy satisfies this requirement because cus-
tomers electing to purchase power generation from a source 
other than the transmitting utility from which they had 
purchased power in the past will be aware of the costs when 
making that decision.

3. FERC's Mobile-Sierra Findings

 Under the Supreme Court's Mobile-Sierra doctrine, where 
parties have negotiated a contract that sets firm prices or 
dictates a specific method of computing charges and includes 
a clause denying either party the right to change such prices 
or charges unilaterally, "FERC may abrogate or modify the 
contract only if the public interest so requires." Texaco, Inc. 
v. FERC, 148 F.3d 1091, 1095 (D.C. Cir. 1998); see also FPC 
v. Sierra Pacific Power Co., 350 U.S. 348, 353-55 (1956); 
United Gas Pipe Line Co. v. Mobile Gas Serv. Corp., 350 U.S. 
332, 344-45 (1956). We have recognized that "the 'public 
interest' that permits FERC to modify private contracts is 
different from and more exacting than the 'public interest' 
that FERC seeks to serve when it promulgates its rules." 
Texaco, 148 F.3d at 1097.

 FERC usually makes Mobile-Sierra determinations on a 
case-by-case basis. A party seeking to modify a contract 

containing a Mobile-Sierra clause petitions FERC. That 
party bears the burden of convincing FERC that the modifi-
cation is in the public interest.

 Order 888 departs from this normal case-by-case practice 
by making two generic public interest findings, one focused 
on utilities, the other on customers. These generic findings 
relieve utilities and customers of the burden of demonstrating 
in individual proceedings that the proposed modifications are 
in the public interest. As to utilities, Order 888 ruled that it 
was in the public interest to allow them to add stranded cost 
amendments to their contracts if they could demonstrate, in 
accordance with Order 888, that they had a reasonable expec-
tation of continued service. See Order 888-A, p 31,048 at 
30,394-95. This finding rested on two considerations: that 
the burden of unrecoverable stranded costs could impair 
utilities' access to capital markets, which could in turn precip-
itate the departure of other customers, thus worsening the 
utilities' financial condition and threatening its ability to 
provide reliable service; and that allowing customers to leave 
a utility without paying their share of costs would shift those 
costs to other customers who lack alternative power sources. 
See Order 888, p 31,036 at 31,811. For its second generic 
finding, FERC concluded that it was in the public interest to 
allow customers to modify their wholesale requirements con-
tracts in any way upon a showing that the terms are no 
longer just and reasonable. See Order 888-A, p 31,048 at 
30,189. Observing that the contracts in question "were en-
tered into during an era in which transmission providers 
exercised monopoly control over access to their transmission 
facilities," FERC based this finding on the unequal bargain-
ing power between utilities and customers. Id. at 30,193. 
Because "[m]any of these contracts were the result of uneven 
bargaining power between customers and monopolist trans-
mission providers," FERC reasoned, "the unprecedented 
competitive changes that have occurred (and are continuing to 
occur) in the industry may render their contracts to be no 
longer in the public interest or just and reasonable." Id.

 Challenging the first finding, POSCR argues that FERC 
lacks authority to make a generic public interest finding that 

allows for contract modification in an entire class of cases. 
POSCR insists that FERC can only proceed on a case-by-
case basis, determining in each case whether a particular 
contract modification is in the public interest. Even if FERC 
has authority to make generic findings, POSCR goes on to 
argue, FERC's Order 888 finding is unsupported by substan-
tial evidence. The investor owned utilities ("IOUs") challenge 
the second finding, arguing that allowing customers to seek 
modification of all contract terms, while limiting utilities to 
stranded cost provisions, fails adequately to balance compet-
ing interests.

a. FERC's authority to make a generic public interest find-
 ing

 POSCR correctly observes that FERC has pointed to no 
case in which a court affirmed a generic Mobile-Sierra find-
ing. At the same time, POSCR has cited no case prohibiting 
FERC from making a generic finding, nor have we found one. 
In the absence of definitive authority in either direction, and 
given the unique circumstances of this case and our tradition-
al deference to FERC's expertise, we find no fault with 
FERC's generic determination.

 The Mobile-Sierra doctrine "represents the Supreme 
Court's attempt to strike a balance between private contrac-
tual rights and the regulatory power to modify contracts 
when necessary to protect the public interest." Northeast 
Utilities Serv. Co. v. FERC, 55 F.3d 686, 689 (1st Cir. 1995). 
In Mobile, the Supreme Court recognized that intervening 
circumstances may create a situation in which contractual 
terms and conditions that were just and reasonable at the 
time the contract was executed are no longer just and reason-
able. 350 U.S. at 344-45. But concluding that a utility is not 
typically "entitled to be relieved of its improvident bargain," 
the Sierra Court required that FERC's predecessor, the 
Federal Power Commission, show more than that the con-
tract was unjust and unreasonable--the Commission had to 
find that contract modification was in the public interest. 350 
U.S. at 355.

 In most cases, intervening circumstances are unique to the 
relationship between contracting parties. See, e.g., Northeast 

Utilities, 55 F.3d 686 (affirming FERC's modification to the 
rate schedule of a contract as a condition for approval of a 
merger between two parties to the contract). But where 
intervening circumstances--in this instance, FERC-mandated 
open access transmission--affect an entire class of contracts 
in an identical manner, we find nothing in the Mobile-Sierra 
doctrine to prohibit FERC from responding with a public 
interest finding applicable to all contracts of that class. 
Moreover, in providing for stranded cost recovery, FERC has 
not relieved utilities of "improvident bargains," the concern of 
the Sierra Court; rather, it has recognized that open access 
affects all utilities in the same manner, namely, leaving them 
vulnerable to potentially unrecoverable stranded costs. In 
fact, to deny FERC authority to make generic findings in 
such a case would simply impose on it and the parties the 
repetitive burden of proving the public interest in each and 
every case.

 In sustaining FERC's generic finding, we are influenced by 
the fact that before recovering stranded costs, a utility must 
prove that it had a reasonable expectation of continued ser-
vice to a particular customer. As the IOUs invervening on 
behalf of FERC explain, the need to make this showing adds 
a particularized element to FERC's generic public interest 
finding. Viewed this way, Order 888's generic finding is more 
precisely stated as follows: It is in the public interest to allow 
utilities to recover stranded costs if they can prove that they 
had a reasonable expectation of continued service to particu-
lar customers. If a utility can demonstrate that it had a 
reasonable expectation of continued service to a particular 
customer, and incurred costs based on that expectation, then 
it would be against the public interest to require other 
customers or shareholders to bear those costs. As Order 888 
explains, "the case-by-case findings that some commenters 
seek will, in effect, be made when the Commission determines 
whether to approve a proposed stranded cost amendment to a 
particular contract." Order 888, p 31,036 at 31,813.

 We stress that generic Mobile-Sierra findings are appro-
priate only in rare circumstances. Order 888 is just such a 
circumstance. It fundamentally changes the regulatory envi-

ronment in which utilities operate, introducing meaningful 
competition into an industry that since its inception has been 
highly regulated and affecting all utilities in a similar way.

b. FERC's stranded cost public interest finding

 Having concluded that the Mobile-Sierra doctrine permits 
a generic finding in this case, we turn to POSCR's claim that 
the finding was unsupported by substantial evidence. 
POSCR faults FERC for failing to adduce evidence to sup-
port its conclusion that denying stranded cost recovery would 
put particular utilities in financial peril. POSCR also thinks 
that the impact on customers of failing to provide for strand-
ed cost recovery is insufficient to support a public interest 
finding.

 With respect to POSCR's first point, it is certainly true 
that Sierra identified impairment of "the financial ability of 
the public utility to continue its service" as one factor sup-
porting a public interest finding. Sierra, 350 U.S. at 355. 
Relying on this, POSCR challenges FERC's public interest 
finding on the ground that the record contains no individual 
assessments of the financial condition of public utilities.

 Although public interest findings made on a case-by-case 
basis necessarily evaluate the harm to the particular utility 
seeking modification, that is not true where, as here, FERC 
implements a generic change in the industry. Just as that 
change can support a generic public interest finding, that 
generic finding can be supported by generic industry-wide 
evidence. FERC has produced such evidence. The record 
contains estimates of stranded costs amounting to $200 billion 
or more. See Stranded Cost NOPR, p 32,507 at 32,866. It 
also includes comments from representatives of the financial 
community stating that "the prospect of not recovering 
stranded costs could erode a utility's ability to attract capi-
tal."

 POSCR points out that eighty-five to ninety percent of the 
estimated $200 billion of stranded costs relates to retail sales, 
not wholesale sales. True enough, but we find no basis for 
questioning FERC's conclusion that unrecovered stranded 

costs of even ten percent of $200 billion--the low end of the 
wholesale stranded cost estimate--could have serious conse-
quences for utilities. See Order 888, p 31,036 at 31,790. In 
any event, if POSCR turns out to be correct about the 
absence of a wholesale stranded cost problem, few utilities 
will avail themselves of Order 888's stranded cost recovery 
provisions.

 POSCR's second argument focuses on FERC's finding that 
"if some customers are permitted to leave their suppliers 
without paying for stranded costs, this may cause an exces-
sive burden on the remaining customers who, for whatever 
reason, cannot leave and therefore may have to bear those 
costs." Order 888, p 31,036 at 31,811. POSCR does not 
agree with FERC that the failure to recover stranded costs 
will create an "undue burden" on remaining customers. But 
disagreeing with FERC is not enough. To prevail in this 
court, POSCR must demonstrate that FERC's prediction that 
failure to recover stranded costs will create an undue burden 
on remaining customers is unsupported by substantial evi-
dence, see 16 U.S.C. s 825l(b), which is another way of saying 
it is arbitrary and capricious. See Michigan Consolidated 
Gas Co. v. FERC, 883 F.2d 117, 124 (D.C. Cir. 1989) ("[M]ak-
ing ... predictions is clearly within the Commission's exper-
tise and will be upheld if rationally based on record evi-
dence.") (internal quotation marks omitted). This POSCR 
has failed to do.

c. FERC's public interest finding regarding customers

 The IOUs mount two challenges to FERC's second public 
interest finding--that it was in the public interest to allow 
customers to seek modification of their wholesale require-
ments contracts. Unlike POSCR, the IOUs make no claim 
that the finding lacks substantial evidence; rather, they 
contend that FERC's decision to allow customers to seek 
modification of all contract terms, while limiting utilities to 
adding stranded cost provisions, fails to balance FERC's 
competing concerns: respecting existing contractual commit-
ments and accelerating the transition to competition. They 
also complain that FERC has failed adequately to explain 

why affording customers this broad ability to modify their 
contracts is in the public interest.

 FERC gave two justifications for affording customers a 
broader opportunity than utilities to modify their contracts, 
both of which seem perfectly rational to us. First, Order 
888-A explains, "these contracts were entered into during an 
era in which transmission providers exercised monopoly con-
trol over access to their transmission facilities." Order 
888-A, p 31,048 at 30,193. Also, the "unprecedented competi-
tive changes.... may affect whether such contracts continue 
to be just and reasonable or not unduly discriminatory both 
as to the direct customers of the contracts, as well as to 
indirect, third-party consumers...." Id. at 30,193-94. In 
fact, Order 888 rests on the very premise that by denying 
competitors access to their transmission lines, utilities en-
gaged in undue discrimination. Confined to purchasing pow-
er from their local utilities, customers suffered from this lack 
of access. In the natural gas restructuring, we affirmed 
FERC's decision to allow customers to seek to modify their 
sales contracts because those contracts "necessarily reflect 
the pipelines' monopoly power." AGD, 824 F.2d at 1017. 
The same reasons call for affirming FERC's decision here. 
In addition, as FERC has explained, the harm to third parties 
(i.e., customers of the wholesale requirements customers) that 
may result from adherence to uneconomical contracts further 
justifies its conclusion. See Order 888-A, p 31,048 at 30,194. 
Remedying potential unfairness to utilities by allowing them 
to seek stranded cost recovery if a customer shortens the 
term of a contract, FERC struck a balance between custom-
ers and utilities that can hardly be characterized as arbitrary 
or capricious.

4. Availability of Stranded Cost Recovery to Nonjurisdic-
 tional Utilities and G&T Cooperatives

 Section 201 of the FPA gives FERC jurisdiction over 
"public utilities" but not over federal and state utilities. 16 
U.S.C. s 824. Although FERC required utilities not subject 
to its jurisdiction ("nonjurisdictional utilities") to provide re-
ciprocal open access transmission when they use a jurisdic-

tional utility's open access tariff, it declined to provide a 
mechanism for them to recover stranded costs. Explaining 
that it promulgated its reciprocity provision pursuant to 
fairness concerns, not statutory authority, FERC reasoned 
that it lacked jurisdiction to provide stranded cost recovery 
for nonjurisdictional utilities. See Order 888-A, p 31,048 at 
30,364. FERC recommended that these utilities include 
stranded cost provisions in their open access tariffs; those 
tariffs would be reviewed not by FERC but by the appropri-
ate regulatory authority. See id.

 Dairyland petitioners contend that FERC acted arbitrarily 
and capriciously in denying nonjurisdictional utilities stranded 
cost recovery, arguing that the same "fairness" concerns 
invoked by FERC to require reciprocal open access transmis-
sion require the award of stranded costs. To be sure, FERC 
may have had authority to include stranded cost recovery as a 
provision of Dairyland's open access tariff. But Dairyland 
has offered no reason for thinking that FERC's refusal to do 
so was arbitrary and capricious. Given the limited scope of 
FERC's stranded cost provisions, its lack of jurisdiction over 
entities like Dairyland, and the ability of nonjurisdictional 
utilities to include stranded cost provisions in their open 
access tariffs, we see no reason to question FERC's judgment 
on this issue.

 The same is true with respect to the transmission-
dependent utilities ("TDUs"). Like the Dairyland petitioners, 
they claim that FERC acted arbitrarily and capriciously by 
failing to provide a mechanism for them to recover stranded 
costs. Owning few or no transmission facilities, TDUs serve 
their loads using other utilities' transmission systems. Not 
only are TDUs nonjurisdictional utilities, but, as Order 888-A 
explains, open access does not cause their costs to become 
stranded--their customers have always had an option to use 
other utilities' transmission services to purchase power. See 
Order 888-A, p 31,048 at 30,365.

 Dairyland also contends that FERC acted arbitrarily and 
capriciously when it declined to treat a generation and trans-
mission ("G&T") cooperative and its member distribution 

cooperatives as a single economic unit for stranded cost 
purposes. G&T cooperatives provide bundled wholesale pow-
er to their member distribution cooperatives, who in turn sell 
the power to the members' retail customers. Observing that 
cooperatives, unlike traditional utilities, are not vertically 
integrated but instead function as single economic units, 
Dairyland claims that G&T cooperatives have reasonable 
expectations of continued service to retail customers of their 
member cooperatives that differ substantially from the expec-
tations public utilities have with respect to retail customers of 
their wholesale customers. This difference, Dairyland ar-
gues, requires FERC to allow G&T cooperatives to recover 
stranded costs from their member cooperatives' customers.

 Rejecting Dairyland's petition for rehearing on this point, 
FERC noted that treating a G&T cooperative and its mem-
bers as a single economic unit for purposes of stranded cost 
recovery would conflict with its treatment of these same 
cooperatives as distinct entities in its reciprocity provisions. 
Order 888-A, p 31,048 at 30,366. There, FERC agreed with 
Dairyland's proposal that if a G&T cooperative seeks open 
access transmission from a public utility, "then only the G&T 
cooperative, and not its member distribution cooperatives, 
would be required to offer [reciprocal] transmission service." 
Order 888, p 31,036 at 31,763. Moreover, FERC reasoned, 
recovering from a retail customer of a member cooperative is, 
in effect, recovering from an indirect customer, a situation 
that FERC declined to include in its stranded cost rule. See 
Order 888-A, p 31,048 at 30,366.

 It is true that FERC could have treated G&T cooperatives 
and their members as single economic units for stranded cost 
purposes. But FERC's explanation of why it chose not to do 
so, particularly the fact that G&T cooperatives and their 
members were treated as distinct entities for reciprocity 
purposes, is entirely reasonable.

5. Challenges to Technical Aspects of Order 888's Stranded 
 Cost Recovery Provisions

 Several petitioners mount challenges to various technical 
aspects of the stranded cost recovery provisions. Before 

addressing these challenges, we emphasize the very limited 
scope of our review. For us to undo what FERC has done, 
petitioners must persuade us that FERC's actions were arbi-
trary or capricious. "Highly deferential," the arbitrary and 
capricious standard "presumes the validity of agency action." 
National Mining Ass'n v. Mine Safety and Health Admin., 
116 F.3d 520, 536 (1997). Where, as here, the issue before us 
"requires a high level of technical expertise, we must defer to 
the informed discretion of the responsible federal agencies." 
Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 
377 (1989) (internal quotation marks omitted). It is not 
enough for petitioners to convince us of the reasonableness of 
their views, see UDC, 88 F.3d at 1169 ("The existence of a 
second reasonable course of action does not invalidate an 
agency's determination."); those arguments should be pre-
sented to FERC, whose commissioners are appointed by the 
President and confirmed by the Senate with the expectation 
that they, not Article III courts, will make policy judgments.

 To prevail in this court, petitioners must demonstrate that 
FERC's policy judgments are arbitrary or capricious, a heavy 
burden indeed. See National Treasury Employees Union v. 
Hefler, 53 F.3d 1289, 1292 (D.C. Cir. 1995) ("The 'scope of 
review under the "arbitrary and capricious" standard is nar-
row and a court is not to substitute its judgment for that of 
the agency.' ") (quoting Motor Vehicles Mfrs. Ass'n v. State 
Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)). With this 
very deferential scope of review in mind, we turn to petition-
ers' arguments.

a. POSCR's challenges to the stranded cost formula

 Reasoning that it would be burdensome to identify each 
and every asset that would become underutilized as a result 
of Order 888, FERC adopted a "revenues lost" formula to 
determine a departing customer's stranded cost obligation. 
Order 888, p 31,036 at 31,839. For each year a utility can 
prove that it had a reasonable expectation of continued ser-
vice to a particular customer, the formula calculates the 
customer's stranded cost obligation by subtracting the com-

petitive market value of the power the customer would have 
purchased from the utility (as estimated by the utility) from 
the amount the customer would have paid had it remained a 
generation customer of the utility (based on FERC-approved 
rates that the customer paid the prior three years). Id. at 
31,839-40.

 POSCR claims that this formula gives utilities no incentive 
to mitigate their stranded costs. Not so. The formula 
automatically provides such an incentive by subtracting from 
utilities' recovery the market price of the power--utilities 
that fail to sell the power at market prices will not recover 
their full costs. POSCR also claims that the formula fails 
accurately to measure stranded costs because it is based on 
an estimate of those costs at one point in time. Responding, 
FERC explained why it rejected a "true-up" provision that 
would have made adjustments to the amount the customer 
owed to reflect market conditions over the reasonable expec-
tation period. According to FERC, such an approach would 
have created enormous uncertainty, outweighing any poten-
tial increase in accuracy. See Order 888-A, p 31,048 at 
30,427-28. POSCR has offered no basis for us to question 
this reasoning.

 POSCR's claim that the formula gives utilities an incentive 
to minimize their estimate of the market value of the power 
the customer would have purchased is similarly groundless. 
To avoid precisely this result, Order 888 gives customers an 
option to either market or broker the capacity and associated 
energy they would have purchased from their historic utility, 
effectively reducing their stranded cost obligations by the 
difference between the actual market value of the power and 
the utility's estimate of the market value. See Order 888, 
p 31,036 at 31,844. Order 888 also gives customers an option 
to substitute the price of power under the customer's contract 
with a new supplier for the utility's estimate of the market 
value. See id.

 One final point. Throughout its brief and at oral argument, 
POSCR consistently referred to stranded costs as "impru-
dently incurred costs." Although it never developed this 

argument, we think it worth noting that all costs included in 
customers' stranded cost obligations are based on FERC-
approved rates and were included in utility rate bases as 
assignable to particular customers. To us, this means that 
these costs are legitimate, prudent, and verifiable.

b. Inclusion of known and measurable costs

 The IOUs take issue with Order 888's stranded cost recov-
ery formula because the estimate of the price the customer 
would have paid for the power is based on rates for the prior 
three years; according to the IOUs, this approach fails to 
consider known and measurable costs resulting from regula-
tory mandates that may have been deferred pursuant to filed 
rate schedules and FERC-approved settlements. The costs 
they cite include deferred costs of generation that have 
already been approved for inclusion in the rate base, costs 
relating to approved qualifying facility contracts, and govern-
ment-imposed costs such as deferred taxes and nuclear de-
commissioning.

 Although it is true that the revenue calculation measures 
only current rates and not deferred costs, Order 888 allows 
customers and utilities to file for a change in the rates before 
the customer's requirements contract terminates; in such 
cases, FERC will calculate the customer's stranded cost 
obligation based on those new rates. See Order 888-A, 
p 31,048 at 30,427. While seeking to avoid detailed listings of 
specific costs that may become stranded, FERC has ade-
quately preserved utilities' ability to include known, measura-
ble costs in revenue estimates through a ratemaking proceed-
ing.

c. Treatment of energy costs in the market option

 The IOUs challenge FERC's treatment of energy costs in 
the market option. To mitigate utilities' incentives to mini-
mize their estimates of the market value of the power (the 
competitive market value estimate or "CMVE"), Order 888 
affords customers an option to buy the power stranded by 
their departure from the utility and resell it. Order 888, 
p 31,036 at 31,844. Customers would purchase generation 

capacity at the utility's estimated market value of the capacity 
and associated energy at average system variable cost. Id. at 
31,845. Thus if a customer believes that a utility is underesti-
mating the price at which it could sell the power, the custom-
er can buy the power and then resell it. While customers 
exercising this option would still have to pay their stranded 
cost obligation as calculated under the formula, they would 
effectively offset the obligation by keeping the profit on the 
resale of the power. Id. at 31,845 n.879.

 The IOUs contend that allowing customers to pay average 
variable cost for the associated energy is inconsistent with 
Order 888's definition of the CMVE, which equals the market 
value of both the generation capacity and associated energy. 
See id. at 31,839 (defining CMVE as "the utility's estimate of 
the average annual revenues ... that it can receive by selling 
the released capacity and associated energy, based on a 
market analysis performed by the utility"). Customers could 
receive a windfall, the IOUs claim, by exercising the market 
option--although they will pay average variable cost for the 
associated energy, they will be able to resell it at the presum-
ably higher market price. At the same time, utilities will be 
unable to recover the full market value of the power because 
they will be forced to sell the associated energy at cost.

 Responding to this argument in Order 888-A, FERC of-
fered two justifications for allowing customers to purchase 
the associated energy at average variable cost. First, be-
cause the capacity being marketed would not generally be 
associated with a single asset, customers exercising this op-
tion are purchasing a "slice of the system" and thus should 
pay average variable cost. Second, customers should be able 
to purchase energy at the price they currently pay, typically 
average variable cost. See Order 888-A, p 31,048 at 30,433. 
But neither explanation responds to the IOUs' argument that 
defining CMVE as the market price of both the capacity and 
associated energy is inconsistent with allowing customers 
exercising the market option to purchase associated energy at 
average variable cost. In its brief in this court, FERC 
continues to misapprehend the IOUs' argument, largely reit-

erating the same arguments and failing to address the incon-
sistency.

 The market option's stated intention is to reduce a utility's 
incentive to understate the CMVE. See Order 888, p 31,036 
at 31,842. If it did understate the CMVE, then customers 
could buy the power from the utility and resell it, keeping the 
difference. But FERC's policy of allowing customers to 
purchase the associated energy at cost gives customers an 
incentive to exercise the market option even when a utility 
has appropriately estimated CMVE because they can buy the 
energy at cost and resell it at the presumably higher market 
price. FERC's failure to explain whether it intended this 
result and if so, the justification for permitting customers to 
receive a windfall while undercompensating utilities consti-
tutes a failure of reasoned decisionmaking. See AGD, 824 
F.2d at 1030 ("We do not require that FERC reach any 
particular conclusion; we merely mandate that it reach its 
conclusion by reasoned decisionmaking."). We therefore va-
cate this portion of the orders and remand the issue to FERC 
for further consideration.

d. Rescission of notice of termination provision

 Until FERC issued Orders 888 and 889, it had required 
parties to power sales contracts to notify it sixty days prior to 
cancellation of a contract or termination of a contract by its 
own terms. See 18 C.F.R. s 35.15 (repealed by Order 888). 
Orders 888 and 889 eliminate the requirement that parties 
notify FERC in advance when a contract terminates by its 
own terms, but only with respect to contracts executed after 
July 9, 1996; in other cases of contract cancellation or 
termination, parties must still notify FERC in advance. See 
18 C.F.R. s 35.15 (1999). TDU petitioners claim that in 
rescinding the notice requirement, FERC ignored the fact 
that utilities still have substantial market power. That some 
utilities retain market power in generation, however, does not 
undermine Orders 888 and 889. Through these orders, 
FERC sought to move the electricity industry toward compe-
tition; by providing an open access mechanism through which 
buyers may purchase power from suppliers other than trans-

mitting utilities, FERC substantially reduced utilities' market 
power. Eliminating the notice requirement furthered that 
policy. Moreover, customers who believe termination of their 
contracts is unjust can seek relief from FERC pursuant to 
section 206 of the FPA. See Order 888-A, p 31,048 at 30,393.

e. Provision for benefits lost

 The TDU petitioners claim that FERC acted arbitrarily 
and capriciously by failing to provide a mechanism for cus-
tomers purchasing power at below-market rates to preserve 
those rates at the termination of their contract with their 
historic utility. Just as utilities may have expectations of 
continued service to particular customers, the TDU petition-
ers contend, customers may have reasonable expectations of 
continuing to receive wholesale requirements service from 
their historic utility at cost-based rates. Order 888-A says 
that the Commission does "not have a sufficient basis on 
which to make generic findings that customers under such 
contracts may be entitled to extend a contract at the existing 
rate." Order 888-A, p 31,048 at 30,393 (emphasis removed). 
Moreover, the order explains, "the consequences of custom-
ers' expectations as a general matter would not have the 
potential to shift significant costs to other customers," where-
as utilities' failure to recover stranded costs could potentially 
shift the costs to other customers. Id.

 We think that FERC has adequately explained why it 
chose not to provide for benefits-lost recovery in Order 888. 
Most important, FERC has not foreclosed customers in this 
situation from seeking relief: As Order 888-A explains, a 
customer may "exercise its procedural rights under section 
206 to show that the contract should be extended at the 
existing contract rate, or [ ] make such a showing in the 
context of a utility's proposed termination of a contract 
pursuant to the section 35.15 notice of termination (approval) 
requirement." Id. (footnote omitted). Given that agencies 
"enjoy[ ] broad discretion in determining how best to handle 
related, yet discrete, issues in terms of procedures ... and 
priorities," we think FERC's refusal to promulgate a generic 
rule on this issue was entirely reasonable. Mobil Oil Explo-

ration & Producing Southeast, Inc. v. United Distrib. Cos., 
498 U.S. 211, 230 (1990).

B. Retail Stranded Costs

 Recognizing state agency authority to address stranded 
costs that relate to retail power sales, Order 888 limits 
FERC's role as a forum for the recovery of these costs to two 
situations: when customers take advantage of state-ordered 
wheeling to reach new power suppliers and when former 
retail customers become wholesale customers through what is 
known as municipalization or municipal annexation. See Or-
der 888-A, p 31,048 at 30,402, 30,410. In the former scenario, 
FERC will consider proposals for the recovery of stranded 
costs only when the appropriate state regulatory commission 
lacks authority to do so; in the latter situation, FERC will 
serve as the primary forum for resolution of stranded cost 
claims.

1. Stranded Costs Arising from Retail Wheeling

 Stranded costs may result from state unbundling of retail 
sales, where retail customers take advantage of state-ordered 
retail wheeling to reach new generation suppliers. See Order 
888, p 31,036 at 31,819. Observing that both FERC and the 
states have authority to address these stranded costs, Order 
888 explains that:

 [B]ecause it is a state decision to permit or require the 
 retail wheeling that causes retail stranded costs to occur, 
 we will leave it to state regulatory authorities to deal 
 with any stranded costs occasioned by retail wheeling. 
 The only circumstance in which we will entertain re-
 quests to recover stranded costs caused by retail wheel-
 ing is when the state regulatory authority does not have 
 authority under state law to address stranded costs when 
 the retail wheeling is required.
 
Order 888, p 31,036 at 31,824-25 (footnote omitted). FERC 
will provide for recovery of those stranded costs through the 
transmission rate the former supplying utility charges the 
departing customer. Order 888-A, p 31,048 at 30,410. (As 
discussed in Section III supra, FERC has jurisdiction over 

the transmission component of unbundled retail sales.) In 
evaluating claims for stranded cost recovery, FERC will use 
the same standards as it applies with respect to wholesale 
stranded costs (i.e., it will require utilities to demonstrate a 
reasonable expectation of continued service). See Order 888, 
p 31,036 at 31,819 n.722.

 Two sets of petitioners challenge FERC's retail stranded 
cost recovery provisions from opposite sides. The States and 
POSCR contend that FERC exceeded its jurisdiction by 
asserting rate authority over retail stranded costs. The 
IOUs argue that FERC abdicated its statutory authority by 
failing to agree to consider all proposals for recovery of 
stranded costs that arise from retail wheeling. Because we 
think FERC has appropriately exercised its jurisdiction, we 
reject both claims.

a. FERC's jurisdiction over retail stranded costs

 The States' and POSCR's arguments boil down to the 
following: Because retail stranded costs relate primarily to 
facilities used for retail generation, and because section 201(b) 
of the FPA explicitly excludes these facilities from FERC's 
jurisdiction, FERC may not provide for recovery of these 
costs in FERC-jurisdictional rates. Unbundling electricity 
sales, they argue, cannot alter the jurisdictional status of 
these costs.

 As an initial matter, we agree with FERC that petitioners 
confuse costs and rates. Rates are jurisdictional; costs are 
not. As Order 888-A explains:

 [T]here are rarely separate retail and wholesale generat-
 ing facilities. Retail customers and wholesale require-
 ments customers get energy from the same facilities, 
 each buying a "slice of the system." Typically all gener-
 ating assets go into both the retail and the wholesale rate 
 bases for determining retail and wholesale rates. Rates 
 are determined by allocating the total generating costs 
 among customer classes. The parties confuse the issue 
 before us to the extent they suggest that state commis-
 sions, not this Commission, have "jurisdiction" over cer-
 
 tain "costs." Neither the state commissions nor this 
 Commission has exclusive jurisdiction over "costs." 
 Each regulatory authority has jurisdiction to determine 
 "rates" for services subject to its jurisdiction and, in 
 determining rates, may take into account all of the costs 
 incurred by the utility.
 
Order 888-A, p 31,048 at 30,414. In other words, as FERC 
explained in its brief, "regulatory authorities do not carve out 
so-called 'wholesale costs' that only FERC can take into 
account in determining rates subject to its jurisdiction or so-
called 'retail costs' that only a state commission can take into 
account in determining rates subject to state jurisdiction." 
Instead, "[u]nder historical cost-of-service ratemaking, each 
regulatory authority, in exercising its respective ratemaking 
jurisdiction, reviews the total costs incurred by a utility to 
provide service and makes its separate and independent 
determination of what costs may be recovered through rates 
within its jurisdiction." Order 888-A, p 31,048 at 30,414.

 Thus, while petitioners correctly point out that section 
201(b) of the FPA denies FERC jurisdiction over "facilities 
used for the generation of electric energy," that provision 
does not necessarily prevent FERC from including costs 
relating to generating facilities in transmission rates, over 
which FERC indisputably has jurisdiction. 16 U.S.C. 
s 824(b). This is so because this part of section 201(b) is 
modified by the phrase "except as specifically provided in this 
subchapter and subchapter III of this chapter." Id. Given 
that section 201(a) grants FERC jurisdiction over "the trans-
mission of electric energy in interstate commerce" and, there-
fore, over transmission rates, 16 U.S.C. s 824(a), FERC may 
exercise jurisdiction over generation facilities to the extent 
necessary to regulate interstate transmission.

 This is exactly the construction that we gave section 201(b) 
in Mississippi Industries v. FERC, 808 F.2d 1525, 1543-45 
(D.C. Cir. 1987) (subsequent history omitted). There, peti-
tioners challenged FERC's authority to reallocate costs relat-
ing to generation facilities among utilities that were parties to 
a power sales agreement. Justifying its authority to reallo-

cate such costs, FERC relied on its "undisputed jurisdiction 
over interstate sales of electric energy at wholesale." Id. at 
1543. We agreed: "[A]lthough allocating cost does, to some 
extent, result in the 'regulation of matters relating to genera-
tion,' such regulation is valid under the FPA when it is the 
byproduct of a legitimate exercise of FERC's power to regu-
late wholesale rates." Id. In reaching this conclusion, we 
rejected petitioners' argument that "the statutory prohibition 
of federal regulation of [generation] facilities in section 201(b) 
becomes meaningless if FERC is permitted to allocate the 
costs of a plant," given FERC's undisputed responsibility to 
regulate the wholesale sale of power. Id. at 1543-44. Under 
Mississippi Industries, then, FERC may regulate costs relat-
ing to generation facilities if such regulation "is the byproduct 
of a legitimate exercise of FERC's power to" regulate inter-
state transmission. Id. at 1543. Because FERC indisputably 
has jurisdiction over transmission rates, Mississippi Indus-
tries also disposes of petitioners' argument that FERC's 
retail stranded cost recovery provisions run afoul of section 
201(a) of the FPA, which provides that "Federal regulation 
[shall] extend only to those matters which are not subject to 
regulation by the States." 16 U.S.C. s 824(a).

 Attempting to distinguish Mississippi Industries, petition-
ers point out that the case "involved authority to allocate 
generation costs to a wholesale sales rate (which may, of 
course, include generation costs)." True, but Mississippi 
Industries provides clear authority for the proposition that 
there is no per se jurisdictional bar to FERC's including 
generation costs in jurisdictional rates, whether wholesale 
sales rates or transmission rates. Thus narrowed, the ques-
tion before us is this: Is inclusion of stranded costs relating 
to generation facilities in transmission rates the byproduct of 
a legitimate exercise of FERC's authority over transmission 
rates? In most cases the answer would be no, but given the 
highly unusual circumstances of this case, we think the an-
swer is yes. Just as FERC may include generation-related 
wholesale stranded costs in transmission rates (see Section 
V.A.1.b), it may include generation-related retail stranded 
costs in transmission rates. That retail stranded costs were 

originally reflected in state-jurisdictional retail sales rates 
does not change the analysis, for in both cases the stranded 
costs can be viewed as "costs" of providing transmission 
services: "While such costs are not a cost of operating the 
physical transmission system, nevertheless, they are an eco-
nomic cost incurred as a result of being required to provide 
retail transmission." Order 888-A, p 31,048 at 30,414 n.708. 
While we agree that generation-related retail costs are not 
typically "costs" relating to transmission services, the funda-
mental changes wrought by state-ordered retail wheeling, as 
well as the narrow circumstances in which FERC will consid-
er stranded cost recovery claims, justify the conclusion that 
these costs are costs of providing transmission service.

 Petitioners claim that by agreeing to consider retail strand-
ed cost recovery claims, FERC has unduly interfered with 
state legislative processes and decisions. We disagree. 
FERC has limited its "interference" to instances where state 
commissions have no authority even to address stranded cost 
recovery claims. Describing its role as limited to "fill[ing] 
any regulatory gap," FERC made it clear that it will deny 
consideration to any utility seeking stranded cost recovery "if 
a state regulatory authority with authority to address retail 
wheeling stranded costs has in fact addressed such costs, 
regardless of whether the state regulatory authority has 
allowed full recovery, partial recovery, or no recovery." Or-
der 888-A, p 31,048 at 30,415. Under these circumstances, it 
can hardly be said that FERC has usurped state authority.

b. FERC's refusal to assert jurisdiction over all retail 
 stranded costs

 Contending that FERC did not go far enough, the IOUs 
challenge the agency's refusal to consider claims for stranded 
costs resulting from state-ordered retail wheeling unless the 
relevant state regulatory commission lacks authority to ad-
dress such claims. They claim that FERC should have 
agreed to consider proposals for retail stranded cost recovery 
whether or not the state commission had authority to address 
the claim, and even whether or not a state commission with 
such authority had already addressed the claim. In support 

of their position, the IOUs advance three related arguments. 
They allege first that by concluding that it had jurisdiction 
over retail stranded costs but declining to exercise it, FERC 
abdicated its legal authority. Second, they say, FERC violat-
ed its statutory obligation to ensure just and reasonable 
rates. And finally, they contend that FERC erred in con-
cluding that stranded costs resulting from retail wheeling lack 
a direct nexus to the open access transmission ordered in 
Order 888.

 With respect to their first argument, the IOUs claim that 
once FERC determined that it had jurisdiction over retail 
stranded costs, the agency had to exercise that jurisdiction. 
In making this argument, the IOUs make the same mistake 
POSCR made: They confuse FERC jurisdiction over costs 
with its jurisdiction over rates. FERC has not "concluded 
that it shares jurisdiction over retail stranded costs with the 
states," as the IOUs assert. As we explained above, "costs" 
are not jurisdictional. The FPA speaks not in terms of 
"costs," but in terms of "rates," requiring FERC to ensure 
that rates are just, reasonable, and not unduly discriminatory. 
FERC indisputably has jurisdiction over interstate transmis-
sion rates. In essence, then, the IOUs claim that FERC has 
no discretion to leave retail stranded cost recovery to state 
authorities.

 We review claims that an agency lacks discretion to follow 
(or decline to follow) a certain course of action by examining 
the agency's governing statute as well as its own regulations. 
See, e.g., National Wildlife Federation v. Browner, 127 F.3d 
1126, 1130 (D.C. Cir. 1997) (concluding that agency regula-
tions do not require EPA to review and approve or disap-
prove a state's decision to maintain existing water quality 
standards); NRDC v. EPA, 25 F.3d 1063, 1069-70 (D.C. Cir. 
1994) (holding that neither the governing statute nor relevant 
regulations impose a mandatory duty on EPA to list all 
wastes that exhibit a hazardous characteristic; statute gives 
EPA "substantial room to exercise its expertise in determin-
ing the appropriate grounds for listing"). The IOUs have 
failed to point to any statutory provision that robs FERC of 
discretion to decide, as a matter of policy, that state regulato-

ry commissions should serve as the primary forum for retail 
stranded cost recovery. Our own examination of the FPA 
reveals no such provision either. Sections of the statute 
giving FERC jurisdiction over transmission in interstate com-
merce, 16 U.S.C. s 824(a), and requiring FERC to ensure 
that rates are just and reasonable, 16 U.S.C. s 824d(a), do 
not alone create a mandatory duty to consider proposals for 
retail stranded cost recovery.

 The two Supreme Court cases the IOUs rely on provide no 
support for their position, for in both cases the agencies, 
unlike FERC in this case, failed to comply with a specific 
statutory mandate. In MCI v. AT&T, 512 U.S. 218 (1994), 
the Supreme Court held that the FCC could not exempt 
certain communication common carriers from filing a tariff; 
the statute specified that all carriers must file tariffs. Simi-
larly, in FPC v. Texaco, Inc., 417 U.S. 380 (1974), the Su-
preme Court determined that the FPC could not exempt 
certain producers from the statute's requirement that rates 
be just and reasonable. Under these cases, FERC would 
abdicate its statutory obligations if it, for example, exempted 
certain utilities from the requirement that rates be just and 
reasonable (as in Texaco), or if it refused to review transmis-
sion rate filings altogether. These cases do not hold that in 
carrying out its statutory obligations, FERC has no discretion 
to determine as a matter of policy that states are better 
positioned to address costs originally included in retail rate 
bases. What the IOUs suggest--that because FERC has 
authority to address retail stranded costs through transmis-
sion rates, it must exercise that authority--is simply not the 
law.

 As an alternative to their legal argument, the IOUs claim 
that FERC acted arbitrarily and capriciously in determining 
that just and reasonable transmission rates include retail 
stranded cost recovery in some circumstances but not in 
others. Their argument goes like this: Section 201(b)(1) of 
the FPA gives FERC exclusive jurisdiction over transmission 
of electric energy in interstate commerce. Under section 205, 
FERC must set just and reasonable rates. In addition, 
sections 205 and 206 prohibit undue discrimination. Thus, 

the IOUs argue, "[b]y approving different transmission rates, 
some including stranded cost recovery (e.g., municipalization), 
and others without (e.g., retail wheeling or bypass), FERC is 
sanctioning arbitrary and capricious differences in violation of 
the FPA."

 In making this argument, the IOUs ignore the wide discre-
tion the FPA affords FERC to determine what constitute 
"just and reasonable rates" and "undue discrimination," as 
well as the unusual circumstances created by an industry 
change as fundamental as Order 888's open access require-
ment. Just because some transmission rates include retail 
stranded costs while others do not does not alone make Order 
888 arbitrary and capricious; rather, petitioners must show 
that there is no reason for the difference. Cf. AGD, 824 F.2d 
at 1009 ("[T]he mere fact of a rate disparity is not enough to 
constitute unlawful discrimination.") (internal quotation 
marks omitted). We think FERC has provided a convincing 
explanation for the difference. "Recovery of this type of cost 
through a transmission rate is obviously not the norm," 
explains Order 888-A, "but is necessitated by the need to deal 
with the transition costs associated with this Rule." Order 
888-A, p 31,048 at 30,418. Only in situations where state 
regulatory commissions lack authority to award stranded 
costs will FERC include these costs in transmission rates. 
Otherwise, customers would be able to avoid their stranded 
cost obligations, leaving utility shareholders or remaining 
customers to bear the costs.

 The IOUs' reliance on the natural gas restructuring cases 
is misplaced. Setting aside the extraordinary nature of take-
or-pay liabilities as compared to the stranded costs at issue 
here, AGD required only that FERC address the take-or-pay 
liabilities that the pipelines had incurred. See AGD, 824 F.2d 
at 1030 ("We do not require that FERC reach any particular 
conclusion; we merely mandate that it reach its conclusion by 
reasoned decisionmaking."). That is exactly what Order 888 
does with respect to stranded costs. While FERC has not 
agreed to serve as the forum for recovery of these costs in all 
situations, neither the FPA nor the natural gas cases requires 
it to do so. By ensuring that utilities have a forum in which 

to bring claims for retail stranded cost recovery, FERC has 
done just what AGD requires.

 Nor do we find merit in the IOUs' argument that FERC 
erred in concluding that stranded costs resulting from retail 
wheeling lack a direct nexus to the open access transmission 
mandated by Order 888. FERC's decision that state regula-
tory commissions should address retail stranded costs rested 
on its conclusion that state-ordered wheeling, not FERC-
mandated open access transmission, causes those costs to 
become stranded. See Order 888-A, p 31,048 at 30,410. 
Recognizing a "limited" nexus between retail stranded costs 
and FERC-mandated open access stemming from FERC's 
jurisdiction over transmission rates and the resulting authori-
ty to award stranded costs, FERC nonetheless found no 
causal nexus between stranded costs and FERC-ordered 
transmission. Id. at 30,419. The lack of a direct causal 
nexus differentiates retail stranded costs from retail-turned-
wholesale stranded costs (see infra Section V.B.2).

 Taking issue with this reasoning, the IOUs contend that 
FERC ignored "the central role played by the federal govern-
ment" in shaping the electric energy industry. Because retail 
wheeling, according to the IOUs, is "a direct result of a 
federally created system of increased competition," FERC 
must take responsibility for all retail stranded costs.

 Nowhere does FERC contest the nexus between state-
ordered wheeling and Order 888's open access requirement. 
But the existence of a nexus does not require FERC to 
address retail stranded costs in light of the fact that in most 
instances state regulatory commissions will have authority to 
do so. Indeed, because the costs were originally included in 
retail rate bases, state agencies are better positioned to 
consider them. Given that it is state-ordered wheeling that 
most directly causes retail costs to become stranded, we find 
no reason to disturb FERC's judgment.

2. Stranded Costs Relating to Retail-Turned-Wholesale 
 Customers

 FERC concluded that open access transmission may en-
courage what is known as "municipalization," where a town 

condemns a utility's distribution plant, becomes a wholesale 
customer of the utility, and utilizes open access transmission 
to purchase power on the competitive market. Concluding 
that costs incurred to serve former retail customers may 
become stranded due to the municipality's (the new wholesal-
er's) utilization of open access transmission, FERC decided to 
serve as the primary forum for resolution of stranded costs 
claims relating to new municipalizations. See Order 888-A, 
p 31,048 at 30,402. FERC also decided to serve as the 
primary forum "in a discrete set of municipal annexation 
cases"--i.e., cases involving "existing municipal utilities that 
annex retail customer service territories and, through the 
availability of Commission-required transmission access, use 
the transmission system of the annexed customers' former 
supplier to access new suppliers to serve the annexed load." 
Order 888-B, p 61,248 at 62,102. In such cases, FERC will 
determine on a case-by-case basis whether there exists the 
requisite nexus between municipal annexation and open ac-
cess transmission. Recognizing that state regulatory authori-
ties may be the first to address claims for stranded cost 
recovery in the retail-turned-wholesale scenario (FERC's la-
bel for new municipalizations and municipal annexations), 
FERC stated that it "will take into account state findings on 
cost determinations ... and will give great weight in [its] 
proceedings to a state's view of what might be recoverable." 
Id. at 62,105 (internal quotation marks omitted).

 This issue provoked the only dissents to Order 888. Al-
though neither dissenting commissioner disputed FERC's 
jurisdiction to allow recovery of these stranded costs, both 
faulted FERC for second-guessing state authorities regarding 
stranded costs. They thought that FERC should have acted 
as the forum for adjudicating these stranded cost issues only 
when state authorities failed to act altogether. See Order 
888, p 31,036 at 31,904-07 (Commissioner Hoecker concurring 
in part and dissenting in part); id. at 31,907 (Commissioner 
Massey dissenting in part).

 Unlike the dissenters, both the States and POSCR chal-
lenge FERC's assertion of jurisdiction. According to the 

States, FERC usurped their role as protectors of retail 
customers by potentially undermining their rate treatment of 
retail costs. POSCR makes three arguments. Advancing 
claims similar to its arguments about stranded costs resulting 
from state-ordered retail wheeling (see Section V.B.1.a su-
pra), POSCR first contends, relying again on section 201(b), 
that FERC lacks jurisdiction to award retail stranded costs in 
the retail-turned-wholesale scenario. Second, it claims, 
FERC failed to weigh properly the adverse effects of Order 
888 on franchise competition between utilities and municipali-
ties. Finally, relying on the Hoecker and Massey dissents, 
POSCR argues that FERC acted arbitrarily and capriciously 
by declaring itself to be the primary forum for retail-turned-
wholesale stranded cost claims. For their part, the IOUs 
fault FERC's failure to consider claims for recovery in the so-
called "bypass" scenario. We address these arguments in 
turn.

 The States begin their argument by asserting that "[w]hen 
retail utility customers leave the utility's system because of 
municipalization, the costs stranded by the customers' migra-
tion normally are not allocable ... to whatever wholesale 
utility service might be sold to the city for resale." While 
this may have been true in the past, the States' argument 
ignores FERC's conclusion that it is open access transmission 
that makes municipalization feasible. Because FERC has 
determined that it will consider proposals for stranded cost 
recovery only when there is a direct nexus between munici-
palization and open access transmission, we see no basis for 
the States' claim that FERC will "override Congress's in-
struction that the states be permitted to protect retail cus-
tomers."

 The answer to POSCR's first argument--that section 
201(b) precludes FERC from awarding stranded costs in the 
retail-turned-wholesale context--appears in our discussion of 
FERC's jurisdiction to address retail stranded costs resulting 
from state-ordered retail wheeling. See Section V.B.1.a su-
pra. Because a town becomes a wholesale customer of the 
historic supplying utility when it municipalizes, FERC's ex-
clusive jurisdiction over all aspects of wholesale sales gives 

FERC all the authority it needs to include generation-related 
costs in rates, including even costs originally incurred to 
provide retail service. We find no reason to question FERC's 
decision to allocate stranded costs caused by retail-turned-
wholesale customers to the cost of providing wholesale service 
subject to its jurisdiction. As in the retail wheeling context, 
these stranded costs are properly viewed as "costs" of the 
former supplying utility's provision of open access transmis-
sion service. With respect to new municipalizations, the 
retail-turned-wholesale customer is able to reach a new gen-
eration supplier only because of open access transmission. 
And with respect to municipal annexations, FERC will re-
quire utilities to demonstrate a nexus between the annexation 
and open access transmission.

 POSCR's second argument relates to what is known as 
"franchise competition." According to POSCR, franchise 
competition occurs "when a privately-owned utility is threat-
ened by the prospect that a municipality may exercise powers 
of eminent domain to take over the utility's operations." 
POSCR argues that stranded cost recovery could impede 
franchise competition, which it says FERC has always en-
couraged. Although this might well be true, the possibility 
that potential stranded cost liability could deter municipalities 
from taking advantage of open access does not undermine 
Order 888. As Order 888-A explains, "the purpose of the 
stranded cost policy is neither to encourage nor to discourage 
municipalization, but rather to facilitate a fair transition to 
competition and to ensure stability in the industry during that 
transition." Order 888-A, p 31,048 at 30,405.

 We turn finally to POSCR's claim that FERC acted arbi-
trarily and capriciously by declaring itself the primary forum 
for recovery of retail-turned-wholesale stranded costs. As-
serting that FERC's action implicitly undermines state deci-
sionmaking and encourages forum shopping, POSCR claims 
that Order 888's treatment of the retail-turned-wholesale 
scenario contravenes agency precedent and conflicts with the 
agency's decision to leave to the states the consideration of 
those stranded costs resulting from state-ordered wheeling.

 While FERC did leave resolution of claims for wholesale-
turned-retail stranded costs to the states in United Illumi-
nating Co., 63 FERC p 61,212 (1993), a pre-Order 888 case 
addressing a particular utility's application for stranded cost 
recovery, Order 888-A explains that, after reanalyzing the 
stranded cost problem, FERC concluded that "where such 
costs are stranded as a direct result of Commission-mandated 
wholesale transmission access, these costs should be viewed 
as costs of the transition to competitive wholesale bulk power 
markets and this Commission should be the primary forum 
for addressing their recovery." Order 888-A, p 31,048 at 
30,407. In our view, this explanation adequately distin-
guishes between recovery of stranded costs from retail cus-
tomers and recovery from retail-turned-wholesale customers. 
In the former situation customers remain retail customers 
subject to state jurisdiction; in the latter situation, customers 
become wholesale customers subject to FERC's exclusive 
jurisdiction. This very different result justifies FERC's dif-
ferent treatment of the two situations.

 The IOUs argue that FERC should have provided for 
stranded cost recovery from a retail-turned-wholesale custom-
er who ceases to purchase power from a utility but does not 
use that utility's transmission service to reach another power 
supplier--the so-called "bypass" scenario. This argument 
requires little discussion. In declining to provide a mecha-
nism for the recovery of bypass stranded costs, FERC ex-
plained that "Order No. 888 does not by its terms bar the 
recovery of costs that do not result from the use of Commis-
sion-required transmission access. Utilities may, as before, 
seek recovery of such non-open-access-related costs on a 
case-by-case basis in individual rate proceedings. The Com-
mission will not prejudge those issues here." Id. at 30,409. 
Given FERC's discretion to proceed through adjudication 
rather than by generic rule, see SEC v. Chenery Corp., 332 
U.S. 194, 201-03 (1947), the IOUs' challenge is without merit.

 * * *

 As evidenced by the numerous petitions for review, FERC 
faced an enormously difficult task in fashioning a stranded 

cost recovery mechanism that fairly compensates utilities for 
past investments while transitioning the electricity industry 
to competition. FERC has done an admirable job. Produc-
ing a comprehensive, evenhanded record and carefully consid-
ering all commenters' claims, it adopted a stranded cost 
recovery policy that accomplishes its stated objectives, com-
plies with the FPA, conforms to our case law, and reasonably 
accommodates all competing interests. No doubt, there were 
alternative approaches to stranded cost recovery--petitioners 
have pointed to several. No doubt some aspects of Order 888 
could have been better supported. But given the extremely 
technical nature of these issues, as well as our highly deferen-
tial standard of review, we find no basis for questioning 
FERC's approach. Although Order 888 may be character-
ized in many ways, it can hardly be said to be either arbitrary 
or capricious.

 VI. Credits for Customer-Owned Facilities 
 and Behind-The-Meter Generation

 The Commission's Open Access Tariff requires that public 
utilities--or "transmission providers"--offer "network inte-
gration transmission service." This requirement is one of the 
key elements in the Commission's attempt to "remove impedi-
ments to competition in the wholesale bulk power market-
place," Order 888, p 31,036 at 31,634. Network service allows 
a customer--for instance, a municipal utility--to use a trans-
mission system in a manner comparable to the way the 
transmission provider utilizes its system to move power from 
its generators to its native load customers.11 See Order 888, 

__________
 11 "Load" may be defined as "[t]he total demand for service on a 
utility system at any given time." Public Utilities Reports Glos-
sary for Utility Management 84 (1992); see also Carl Pechman, 
Regulating Power: the Economics of Electricity in the Informa-
tion Age 11 (1993). The Tariff defines "native load customers" as 
the "wholesale and retail power customers of the Transmission 
Provider on whose behalf the Transmission Provider, by statute, 
franchise, regulatory requirement, or contract, has undertaken an 
obligation to construct and operate the Transmission Provider's 

p 31,036 at 31,736; id. at 31,751; Order 888-A, p 31,048 at 
30,260 n.247; id. at 30,325.12 With network service, resources 
located throughout the system serve loads dispersed through-
out the system. For this, the transmission provider incorpo-
rates the network customer's resources and loads (projected 
over a minimum ten-year period) into its own long term 
planning. Because network service ultimately provides the 
customer with the same full system ability for transmitting 
power as the transmission owner, the Commission required 
that costs be allocated on the basis of a ratio of the network 
customer's load to the transmission provider's entire load on 
its transmission system. A group of petitioners, led by 
Florida Municipal Power Agency (FMPA), challenge the 
Commission's use of this "load-ratio pricing."

 The FMPA petitioners do not object to load-ratio pricing as 
such. In fact they think it "is a good method to allocate the 
costs of a transmission network among network owners or 
users," Brief of Credits for Customer-Owned Facilities, etc., 
at 3-4 ("Credits Brief"). Their principal complaint, repeated 
many times and in many ways throughout their briefs, stems 
from their view that as a practical matter the Commission 
required that the network customer's total load be used in 
calculating the ratio,13 even though some customers "sell 
power from local, 'behind the meter' generation and transmis-
sion, or ... obtain power from more than one transmission 
system...." Id. at 8.14 The FMPA petitioners say this 

__________
system to meet the reliable electric needs of such customers." 
Order 888-A, p 31,048 at 30,508.

 12 Public utilities must also offer point-to-point service, that is, 
transmission service reserved and/or scheduled between specified 
points of receipt and delivery. Order 888-A, p 31,048 at 30,508.

 13 The Commission did not actually require a customer to desig-
nate its total load to obtain network service: a customer may 
exclude all--not merely part--of its load at a discrete delivery 
point. See Order 888-A, p 31,048 at 30,256-62.

 14 "Behind the meter generation [and transmission] means gener-
ation [or transmission] located on the customer's side of the point of 
delivery." Order 888-A, p 31,048 at 30,254 n.230.

allows "transmission providers to charge wholesale customers 
for network transmission that they do not want, need or use 
to provide electric power service to their customers." Id. at 
18.

 The Commission provided some relief in response to these 
complaints, but not enough to satisfy the FMPA petitioners. 
"Because of the diverse concerns raised by the commenters," 
the Commission wrote in the preamble to Order No. 888, "we 
are unable to resolve on the basis of this record the extent to 
which, or under what circumstances, cost credits related to 
customer-owned facilities would be appropriate under an 
open-access transmission tariff." Order 888, p 31,036 at 
31,742. Rather, this will be done on a case-by-case basis. 
The Commission warned, however, that mere interconnection 
between a customer's facilities and the transmission provid-
er's facilities will not be sufficient to warrant a cost credit. 
Relying on Florida Municipal Power Agency v. Florida 
Power & Light Co., 67 F.E.R.C. p 61,167 (1994) (FMPA I), 
modified, 74 F.E.R.C. p 61,006 (1996) (FMPA II), the Com-
mission required the customer to demonstrate that its "trans-
mission facilities are integrated with the transmission system 
of the transmission provider" and "provide additional benefits 
to the transmission grid in terms of capability and reliability, 
and [are] relied upon for the coordinated operation of the 
grid." Order 888, p 31,036 at 31,742; Order 888-A, p 31,048 
at 30,271. The Commission did, however, guarantee credits 
for new, integrated transmission facilities built by a customer 
if jointly planned with the transmission provider.

 We detect nothing in the arguments of the FMPA petition-
ers to warrant setting aside this aspect of the Commission's 
rule. It is true that as the owners of generation and trans-
mission facilities, any one of these petitioners can satisfy 
some of its needs. But network service, as the Commission 
defined it, means that network customers can call upon the 
transmission provider to supply not just some, but all of their 
load at any given moment, when for instance they experience 
blackouts or brownouts. The Commission decided that if a 
customer does not desire such full network service for its 
entire load, it may exclude loads at discrete delivery points 

and purchase point-to-point service instead. What it cannot 
do is split loads at delivery points. The FMPA petitioners 
object to the Commission's refusal to allow a split system, but 
their objection is not well-taken. They ignore the technical 
problems with a split system, stemming partly from the 
manner in which electrons flow and the impossibility of 
isolating loads from the transmission provider's system. See 
FPC v. Florida Power & Light, 404 U.S. 453 (1972). Fur-
thermore, "such a split system creates the potential for a 
customer to 'game the system' thereby evading some or all of 
its load-ratio cost responsibility for network services." Order 
888-A, p 31,048 at 30,259.15 The FMPA petitioners label this 
prospect a "fiction," but offer neither evidence nor reasoning 
to counter the Commission's expert judgment.16

 As to credits, these petitioners maintain that if the Com-
mission is going to use total "load-ratio pricing with Network 
Load defined as total customer load, simultaneous credits are 
required." Credits Brief at 41. What they mean by credits 
is reduced prices for any and all behind-the-meter facilities 
they own. The Commission's rejection of this blanket ap-
proach is well-supported. Credit may be given, but not 
automatically. The question can only be determined on a 
case-by-case basis because it depends on whether the custom-
er's facilities are truly integrated with the transmission sys-
tem, rather than merely interconnected. Only if they are 

__________
 15 Load-ratio cost responsibility is based on the customer's contri-
bution to the transmission system peak each month. With a split 
system a customer could, at the time of the monthly system peak, 
increase its behind-the-meter generation in order to decrease its 
load-ratio cost responsibility, while making significant use of the 
transmission system throughout the rest of the month. See Order 
888-A, p 31,048 at 30,259 & nn.244 & 245.

 16 Petitioners claim that Florida Power Co., 81 F.E. R. C. p 61,247 
(1997), decided after Order No. 888, shows that it is not "necessary 
for customers to purchase amounts of network transmission equal 
to their entire load behind a delivery point." Credits Brief at 30. 
It shows no such thing. The case involved not network integration 
transmission service, but a sort of hybrid service called "network 
contract demand transmission service."

integrated will the transmission system benefit and only then, 
the Commission decided, should credits--which shift the costs 
of the customer's facilities to the transmission provider's 
customers--be allowed. Order 888-A, p 31,048 at 30,271. 
Petitioners call the Commission's rule in this regard "an 
unexplained and inexplicable retreat from FMPA v. FPL." 
Credits Brief at 42. It is nothing of the sort. The Commis-
sion made this abundantly clear. In FMPA I the Commis-
sion said that "if [a customer] has transmission facilities that 
will operate as part of the integrated transmission system, a 
credit would be reasonable." 67 F.E.R.C. at 61,482 n.76. 
And in FMPA II the Commission said that mere interconnec-
tion does not equal integration and that integration must be 
determined case by case. 74 F.E.R.C. at 61,010. This is 
completely consistent with the Commission's resolution of the 
credits issue in the proceedings before us.

 The FMPA petitioners' next objection deals with new cus-
tomer facilities--that is, those built after network service 
begins under the Tariff. The Commission determined that 
"the Network customer shall receive a credit where such 
facilities are jointly planned and installed in coordination with 
the Transmission Provider." Order 888-A, p 31,048 at 
30,534. Petitioners begin by reading this as some sort of 
"limitation," they expand it into a "condition precedent for 
customers to receive credit for new facilities," and they end 
by treating it as a bar to "credits for new customer-facilities 
unless they are jointly planned," Credits Brief at 43, 44, 45. 
Commission counsel rightly points out that petitioners have 
completely misread the rule: "simply put, the Rule does not 
speak to the situation of new facilities built outside a joint 
planning effort." Commission Brief at 104. The Commission 
did determine that a joint planning mandate was "beyond the 
scope of this proceeding," Order 888-A, p 1,048 at 30,311. 
Using their mistaken premise, petitioners insist that the 
Commission acted arbitrarily in this regard, giving transmis-
sion providers the power to block all customer credits for new 
facilities. See Credits Brief at 45. Since their premise is 
mistaken, their conclusion must be rejected. The balance of 

the FMPA petitioners' arguments have been considered and 
rejected.

 VII. Liability, Interface Allocation, and Discounting

 As part of Order 888, FERC adopted a pro forma Open 
Access Transmission Tariff (OATT), containing minimum 
terms and conditions for non-discriminatory service, which 
every transmission-owning public utility must file with the 
Commission and by which it must abide in providing trans-
mission services to itself and others. Various petitioners 
have challenged isolated provisions of the OATT--specifically 
the provisions governing liability and indemnification, inter-
face allocation, and delivery-point specific discounting. We 
reject each of these challenges.

A. Liability and Indemnification

 Prior to unbundling, retail tariffs were primarily a matter 
for state regulation, and most states had approved tariff 
provisions permitting utilities to limit their liability for service 
interruptions to instances of gross negligence or willful mis-
conduct. Courts upheld these limitations on the public policy 
grounds that they balanced lower rates for all customers 
against the burden of limited recovery for some, and that the 
technological complexity of modern utility systems and result-
ing potential for service failures unrelated to human errors 
justified liability limitations. In the past, FERC also has 
allowed electric utility tariffs to explicitly limit a utility's 
liability for service interruptions to instances of gross negli-
gence or willful misconduct.

 One of the pro forma tariffs included in the Notice of 
Proposed Rulemaking contained a provision explicitly limiting 
the liability of transmission providers to circumstances of 
gross negligence or intentional wrongdoing. See Open Access 
NOPR, p 32,514 at App. C s 15.0. Section 10.2 of the OATT 
requires the transmission customer to "at all times indemnify, 
defend, and save the Transmission Provider harmless from, 
any and all damages ... except in cases of negligence or 
intentional wrongdoing by the Transmission Provider." Or-
der 888, p 31,036 at 31,936-37 (emphasis added). In Order 

888, FERC justified the change with a single statement: "We 
find that this new indemnification provision would be too 
strict if it required customers to indemnify transmission 
providers even in cases where the transmission provider is 
negligent." Order 888, p 31,036 at 31,765.

 The investor owned utility petitioners (IOUs) challenge the 
OATT's indemnification provision on the ground that FERC 
adopted the lesser ordinary negligence standard in Order 888 
without first notifying interested parties that it was contem-
plating such a major policy change. The IOUs claim that the 
change in the provision's language represents a significant 
shift in indemnification policy, in that it leaves transmission 
providers open to claims of ordinary negligence for the first 
time. The courts consistently have relied upon explicit tariff 
provisions to enforce the gross negligence standard for liabili-
ty, see, e.g., Southwestern Bell Tel. Co. v. Rucker, 537 S.W.2d 
326, 330-32, 334 (Tex. App. 1976); and if the tariffs do not 
explicitly limit liability for ordinary negligence, the IOUs 
claim, the courts will assess such matters differently. Be-
cause FERC's notice was not clear that the liability standard 
was a subject or issue of the rulemaking, the IOUs claim that 
FERC denied their right to comment on the change. See, 
e.g., AFL-CIO v. Donovan, 757 F.2d 330 (D.C. Cir. 1985); 
McLouth Steel Prods. Corp. v. Thomas, 838 F.2d 1317 (D.C. 
Cir. 1988). Citing principally our opinion in Air Transport 
Association of America v. DOT, 900 F.2d 369, 379 (D.C. Cir. 
1990), the IOUs contend that the fact that they were able to 
raise their concerns in their petition for rehearing is not a 
substitute for pre-issuance notice and comment.17

 FERC responds by denying that the indemnification provi-
sion adopts a particular liability standard at all. FERC 
claims that it has merely distinguished liability from indemni-
fication, and that the change to the pro forma tariff does not 
establish a new, simple negligence standard of liability for 
transmission providers. Citing its own statements in Order 

__________
 17 We recognize that Air Transport has been vacated. See Air 
Transport Association of America v. DOT, 933 F.2d 1043 (1991) 
(per curiam).

888-A, FERC asserts that the tariff's indemnification provi-
sion should not be construed as preempting state liability 
standards. See Order 888-B, p 61,248 at 62,080-81. FERC 
maintains that, since the change to the indemnification provi-
sion does not represent a substantive alteration in policy or 
the standards governing legal liability, the Commission was 
not obligated to notify interested parties and seek comment. 
FERC accuses the petitioners of wanting FERC to impose a 
federal gross negligence liability standard, which FERC con-
tends that it properly declined to do pursuant to United Gas 
Pipe Line Co. v. FERC, 824 F.2d 417 (5th Cir. 1987) (reject-
ing the need for a federal liability standard for pipelines).

 The IOUs charged that FERC has deleted a limitation of 
liability to gross negligence from the existing background of 
utilities liability law and has done so without substantial 
evidence and without exercising reasoned decision making. 
See Mid-Tex Elec. Coop., Inc. v. FERC, 773 F.2d 327, 338 
(D.C. Cir. 1985) (the Commission's decision must be sup-
ported by substantial evidence and be the result of reasoned 
decision making). The Commission denies that it has estab-
lished a standard of liability nearly so sweeping as the IOUs 
fear. We agree with FERC's reading of the rule. While the 
petitioners argue that the rule works a "dramatic change" 
regarding the liability of electric utilities by imposing an 
ordinary negligence rather than a gross negligence standard 
that previously prevailed, in fact, the rule does not establish a 
new simple negligence standard of liability for transmission 
providers. While we read FERC's interpretation of its own 
rule deferentially, see Jersey Shore Broad. Corp. v. FERC, 37 
F.3d 1531, 1536 (D.C. Cir. 1994), by any standard, its con-
struction is correct in the present controversy. In the 
preamble to the regulations before us, FERC plainly de-
scribes the disputed provision as an "indemnification" provi-
sion, and recites reasoning supporting the particular indemni-
fication provision it adopted. "[T]his new indemnification 
provision would be too strict if it required customers to 
indemnify transmission providers even in cases where the 
transmission provider is negligent." Order 888, p 31,036 at 
31,765. In the preamble to Order 888-A, in a section con-

cededly headed "Liability and Indemnification" (emphasis 
added), FERC explains the later version of the relevant 
provisions in terms consistent with the Order 888 preamble. 
See generally Order 888-A, p 31,048 at 30,299-302. Finally, 
in Order 888-B, FERC summarizes its reasoning for its 
indemnification and liability decisions, again both adequately 
and in ways not amounting to the adoption of the universal 
standard as asserted by the IOUs. See generally Order 
888-B, p 61,248 at 62,079-81. In short, FERC's rule does not 
work so sweeping a change in the legal landscape as the IOUs 
assert, and FERC has exercised reasoned decisionmaking in 
support of such pronouncements as it has made.

 Insofar as the IOUs challenge the adequacy of FERC's 
notice in the NOPR that it was contemplating a change in the 
indemnification and liability provisions of pro forma tariffs, 
that challenge also fails. It is well established that a final 
rule need not be identical to the original proposed rule. See, 
e.g., AFL-CIO v. Donovan, 757 F.2d at 338; Trans-Pacific 
Freight Conference v. Federal Maritime Comm'n, 650 F.2d 
1235, 1249 (D.C. Cir. 1980). Were the change between the 
proposed and final rule an important one, we would have to 
ask whether the final rule is a logical outgrowth of the 
proposed one. See, e.g., National Mining Ass'n v. Mine 
Safety & Health Admin., 116 F.3d 520, 531 (D.C. Cir. 1997). 
Not all changes are sufficiently important to warrant such 
scrutiny and concern, however. "An agency, after all, must 
be free to adopt a final rule not described exactly in the 
[notice of proposed rulemaking] where the difference is suffi-
ciently minor, or agencies could not change a rule in response 
to valid comments without beginning the rulemaking anew." 
National Cable Television Ass'n v. FCC, 747 F.2d 1503, 1507 
(D.C. Cir. 1984).

 We agree with FERC that its indemnification provision 
does not preclude the states from shielding utilities from 
liability for ordinary negligence. States did so before, 
through both their regulatory commissions and their courts; 
and they remain free to do so under Order 888. The deletion 
of the gross negligence language from the pro forma tariff's 
indemnification provision does not significantly change the 

petitioners' legal position. Therefore, contrary to the IOUs' 
challenge, the deviation of the final rule from the proposed 
one is not a major one; and FERC's failure to notify interest-
ed parties that it was considering the change does not render 
the provision arbitrary or capricious under the APA. Accord-
ingly, we affirm this portion of the pro forma tariff.

B. Interface Allocation

 The IOUs also challenge FERC's treatment of interface 
allocation as unsupported by the record and contrary to 
reasoned decision making. Section 30.8 of the pro forma 
tariff addresses how much of a transmission provider's inter-
face capacity a network customer can use. See Order 888, 
p 31,036 at 31,954-55. Interface capacity represents the ca-
pability of a transmission facility to transfer power between 
two utilities. Section 30.8 permits a network customer to use 
a transmission provider's capacity to the extent of the net-
work customer's total load without limitation.

 In the rulemaking process, several parties argued that a 
fair method of interface allocation would be the use of a load 
ratio, under which the transmission provider and each net-
work customer would be allocated a share of each specific 
interface based upon their respective loads. Nevertheless, in 
Order 888, FERC ruled that network customers could use 
any of the transmission providers' interfaces to import up to 
their full load on a first-come, first-served basis. The IOUs 
maintain that this ruling does not promote an equitable 
allocation of a transmission provider's interfaces.

 The IOUs also note that, responding to the IOUs petition 
for rehearing on this issue in Order 888-A, FERC merely 
referenced Florida Municipal Power Agency v. Florida Pow-
er & Light Co., 74 F.E.R.C. p 61,006 (1996) (hereinafter 
FMPA II), to support its conclusion, without addressing 
either the comments or the rehearing petitions. FERC 
meanwhile maintains it found the load ratio share method 
advocated by some transmission owners to be unreasonable 
for the same reasons discussed at length in FMPA II. 
Intervenors add that the IOUs' challenge of the aggregate, 

first-come, first-served approach adopted by FERC as inequi-
table merely reflects a disagreement with FERC's policy 
choice.

 Whether to adopt a load ratio share approach or an aggre-
gate, first-come, first-served approach to capacity allocation is 
a matter of policy. Again, the IOUs have not challenged 
FERC's legal authority to select a particular interface alloca-
tion method, but rather whether FERC's choice was based 
upon reasoned decision making. Accordingly, we evaluate 
FERC's treatment of interface capacity allocation under the 
APA's arbitrary and capricious standard. See 5 U.S.C. 
s 706(2)(A) (1994).

 FERC's analysis of the issue in the present rulemaking 
consists solely of a reference to and quotation from its earlier 
decision in FMPA II. See Order 888-A, p 31,048 at 30,304-
05. That proceeding involved an application by Florida Mu-
nicipal Power Agency for open access to Florida Power & 
Light Company's transmission facilities pursuant to FPA 
ss 211 and 212. See FMPA II, 74 F.E.R.C. p 61,006 at 
61,004; see also Florida Mun. Power Agency v. Florida 
Power & Light Co., 67 F.E.R.C. p 61,167 (1994) (hereinafter 
FMPA I). In FMPA I and FMPA II, FERC justified its 
choice of policies as follows:

 [T]here are no restrictions on the use of other parts of 
 the transmission system. If the interfaces are con-
 strained, Florida Power and FMPA should simply redis-
 patch and share the redispatch costs and, ultimately, 
 Florida Power will build new facilities when needed. 
 The interfaces are just another part of the transmission 
 grid, and Florida Power must plan and operate the grid, 
 including the interfaces, to meet the combined needs of 
 Florida Power and FMPA on an equal basis. When 
 there are conflicting needs to use the same interface 
 capacity, the parties have already agreed that the com-
 bined Florida Power and FMPA systems will be redis-
 patched and the costs shared. When the grid, including 
 interfaces, needs to be expanded, Florida Power will 
 undertake the expansion on behalf of the combined sys-
 tem.
 
FMPA II, 74 F.E.R.C. p 61,006 at 61,018 (quoting FMPA I, 
67 F.E.R.C. p 61,167 at 61,484). While FERC's recognition of 
the petitioners' concerns was certainly cursory, and its lan-
guage in FMPA II is slightly oblique, FERC has adequately 
demonstrated that it gave full consideration before rejecting 
load ratio share in favor of aggregate, first-come, first-served 
capacity allocation. Accordingly, we uphold FERC's ruling 
on the interface capacity allocation issue.

C. Delivery-Point-Specific Discounting

 Two groups of transmission dependent utilities, TAPS and 
TDU Systems, and the nation's largest power wholesaler, 
Enron Power Marketing (collectively the U&D petitioners), 
challenge FERC's decision to permit delivery-point-specific 
discounting. Electric utilities often offer both firm and non-
firm service. Firm service permits customers to demand 
transmission at any time, while non-firm service permits the 
utility to cut service when there is not enough excess capaci-
ty.

 In Order 888, FERC allowed transmission providers to 
offer discounted rates for non-firm service only if they gave 
the same discounted rate to all customers for the same 
transmission path and on all other unconstrained transmis-
sion paths. See Order 888, p 31,036 at 31,743-44. FERC 
also required that the discounts be posted in advance so that 
all customers could have equal opportunity to take advantage 
of the discounted rate. See id. at 31,744. In Order 888-A, 
FERC narrowed the requirement, so that a transmission 
provider offering a discount on a particular path need only 
provide the same discount to all other unconstrained paths 
that go to the same delivery point on the provider's system. 
See Order 888-A, p 31,048 at 30,275-76. FERC also said that 
a transmission provider should discount only if necessary to 
increase throughput on its system. See id. at 30,274.

 The U&D petitioners contend that delivery-point-specific 
discounting results in higher transmission rates for trans-
mission dependent utilities (TDUs), who rely on point-to-
point service rather than network service for their transmis-

sions. Delivery-point-specific discounting permits transmis-
sion facility owners to select the delivery points for which 
they will discount firm and non-firm service. The U&D 
petitioners argue that this discounting method allows trans-
mission facility owners to discriminate by denying discounts 
to the delivery points used by the TDUs, thereby raising the 
transmission costs of these competitors, and in turn decreas-
ing competition at both retail and wholesale.

 Additionally, because of the subordination and interrupti-
bility of non-firm service, the U&D petitioners claim that 
FERC's longstanding pricing policies utilized discounting as 
the mechanism for ensuring that non-firm service was priced 
below firm service. The notice of proposed rulemaking em-
phasized FERC's reliance on non-discriminatory discounting 
to achieve higher firm service rates than non-firm rates, so 
that non-firm rates would reflect the interruptibility of 
transmission services and be economically efficient. The pe-
titioners argue that FERC's decision in Order 888 to deny 
discounting of non-firm rates unless firm rates are also dis-
counted an unexplained reversal of that longstanding pricing 
policy. By adopting a delivery-point-specific discounting 
rule, the petitioners claim that FERC subjects TDUs to firm 
rates for all non-firm service. As a result, the petitioners 
contend, the price that TDUs have to pay for non-firm 
service does not reflect the interruptibility of that service. 
The petitioners maintain that this aspect of FERC's order 
itself represents undue discrimination, and that FERC failed 
to explain why it rejected a compromise position which 
would restrict opportunities for discrimination and address 
concerns that the new rules discourage discounting.

 FERC notes that it discussed the discounting issue in 
Orders No. 888, 888-A, and 888-B. See Order 888, p 31,036 at 
31,743-44; Order 888-A, p 31,048 at 30,272-76; Order 888-B, 
p 61,248 at 62,072-75. FERC accuses the petitioners of 
wanting the Commission to require transmission providers to 
discount all non-firm services below firm rates regardless of 
the facts of the particular case. FERC asserts that it did not 
seek to discourage discounting, but was concerned that if it 
required discounting on all unconstrained paths as a condition 

for offering discounts, transmission providers would be dis-
couraged from offering any discounts at all. Fewer discounts 
could lead to decreased use of transmission services, and 
therefore a decline in overall transmission revenues, and a 
corresponding increase in transmission rates to enable trans-
mission providers to recover their costs. FERC maintains 
that the petitioners, like everyone else, retain the opportunity 
to compete with the transmission provider for power sales to 
the same delivery point at the same discounted rate. FERC 
argues that its orders are consistent with its established 
pricing policy of permitting flexibility to reflect interruptibili-
ty and efficient use of the transmission system, subject to the 
firm price cap. In most cases, FERC expects that non-firm 
transmission rates will be priced below the firm rate.

 Although the petitioners hint at a statutory claim by alleg-
ing that FERC's orders result in undue discrimination and 
higher rates in violation of the FPA's statutory mandate, the 
petitioners generally confine themselves to arguing that 
FERC's decisions to permit delivery-point-specific discount-
ing and non-firm rates equal to firm rates represent unex-
plained departures from established policy. We therefore 
analyze this issue under the arbitrary and capricious standard 
of the APA. See 5 U.S.C. s 706(2)(A).

 With respect to non-firm versus firm rates, the cases cited 
by the petitioners as demonstrating a previously established 
discounting policy actually establish that FERC addresses 
this issue on a case-by-case basis. For example, in Kentucky 
Utilities Co., 15 F.E.R.C. p 61,002 (1981), FERC said that the 
utility could not allocate capacity costs to non-firm transmis-
sion service since such service did not factor into the utility's 
capacity decisions. In contrast, in Central Maine Power Co., 
60 F.E.R.C. p 61,285 (1992), while FERC noted that non-firm 
service generally warrants a rate lower than firm service, 
FERC also upheld the utility's decision not to offer non-firm 
rate discounts on several contracts. Indeed, the petitioners 
acknowledge that FERC's pre-Order 888 Transmission Pric-
ing Policy Statement, 59 Fed. Reg. 55,031 (1994), does not 

expressly require non-firm rates to be priced below firm rates 
in all cases. See Br. of U&D Petitioners at 24 n.30.

 The petitioners cite American Electric Power Service 
Corp., 82 F.E.R.C. p 61,090 (1998), for the proposition that, 
after adopting delivery-point-specific discounting, FERC has 
refused to consider whether non-firm rates should be lower 
than firm rates; but in that case, FERC did consider that 
issue, found the rates in question to be nondiscriminatory, 
and refused only to consider the petitioners' generic chal-
lenges to its broader policy of flexibility. Additionally, the 
petitioners charge that FERC's acceptance of firm rates for 
non-firm service conflicts with this court's decision in Fort 
Pierce Utilities Authority v. FERC, 730 F.2d 778, 788-89 
(D.C. Cir. 1984); but in that case, this court merely noted 
that FERC had failed to reconcile its decision to allocate 
capacity costs to non-firm transmission service with its previ-
ous refusal to do so in Kentucky Utilities, and remanded for 
further consideration. In short, FERC does not appear to 
have changed its overall pricing policy at all, except to fine 
tune its guidance as to when discounting might be considered 
discriminatory.

 Which brings us to whether delivery-point-specific dis-
counting in fact discriminates against the TDUs. Essentially, 
FERC and the petitioners offer conflicting discounting theo-
ries, both of which seem plausible. In its request for rehear-
ing, TAPS observed that, by allowing transmission providers 
to select which delivery points merit discounts, FERC per-
mits the providers to select for discounting those delivery 
points which serve their affiliates, and not to select the 
similarly situated delivery points which serve the TDUs. On 
rehearing, FERC quite logically maintained that requiring 
transmission providers to apply discounts to all unconstrained 
transmission paths could discourage discounting generally, 
resulting in higher rates for all. See Order 888-A, p 31,048 at 
30,275. FERC subsequently asserted that requiring trans-
mission providers to offer the same discount for the same 
time period on all unconstrained paths that go to the same 

delivery point will achieve sufficient comparability. See Or-
der 888-B, p 61,248 at 62,075. FERC noted that it will be 
able to monitor the discounting behavior of transmission 
providers for discrimination through the data posted on OA-
SIS. See id.

 The record reflects that FERC considered fully all of the 
arguments, and concluded that delivery-point-specific dis-
counting best accomplished comparability while encouraging 
discounting. Thus, the discounting policies outlined in Orders 
888, 888-A, and 888-B are not arbitrary or capricious. We 
therefore affirm FERC's resolution of this issue.

 VIII. Tariff Terms and Conditions

A. Headroom Allocation

 Firm point-to-point service, as distinguished from network 
service, is transmission service reserved and/or scheduled 
between specified points of receipt and delivery. See Order 
888-A, p 31,048 at 30,508. Point-to-point customers may not 
need all the service for which they contracted. The Commis-
sion decided that they may, without extra charge, use their 
excess capacity to make firm sales between the receipt and 
delivery points specified in their agreement. Section 22.1 of 
the Tariff gives them another option for dealing with this 
"headroom." The point-to-point customer may, without 
charge, have the public utility provide transmission on a non-
firm basis over receipt and delivery points other than those 
specified in the service agreement (so-called "secondary" 
points).

 Network customers describing themselves as Transmission 
Dependent Utilities (TDUs) contend that the flexibility given 
to point-to-point customers to sell their unused capacity 
should also be given to them. Three transmission providers18
--the CPL petitioners--want restrictions placed on point-to-

_____________
 18 Carolina Power & Light Company (CPL), Florida Power & 
Light Company and Niagara Mohawk Power Corporation.
point customers in order to avoid putting the customers at a 
competitive advantage. The Commission refused to adopt 
these proposals for reasons we believe are sound.

 As to transmission providers, the Commission noted that if 
they want to make off-system sales they too must take point-
to-point service; in doing so they gain the same flexibility as 
regular point-to-point customers. See Order 888, p 31,036 at 
31,751. For network customers, the Commission stated that 
they "are not obligated to take network transmission service" 
and if they "want to take advantage of the as-available, non-
firm service over secondary points of receipt and delivery 
through the point-to-point service, they may elect to take firm 
point-to-point transmission service in lieu of the network 
service." Order 888-A, p 31,048 at 30,253. The Commission 
properly insisted on maintaining its basic distinctions between 
network service and point-to-point service. Unlike a point-to-
point customer, a network customer's rights are defined in 
terms of capacity needed, and thus "vary as the customer's 
load varies," rendering them not sufficiently definite and 
defined to be "reassignable in the secondary market." Id. at 
30,223. At least one of the TDUs agreed with the Commis-
sion "that, because there is no fixed capacity reservation for 
network customers, allowing them unrestricted use of capaci-
ty to make off-system sales without additional charge would 
give such customers a competitive advantage over [point-to-
point] customers." Terms and Conditions Brief at 11.19

B. Headroom Prioritization

 Some petitioners complain that secondary non-firm point-
to-point customers should not have been placed in a status 
below non-firm point-to-point customers and that the Com-
_______________

 19 These petitioners add that the Vermont Department of Public 
Service (VDPS) offered a solution to the problem but the Commis-
sion overlooked it. Terms and Conditions Brief at 12. This is not 
correct. The Commission did consider the Vermont proposal, find-
ing it to be an "artifice derived from the load ratio share calcula-
tion," a "formula [that] does not result in a reassignable capacity 
right." Order 888-A, p 31,048 at 30,223.mission offered no explanation for its doing so. See Terms 
and Conditions Brief at 14-17. The Commission did explain 
itself. Firm point-to-point customers are permitted to desig-
nate secondary receipt and delivery points at no extra charge 
and therefore "are properly accorded a lower priority than 
stand alone, non-firm transmission." Order 888-A, p 31,048 
at 30,281. Furthermore, the Commission promised to reeval-
uate its approach in response to any "future transmission rate 
proposal that is based on the concept of tradable capacity 
rights," but it was moving cautiously because in the electric 
utility industry (unlike the natural gas industry) such "trading 
rights simply do not exist at this time." Id.

C. Duplicative Charges

 The TDU petitioners argue that the new rules cause them 
to be double-charged in certain transactions. They first 
object to the Commission's decision that in power exchanges 
(flows in one direction for a time and then flows in the 
opposite direction) each party must reserve and pay for 
transmission along the same path. See Terms and Conditions 
Brief at 18. The Commission's response was that traditional-
ly and "from the transmitting utility's planning and reserva-
tion perspective," the power exchange consists of two one-way 
transmission services. Commission Brief at 115. Petitioners 
offer no legal basis for us to prefer their treatment to that of 
the agency and so we will not disturb the Commission's 
approach.

 Petitioners' second objection is that the Tariff double 
counts network load served by two separate energy suppliers 
because, "[i]f two separate suppliers purchase network ser-
vice to supply a portion of the load for a particular customer, 
the entire load of the customer is included in calculating the 
reservation charges paid by both supplying network custom-
ers, unless each load portion is isolated electrically from the 
other." Terms and Conditions Brief at 21. We confess to 
some difficulty in comprehending petitioners' complaint. It 
seems perfectly reasonable to answer, as the Commission's 
counsel does, that "there is no rational basis for both the 
network transmission customer and its power marketer sup-

plier to designate the same load under the Tariff." Commis-
sion Brief at 115. The power supplier itself may, the Com-
mission pointed out, purchase network service; we cannot see 
why both the power supplier and the power buyer would 
purchase such service when a purchase by either would 
suffice. Petitioners seem to concede that in some instances 
the double-counting problem could be avoided in this manner, 
yet they think that in some other, ill-defined circumstance it 
could not. This rulemaking set forth the standard tariff 
terms. If petitioners, or any one of them, have some unique 
circumstances warranting an adjustment, there will be time 
enough for them to seek relief from the Commission.

D. Multiple Control Areas

 Network customers may wish to serve loads in two or more 
control areas. Some commenters were concerned that such 
customers would have to pay a network transmission rate to 
two or more transmission providers based on the customer's 
total load. See supra Section VI (credits for customers). 
The Commission had several responses. First, the risk could 
be avoided or alleviated by the customer's purchasing point-
to-point service, or a combination of network and point-to-
point service at discrete delivery points (thereby reducing its 
load ratio). Or the customer could purchase network service 
alone in each transmission provider's control area. See Order 
888-B, p 61,248 at 62,096 n.157. If the customer insists on 
foregoing the last option, it can hardly expect that the 
additional service it is demanding--the moving of power from 
one transmission provider's system to another system--
should be free of charge. As the Commission put it:

 Because the additional transmission service to non-
 designated network load outside of the transmission pro-
 vider's control area is a service for which the transmis-
 sion provider must separately plan and operate its sys-
 tem beyond what is required to provide service to the 
 customer's designated network load [within the control 
 area], it is appropriate to have an additional charge 
 associated with the additional [point-to-point] service.
 
Order 888-A, p 31,048 at 30,255, quoted in Order 888-B, 81 
F.E.R.C. p 61,248 at 62,096. This is consistent with the 
handling of an analogous situation involving separate trans-
mission systems in the past. See Fort Pierce Utils. Auth. v. 
FERC, 730 F.2d 778, 781-85 (D.C. Cir. 1984).20

E. Right-of-First-Refusal

 In order to preserve the certainty and continuity of trans-
mission service, the Commission granted existing customers a 
right-of-first-refusal (ROFR) upon the expiration of firm con-
tracts exceeding one year provided that the existing customer 
agreed to match the contract price and term of any party 
competing for that service. See Order 888, p 31,036 at 31,665. 
The Commission did not set an upper limit on the terms that 
a competing party could offer, but chose instead to allow the 
market to determine rates and terms. Petitioners argue that 
the Commission's failure to establish an upper limit should be 
set aside and remanded for further consideration. The Com-
mission conceded error on this point at oral argument in light 
of United Gas Distribution Cos. v FERC, 88 F.3d 1105, 1138-
40 (D.C. Cir. 1996). We therefore remand this matter to the 
Commission so that it may provide a reasonable cap on 
contract extensions.21

________________
 20 Petitioners claim that the Commission failed to consider a 
particular proposal related to this subject. See Terms and Condi-
tions Brief at 33. It is unnecessary to describe the proposal. All 
that need be said is that the Commission rejected a nearly identical 
proposal and gave its reasons for doing so. See Order 888-B, 
p 61,248 at 62,096.

 21 The TDU petitioners stated in their reply brief that Commis-
sion counsel's explanation of s 13.2 of the Tariff, as amended in 
Order No. 888-A and as interpreted in Madison Gas & Electric Co., 
82 F.E.R.C. p 61,099 at 61,372 (1998), to apply only to short term 
customers satisfies their objection. See Terms and Conditions 
Reply Brief at 25. The remaining arguments of these petitioners 
not discussed in this part or in part V have been considered and 
rejected. IX. National Environmental Policy Act and 
 Regulatory Flexibility Act Compliance

A. NEPA Compliance

 One investor-owned utility, Public Service Electric & Gas 
Company ("PSE&G"), claims that FERC failed to comply 
with the National Environmental Policy Act ("NEPA"), 42 
U.S.C. ss 4321 et seq. It argues first that the base case 
FERC adopted to evaluate the effects of open access trans-
mission was unreasonable because it "defined away" the 
effects of open access. Second, it argues, FERC acted 
arbitrarily and capriciously by failing to undertake measures 
to mitigate the environmental impact of Order 888.

1. Adequacy of Base Case

 NEPA requires federal agencies contemplating a major 
action "significantly affecting the quality of the human envi-
ronment" to prepare a thorough analysis of the action's 
environmental impact. 42 U.S.C. s 4332(C). The statute 
requires that environmental impact studies include "a detailed 
statement ... [of] alternatives to the proposed action." Id. 
s 4332(C)(iii).

 In its environmental impact study prepared in connection 
with Order 888, FERC identified as the base case alternative 
a scenario that "maintain[s] the status quo." FERC Final 
Environmental Impact Statement, Promoting Wholesale 
Competition through Open Access Non-discriminatory 
Transmission Services by Public Utilities and Recovery of 
Stranded Costs by Public Utilities and Transmitting Utili-
ties at 2-1 (Apr. 1996) ("FEIS"). Under that scenario, FERC 
would continue on a case-by-case basis to (1) condition ap-
proval of mergers and applications for sales at market rates 
on the filing of open access tariffs and (2) approve open 
access wheeling orders under section 211 of the FPA. Id.

 Several commenters (including EPA) argued that FERC 
should adopt as its base case an alternative that freezes the 
status quo, i.e., assumes that no further open access transmis-
sion of any kind occurs and that efficiency in the industry 
remains unchanged. See id. at 6-1. Characterizing this 

"frozen efficiency" case as unreasonable, FERC declined to 
adopt it as the base case. See id. at 6-9-6-14. It neverthe-
less conducted sensitivity analyses comparing emissions un-
der the frozen efficiency case with those under its base case. 
This comparison revealed "modest" reductions in emissions 
under the frozen efficiency case in certain circumstances. Id. 
at 6-4. When market conditions favor coal versus natural 
gas, NOx emissions under the base case are higher than 
under the frozen efficiency case by two percent in 2000, three 
percent in 2005, and five percent in 2010. Id. at 6-15. But 
when market conditions favor gas, the base case produces 
more favorable environmental benefits for all three years. 
Id. at 6-17.

 We evaluate agency compliance with NEPA under a rule of 
reason standard. "[A]s long as the agency's decision is 'fully 
informed' and 'well-considered,' it is entitled to judicial defer-
ence and a reviewing court should not substitute its own 
policy judgment." Natural Resources Defense Council, Inc. 
v. Hodel, 865 F.2d 288, 294 (D.C. Cir. 1988) (quoting North 
Slope Borough v. Andrus, 642 F.2d 589, 599 (D.C. Cir. 1980)).

 PSE&G argues that FERC, in adopting its base case, 
"defined away" the impact of open access by comparing the 
environmental effects that would result from immediate im-
plementation through Order 888 to those that would result 
from gradual implementation. Calling FERC's evaluation of 
the frozen efficiency case "cursory," PSE&G contends that 
the proper no action base case is not to implement open 
access at all.

 Given the terms of NEPA and our highly deferential 
review, we think FERC's FEIS complied with the statute. 
For one thing, NEPA does not require that a certain alterna-
tive be adopted as the base case. Rather, NEPA requires 
that agencies include in their FEIS analysis of "alternatives 
to the proposed action." 42 U.S.C. s 4332(C)(iii). Thus 
there is no merit to the contention that NEPA requires 
FERC to adopt the frozen efficiency case as the base case. 
We agree with PSE&G that one of the alternatives NEPA 
requires FERC to consider is the alternative of no action. 

But based on our own examination of the FEIS, we think that 
FERC devoted sufficient attention to evaluating the frozen 
efficiency case (what PSE&G calls the no action alternative) 
to satisfy NEPA's requirements. In conducting sensitivity 
analyses to its base case, FERC identified the changes in 
both NOx and CO2 emissions that the frozen efficiency case 
would produce. Given that FERC's comparison of the frozen 
efficiency case to its base case yielded little difference, the 
agency had no reason to conduct further analysis. By rigor-
ously examining the frozen efficiency case, even though it 
believed the case to be unreasonable, FERC ensured that its 
decision was "fully informed" and "well-considered." Hodel, 
865 F.2d at 294.

2. Failure to Adopt Mitigation Measures

 PSE&G argues that FERC acted arbitrarily and capri-
ciously by failing to adopt measures to mitigate the expected 
harmful environmental effects of Order 888. Noting that an 
agency must consider mitigation if the proposed action would 
result in adverse environmental impacts, FERC considered 
but ultimately rejected any mitigation measures. See FEIS 
s 7. In reaching this conclusion, FERC relied on (1) the fact 
that any mitigation measures it might undertake are unwar-
ranted in view of Order 888's small impact (especially given 
that its effects are as likely to be beneficial as harmful) and 
(2) its lack of expertise in atmospheric chemistry, together 
with the fact that any impact of open access would be 
"dwarfed by the far larger existing ozone and NOx emission 
issues" currently being dealt with by EPA under its Clean 
Air Act authority. FEIS at 7-47-7-48.

 The heart of PSE&G's challenge is this: downwind utilities, 
which are subject to NOx reduction requirements, will face 
increased compliance costs due to the purported increase in 
emission levels resulting from Order 888; by comparison, 
upwind utilities that generate the pollution but are not sub-
ject to NOx reduction requirements will experience no in-
creased costs. PSE&G insists that FERC remedy this "un-
due preference" for upwind utilities.

 Given that FERC has identified only small increases in 
emissions resulting from open access transmission--indeed, 
under some circumstances, the Commission predicted small 
decreases--we think it was entirely reasonable for FERC to 
decline to adopt mitigation measures to address a problem 
that it believed might not even develop. Not relying solely 
on Order 888's relatively insignificant environmental impact, 
however, FERC comprehensively analyzed proposed mitiga-
tion measures, explaining why it declined to require any. In 
light of this thorough analysis, we think FERC's conclusion--
that NOx emission increases resulting from Order 888, if any, 
are best addressed by EPA and the states through a compre-
hensive emissions control program--is hardly arbitrary or 
capricious. We therefore have no need to resolve the parties' 
debate about FERC's legal authority to order environmental 
mitigation.

 PSE&G also argues that FERC employed unreasonable 
assumptions in the FEIS and ignored its own data showing 
adverse environmental impacts. In our view, these argu-
ments amount to an effort by PSE&G to substitute its own 
analysis for FERC's. To prevail in this court, it must demon-
strate that FERC's analysis is arbitrary and capricious, a 
showing it has fallen far short of making.

B. Regulatory Flexibility Act Compliance

 The Regulatory Flexibility Act requires agencies to conduct 
a regulatory flexibility analysis for any final rule. The Act 
exempts agencies from this requirement if they certify that 
"the rule will not, if promulgated, have a significant economic 
impact on a substantial number of small entities." 5 U.S.C. 
s 605(a)-(b). Invoking this exemption, FERC certified that 
both Order 888 (open access) and Order 889 (OASIS and 
standard of conduct rules) would have no such impact. Order 
888, p 31,036 at 31,896; Order 889, p 31,035 at 31,628.

 The TDU petitioners claim that FERC failed adequately to 
consider the impact of Orders 888 and 889 on nonjurisdiction-
al entities that may have to provide open access transmission 
and file open access tariffs under the orders' reciprocity 
provisions. In contrast to jurisdictional utilities, several non-

jurisdictional utilities are classified as small entities. Accord-
ing to TDU petitioners, the orders impose a significant eco-
nomic burden on them, requiring compliance activities as well 
as alterations to their operations.

 Although the RFA's judicial review provision was amended 
in 1996, see Small Business Regulatory Enforcement Fairness 
Act, Pub. L. No. 104-121, tit. II, 110 Stat. 857 (1996), the 
TDU petitioners and FERC agree that the pre-amendment 
version of the RFA applies in this case. Under that version, 
our review is quite narrow. Section 611(b) provided that 
"[a]ny regulatory flexibility analysis ... and the compliance 
or noncompliance of the agency with the provisions of this 
chapter shall not be subject to judicial review. When an 
action for judicial review of a rule is instituted, any regulatory 
flexibility analysis for such rule shall constitute part of the 
whole record of agency action in connection with the review." 
5 U.S.C. s 611(b) (1994). We have interpreted this language 
to mean that " 'a reviewing court should consider the regula-
tory flexibility analysis as part of its overall judgment wheth-
er a rule is reasonable and may, in an appropriate case, strike 
down a rule because of a defect in the flexibility analysis.' 
We emphasize[ ], however, that 'a major error in the regulato-
ry flexibility analysis may be, but does not have to be, 
grounds for overturning a rule.' " Mid-Tex Elec. Co-op, Inc. 
v. FERC, 773 F.2d 327, 340-41 (D.C. Cir. 1985) (quoting 
Small Refiner Lead Phase-Down Task Force v. EPA, 705 
F.2d 506, 537-39 (D.C. Cir. 1983)).

 In this case, FERC explained that Orders 888 and 889, 
considered in their entirety, do not have a "significant" im-
pact on a "substantial" number of small entities. According 
to FERC, the orders will affect nonjurisdictional utilities only 
in the limited situation where they take advantage of a 
jurisdictional utility's open access transmission tariff. Given 
our highly deferential standard of review, and given the fact 
that petitioners have offered nothing other than their own 
views to the contrary, we have no basis for questioning 
FERC's judgment.

 FERC, moreover, was not insensitive to the potential im-
pact of Order 888 on small nonjurisdictional entities. Order 
888 contains a waiver provision allowing these entities to seek 
an exemption from compliance with the reciprocity conditions. 
See 18 C.F.R. s 35.28(e)(2) (allowing nonjurisdictional utilities 
to file a request for waiver "for good cause shown"). As of 
March 1997, FERC had granted waivers to thirty-six small 
entities. See Order 888-A, p 31,049 at 30,578.

 Most important in view of our standard of review, nothing 
in petitioners' arguments causes us to question the reason-
ableness of the reciprocity provisions themselves. See Mid-
Tex, 773 F.2d at 340-41. We therefore affirm FERC's RFA 
certification.

 Conclusion

 In summary, we affirm Orders 888 and 889 in all respects 
except as specifically provided above.